John W. Lucas (CA Bar No. 271038)
Jason H. Rosell (CA Bar No. 269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail: jlucas@pszjlaw.com
jrosell@pszjlaw.com

Randy Nussbaum (AZ Bar No. 6417)
Dean M. Dinner (AZ Bar No. 10216)
John Parzych (AZ Bar No. 26079)
Nussbaum Gillis & Dinner, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
Telephone: (480) 609-0011
Facsimile: (480) 609-0016
Email: rnussbaum@ngdlaw.com
ddinner@ngdlaw.com
jparzych@ngdlaw.com

Proposed Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | |
| Z'Tejas Scottsdale, LLC, et al., | Case No.: 2:15-bk-09178-PS |
| Debtors. | Chapter 11 |
| Joint Administration Pending With: | Joint Administration Pending With Case Nos.: |
| Z'Tejas 6th Street, LLC | 2:15-bk-09180-EPB |
| Z'Tejas Avery Ranch, LLC | 2:15-bk-09184-BKM |
| Z'Tejas Bellevue, LLC | 2:15-bk-09188-DPC |
| Z'Tejas Bethany Home LLC | 2:15-bk-09193-DPC |
| Z'Tejas Chandler, LLC | 2:15-bk-09194-BMW |
| Z'Tejas Costa Mesa, LLC | 2:15-bk-09195-MCW |
| Z'Tejas GP, LLC | 2:15-bk-09198-MCW |
| Z'Tejas Grill Gateway, L.L.C. | 2:15-bk-09200-EPB |
| Z'Tejas Holdings, Inc. | 2:15-bk-09201-EPB |
| Z'Tejas, Inc. | 2:15-bk-09203-PS |
| Z'Tejas La Cantera, LLC | 2:15-bk-09205-BKM |
| Z'Tejas LP, LLC | 2:15-bk-09207-MCW |
| Z'Tejas of Arboretum, LLC | 2:15-bk-09208-PS |
| Z'Tejas Restaurant Holdings, LP | 2:15-bk-09210-DPC |
| Z'Tejas Salt Lake City, LLC | 2:15-bk-09212-GBN |
| Z'Tejas Summerlin, LLC | 2:15-bk-09213-PS |
| Z'Tejas Tempe, LLC | 2:15-bk-09214-BKM |
| Taco Guild Osborn LLC | 2:15-bk-09215-MCW |
| This Pleading applies to: ☑ All Debtors ☐ Specified Debtors | **DECLARATION OF STEVEN MICHELETTI IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |

Steven Micheletti, being duly sworn, hereby deposes and says:

I am the President and Chief Executive Officer of Z'Tejas Holdings, Inc. and its affiliated debtors and debtors in possession (together, the "**Debtors**") in the above-captioned chapter 11 cases. I joined the company in March of 2004 as President and subsequently was appointed as CEO in April of 2006. In these roles, I supervise controller activities, marketing, human resources, risk assessment, and training and operations. Prior to joining the Debtors, I held many positions in the restaurant industry, including Vice President of Operations of Bugaboo Creek Steak House with Rare Hospitality International, Inc., President and Chief Operating Officer of MARS 2112 in New York City, regional Vice President or Rainforest Café in Minneapolis and Back Bay Restaurant Group in Boston. I began my career as an attorney and am a current member of the Virginia State Bar Association but not currently active. I later entered the restaurant industry as an owner with Raphael's Restaurant and Rumors Restaurant in Washington D.C. I have been active in the restaurant industry for over 30 years.

I am familiar with the Debtors' business operations. Based on my involvement with the Debtors, I am generally familiar with the day-to-day operations, business, and financial affairs of the Debtors, and the various first day motions and other pleadings filed in in connection with the chapter 11 petitions filed by the Debtors.

I am authorized by the Debtors to submit this declaration (the "**Declaration**"). I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**") and (b) the requested relief, in the form of motions and applications, that the Debtors have filed with the Court (the "**First Day Motions**") and the other pleadings and documents contemporaneously filed therewith. The Debtors seek the relief set forth in the First Day Motions with the goal of minimizing the potential adverse effects of the commencement of their chapter 11 cases on their businesses.

Except as otherwise indicated, all facts set forth in this Declaration are based on: my personal knowledge, information supplied by employees under my supervision, or my opinion based

on experience, knowledge, and information concerning the operations of the Debtors. It is my belief that the relief sought in the First Day Motions is essential to ensure the uninterrupted operation of the Debtors' businesses and to the success of the Debtors' restructuring.

I have reviewed each of the First Day Motions, am familiar with the factual information set forth therein, and incorporate such facts into this Declaration by reference and adopt them as my own as if they were set forth herein. If I were called upon to testify, I would testify competently to the facts set forth herein and in the First Day Motions.

**I.**

**Introduction**

The Debtors do business as "Z'Tejas" and "Z'Tejas Southwestern Grill," and operate a full-service, casual dining restaurant founded in 1989 by Larry Foels and Guy Villavso. Since its inception, the Debtors' objective has been to serve exceptional and innovative food in a casual, contemporary atmosphere at a great value. The Debtors' menu focuses on select dishes created to capture the characteristic flavors of Arizona, California, Louisiana, New Mexico, and Texas. Over time, the Debtors' restaurants have become "destination locations" that appeal to a broad spectrum of consumers and are particularly popular among middle to upper income guests, families, young professionals, and empty nesters. The Debtors' warm and comfortable interiors create a welcoming and friendly atmosphere with a unique look at each location providing a "non-chain" feel. In addition to "Z'Tejas," the Debtors also operate a newer restaurant concept styled as "Taco Guild."

The Debtors are based in Scottsdale, Arizona and currently operate nine restaurants within the United States. Five in Arizona located in the Phoenix metropolitan area, Scottsdale, Tempe, Chandler, and Phoenix, three in Austin, Texas, and one in Costa Mesa, California. The Debtors' Taco Guild location is in Phoenix, Arizona. The Debtors previously operated restaurants in Bellevue, Washington, Salt Lake City, Utah, and San Antonio, Texas. These locations were closed prior to the Petition Date.

The Debtors currently employ approximately 300 full time employees and 425 part-time employees. The Debtors' work-force is not unionized. The Debtors intend to utilize the chapter 11 process to facilitate a sale of their business operation as a going concern.

As discussed in further detail below, in the years and months leading up to the Petition Date, the Debtors' overleveraged balance sheet and competitive industry has had and continues to have an adverse impact on the Debtors' financial performance. In addition, consumer discretionary spending has dropped significantly leading to reduced consumer traffic and sales. Within the restaurant industry, the mid-scale sector suffered sale declines, which sector encompasses the Debtors' restaurant business.

In an effort to address declining sales and increasing losses, the Debtors introduced new advertising campaigns, marketing, menu initiatives and cost-cutting programs to mitigate these effects on their business. The Debtors' efforts were not, however, sufficient to address the effects of the economy and rising commodity prices, and labor costs in the face of a continued decline in restaurant sales and overall profitability.

Beginning in 2014, the Debtors' liquidity position continued to deteriorate, the Debtors struggled to meet their debt service obligations under their prepetition credit agreements, which later resulted in defaults under the Debtors' financing facilities. During the past twelve months, the Debtors have explored available restructuring alternatives as part of their overall turnaround efforts. These efforts have included various operational initiatives designed to increase operating performance and attempts to locate a strategic partner to invest or lend additional money into the Debtors or acquire the Debtors' business operations as a going concern.

After months of careful review, the Debtors have determined that the sale of their business through a bankruptcy court supervised auction process is the best way to preserve the jobs of their employees and maximize value for stakeholders. The Debtors have entered into an asset purchase agreement with a stalking horse bidder, Cornbread Ventures, LP (the "**Stalking Horse Purchaser**"), and will immediately seek the Court's approval of sales procedures. As part of the postpetition marketing and sale process, the Debtors will seek to retain Mastodon Ventures, Inc. ("**Mastodon**") as their investment banker, who has been marketing the Debtors' assets for the year prior to the Petition Date and will continue this process during the postpetition period with the goal of obtaining the highest and best offer for the benefit of all stakeholders.

## II.

## General Background

### A. Z'Tejas Restaurants

The Debtors do business as "Z'Tejas" and "Z'Tejas Southwestern Grill," and operate a full-service, polished casual dining restaurant founded in 1989 by Larry Foels and Guy Villavso. Since its inception, the Debtors' objective has been to serve exceptional and innovative food in a casual, contemporary atmosphere at a great value. The Debtors' menu focuses on select dishes created to capture the characteristic flavors of Arizona, California, Louisiana, New Mexico, and Texas. Over time, the Debtors' restaurants have become "destination locations" that appeal to a broad spectrum of consumers and are particularly popular among middle to upper income guests, families, young professionals, and empty nesters. The Debtors' warm and comfortable interiors create a welcoming and friendly atmosphere with a unique look at each location providing a "non-chain" feel. In addition to "Z'Tejas," the Debtors also operate a newer restaurant concept styled as "Taco Guild."

The following chart reflects the Debtors' recent financial performance.[1]

| Fiscal Year | Net Revenues[2] | Corporate Cash EBITDA[3] | Same Store Sales[4] |
|---|---|---|---|
| 2012 | $34,073,309 | $2,673,010 | 2.9% |
| 2013 | $33,866,832 | $1,546,549 | -2.9% |
| 2014 | $35,634,359 | $515,042 | -4.8% |

### B. Debtors' Prepetition Organizational Structure

Z'Tejas Holdings, Inc. ("**Holdings, Inc.**") is a Delaware corporation. Holdings, Inc. is privately owned. Z'Tejas, Inc. ("**Tejas, Inc.**") is also a Delaware corporation and wholly owned by

---

[1] Note: Financials exclude stores no longer in operation: Summerlin (closed in FY 2007), Bellevue (closed in FY 2013), Salt Lake City (closed in FY 2015), and La Cantera (closed in FY 2015).

[2] Net revenue includes food, alcohol, and other revenue, net of comps and discounts, for current operating stores only.

[3] Corporate Cash EBITDA excludes deferred rent (non-cash item) and one-time/non-recurring expenses. Corporate Cash EBITDA includes current operating stores only.

[4] Same Store Sales % includes stores that were open in the prior year and therefore excludes Bethany Home (opened in FY 2013) and Taco Guild (opened in FY 2014). Same Store Sales % includes current operating stores only.

Holdings, Inc. Tejas, Inc. in turn wholly owns Z'Tejas GP, LLC, a Texas limited liability company, and Z'Tejas LP, LLC, a Nevada limited liability company. These limited liability companies directly hold a 1% and 99% respective interest in Z'Tejas Restaurant Holdings, LP ("**Restaurant Holdings**"), which is Delaware limited partnership. Restaurant Holdings in turn is the 100% owner of fourteen different limited liability companies that are the tenants/lease counterparties of each of the current and former restaurant locations. Annexed hereto as **Exhibit A**, is a corporate organization chart that lists each of the Debtors and reflects their position in the corporate hierarchy.

### C. Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $9,255,214 consisting primarily of approximately (a) $5,941,552 in secured debt under a first lien secured credit facility, (b) $663,662 that is secured by a lien and judgment against the assets of Z'Tejas Chandler, LLC, and (c) $2,650,000 owed to trade creditors and other vendors that hold unsecured claims, inclusive of lease rejection claims but exclusive liability with respect to outstanding gift cards.

(i) First Lien Financing Agreement

As of the Petition Date, the Debtors are parties to that certain Loan Agreement, dated as of November 16, 2011 (the "**First Lien Financing Agreement**"), by and among the Debtors and KarpReilly Investments, LLC (as successor to National Bank of Arizona) (the "**First Lien Lender**"). Under the First Lien Financing Agreement, the First Lien Lender made available to the Debtors a term loan in the original principal amount of $5,500,000 (the "**Term Loan**") and a revolving line of credit in the maximum principal amount of $2,000,000 (the "**RLOC**" and together with the Term Loan, the "**Loan**"). The Loan is secured by substantially all of the Debtors' assets. As of the Petition Date, approximately $4,019,330 (inclusive of accrued interest) is outstanding under the Term Loan and $1,922,222 (inclusive of accrued interest) under the RLOC, exclusive of accrued and unpaid interest and fees and costs.

(ii) February 2002 Loan Agreement

The Debtors and GE Capital Franchise Finance Corporation, as original lender, entered into a loan agreement (the "**February 2002 Loan Agreement**") with Z'Tejas Chandler, Inc. (the

5

predecessor in interest to Debtor Z'Tejas, Inc.) in the original principal amount of $1,900,000. The February 2002 Loan Agreement is currently held by Cornbread Ventures, LP ("**CBV**"). The Debtor's obligations are secured by certain personal property at the Debtor's restaurant location in Chandler, Arizona. The Debtor defaulted under its obligations under the February 2002 Loan Agreement and subsequently entered into a stipulated judgment with CEF in the approximate amount of $663,662 that is now held by CBV.

(iii) General Unsecured Debt

The Debtors have approximately $2,650,000 in unsecured debt, inclusive of claims of landlords resulting from the Debtors' rejection of non-residential real property leases but exclusive of the outstanding gift card liability.

**III.**

**Events Leading to these Chapter 11 Cases**

During the past few years, a series of factors has contributed to the Debtors' need to file these chapter 11 cases, as described below. The Debtors' sales decreased, while their profitability declined as a result of, among other factors, decreased consumer spending and increased commodity and labor costs. These factors placed significant strain on the Debtors' business, liquidity, and ability to satisfy their obligations under the financing obligations while also maintaining their day-to-day trade obligations.

**A. Restaurant Sales**

In addition to the factors discussed in the Introduction, the Debtors' operations and financial performance were also adversely affected as a result of consumers' change in their discretionary spending habits (*i.e.*, dining at home as opposed to dining at a restaurant). The Debtors' restaurants are located in markets with historically high unemployment. These factors depressed restaurant sales and reduced or eliminated customer traffic.

In addition to declining sales, the cost of certain commodities and key food items, had an impact on the Debtors' operating results for several years. The Debtors have implemented strategies to mitigate or partially offset the impact of higher commodity prices, including price increases, cost reduction actions, menu reengineering; however, due to the magnitude and duration of the increased

6

food and commodity costs, these strategies offset only a portion of the overall adverse effect of commodity prices on the Debtors' operating profits.

In the past six months, the Debtors reported an approximate 5.5% decline in comparable store sales compared to same period in the prior year. These decreases were driven primarily by a decline in consumer traffic at virtually all locations.

### B. Prepetition Marketing Efforts and Proposed Sale of Debtors' Assets

The Debtors engaged Mastodon in the Spring of 2014 as their investment banker to evaluate restructuring alternatives for the Debtors, including a potential sale or recapitalization of the Debtors. Mastodon prepared a detailed confidential information memorandum and set up an electronic data room for interested parties to conduct due diligence. In connection with such efforts, Mastodon contacted banks, non-institutional investors, and other parties, resulting in the Debtors' entry into non-disclosure agreements. As noted below, the Debtors entered into an asset purchase agreement with a stalking horse bidder CBV. The Debtors filed a sale motion contemporaneously herewith by which they are seeking approval of procedures regarding a court supervised section 363 auction process for the sale of substantially all of their assets. The Debtors believe that an open and transparent auction and sale process is the best way to maximize value for stakeholders.

### IV.

### Overview of First Day Motions

### A. Joint Administration

The Debtors are seeking to have these chapter 11 cases jointly administered for procedural purposes only so that the cases may be administered more efficiently. The facts supporting joint administration of the Debtors' chapter 11 cases are as follows:

(a) The Debtors are affiliates of each other within the meaning of 11 U.S.C. § 101(2)(B);

(b) The Debtors are under common control;

(c) The Debtors share common management; and

(d) Joint administration, by preventing the duplicate filing and service of numerous pleadings, will ease the administrative burden on the Court, the Debtors, and the creditors, and will reduce the costs for all parties in administering these cases.

I believe that joint administration will reduce the costs of administering the cases, serve to eliminate the substantial confusion and waste created by maintaining separate dockets and reduce the burden that the cases will place on the Court system. Absent joint administration, the only material differences between many of the pleadings to be filed in each case will be in the captions because many of the substantive matters affecting one estate will affect the other estate. By requiring separate pleadings to be filed in each case, additional fees will be incurred as well as additional copying expenses without any additional benefit to creditors. Moreover, such duplication would divert valuable resources away from addressing substantive issues, including maximizing the value of the estates for all affected parties. The filing of separate pleadings in each of the cases also would undoubtedly create an unnecessary burden for the clerk's office, which must keep track of the filings in each case. Joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files. Similarly, joint administration will reduce the administrative burden on the office of the United States Trustee in its supervision of these cases.

If this Motion is not granted, the Debtors' creditors will similarly feel the burden. As with the Debtors, creditors will often also be required to file duplicate copies of pleadings (with only the caption changed) in each of the cases for no reason other than to maintain separate dockets and files. Moreover, by maintaining administratively separate cases, some creditors may be confused as to when their rights are being affected, as they may be creditors of one or more estates. By jointly administering the estates, creditors will receive notice, as appropriate, of all matters involving the Debtors, thereby ensuring that they are fully informed of all matters potentially affecting their claims.

**B.  Motion to Approve DIP Financing and Use of Cash Collateral**

Pursuant to the DIP Financing Motion,[5] the Debtors seek the entry of an Interim Order and a Final Order, which the Debtors will receive up to $725,000 in cash from Cornbread Ventures, LP (the "**Lender**").

---

[5] Capitalized terms not defined in this section shall have the meanings used in the *Debtors' Motion for Interim and Final Orders (A) Authorizing Postpetition Secured Financing; (B) Authoring Use of Cash Collateral; (C) Granting Adequate Protection, and (D) Granting Related Relief* (the "**DIP Financing Motion**") filed contemporaneously herewith.

During the course of the review of strategic alternatives, it became apparent that a new capital investment would be required for the Debtors to satisfy their working capital and liquidity requirements, whether in the context of an out-of-court or in-court restructuring. In connection with the extensive prepetition effort that the Debtors undertook to locate an investor for the Debtors, the Debtors and their advisors discussed potential debtor-in-possession financing with four (4) potential investors other than the Lender. None of these parties indicated an interest to provide financing, whether on a priming or junior basis to the Debtors' prepetition lenders.

Concurrently with these efforts, the Debtor engaged in negotiations with the Lender for debtor in possession financing. After negotiating terms with the Lender, which were improved from its initial proposal, the Debtor, together with its advisors, determined that the Lender's proposal is within competitive market terms and provided the most advantageous terms to the Debtors under the circumstances. And by accepting the Lender's proposal, the Debtors eliminated an unnecessary priming fight.

The Debtors do not believe that they are able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the loan and described in the underlying DIP Financing Motion and related proposed orders. The loan was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors. The management of the Debtors believe that the proposed terms of the loan are fair and reasonable in light of current market conditions and is in the best interests of the Debtors' estates. In addition, without access to cash collateral, the Debtors will not have sufficient working capital to continue operating as a going concern while they attempt to complete the sale process. Absent immediate access to cash collateral, the Debtors would be forced to shut-down their business and convert these cases to chapter 7, which would have a tremendously adverse effect on the Debtors' estates and their employees, vendors, creditors and other constituents

The financing to be provided under the loan and the use of Cash Collateral will allow the Debtor to, among other things: (a) continue to operate its business in an orderly manner; (b) maintain its valuable relationships with vendors, suppliers, customers, and employees; and (c)

support the Debtor's working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful restructuring.

### C. Cash Management

By the Cash Management Motion,[6] the Debtors are seeking authorization to maintain their current cash system for the following reasons. The Debtors' cash management system (the "**Cash Management System**") has been in place for approximately ten years. The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtors' day-to-day business. Because of the nature of the Debtors' business and the disruption that would result if the Debtors were forced to close their existing Bank Accounts and establish a new cash management system, it is critical that the existing Cash Management System remain in place.

In these cases, I believe that requiring the Debtors to close the Bank Accounts and to open new accounts would disrupt the Debtors' administration of their cash and business operations. Further, closing the Bank Accounts and opening new accounts would increase the work required of the Debtors' accounting personnel, who already must deal with the many and varied issues related to these chapter 11 cases, and would needlessly cost the Debtors time and money with no discernible benefit to the estates.

The Debtors are seeking a waiver of the U.S. Trustee's requirement that they close the existing Bank Accounts. Instead, the Debtors request that they be allowed to convert the Bank Accounts to "debtor in possession" accounts and continue to utilize them as necessary to best serve their business needs. Each Bank Account is held at the Bank, which I am informed is a depository authorized by the U.S. Trustee. Each Bank Account is insured up to applicable limits provided by the Federal Deposit Insurance Corporation.

Because there are ten Bank Accounts as part of the Debtors' efficient Cash Management System, I believe that requiring the Debtors to close the Bank Accounts would serve no purpose and

---

[6] Capitalized terms not defined in this section shall the meanings used in the *Motion to Approve Cash Management System* (the "**Cash Management Motion**") file contemporaneously herewith.

10

would impede the Debtors' ability to access and utilize working capital. Closing the Bank Accounts also would put further burdens on accounting personnel dealing with the Debtors' financial issues and cost the Debtors time and money that could be better invested in maximizing value for the benefit of creditors.

### D. Motion for Authority to Pay Prepetition Wages and Employee Benefits

By the Wage Motion,[7] the Debtors seek authorization to continue their wage and benefit programs on the same basis they were operated on a prepetition basis. Due to the timing of the commencement of these cases, certain Employees of the Debtors accrued Employee Benefits for which payment would otherwise be made postpetition. A blow to Employee morale could clearly lead to disruptions to the Debtors' operations to the detriment of the Debtors' going concern value. In particular, due to unavoidable timing issues associated with the commencement of these cases, certain payroll and other Employee related obligations may have accrued, but gone unpaid, prior to the filing of the cases. If the Debtors are not permitted to meet all such obligations in the ordinary course of business, the Debtors could suffer unmanageable Employee outrage or turnover to the detriment of all parties in interest in the Debtors' cases. Any significant number of Employee departures or deterioration in morale at this critical time will substantially and adversely impact the Debtors' businesses and result in immediate and irreparable harm to the Debtors' estates.

The amounts to be paid pursuant to the Wage Motion are comparatively small in light of the importance and necessity of preserving the Employees' services and morale and the difficulties and losses the Debtors will suffer if Employees leave in significant numbers. I believe the facts show that there is ample justification that even the slightest delay in providing this relief to Employees will hamper operations and damage the Debtors' estates, and as a consequence, the Debtors are anxious to reassure their Employees.

Moreover, the Prepetition Wages, in addition to prepetition rank-and-file Employee bonuses and other employee related obligations described herein are entitled to priority in payment under sections 507(a)(4) and (a)(8)(D) of the Bankruptcy Code. In no instance does the aggregate

---

[7] Capitalized terms not defined in this section shall the meanings used in the *Motion for Authority to Pay Pre-petition Wages and Employee Benefits* (the "**Wage Motion**") filed contemporaneously herewith.

Prepetition Wages due and owing by the Debtors to a particular Employee exceed the sum of $12,475 allowable as a priority claim under section 507(a)(4) of the Bankruptcy Code, and no Employee will be paid a total distribution of more than the $12,475 priority cap on account of Prepetition Wages, any prepetition bonuses, and accrued vacation pay (if applicable).

Further, (a) the Employees subject to the Wage Motion are still employed by the Debtors as of the Petition Date, (b) the payment of the claims subject to this Motion are necessary in that they will preserve morale, ensure the Debtors can maintain operating their business, and will support the Debtors' efforts to maximize the value of their assets for all stakeholders, and (c) while Prepetition Wages will be paid to certain insiders (including officers) in the ordinary course, payment to such persons will be subject to the statutory priority cap, and no insider is proposed by the Wage Motion to be paid any prepetition bonus or other such compensation.

Thus, I request authority to pay all such amounts in the ordinary course of business, subject to the applicable statutory caps and continue the Debtors' wage and benefit programs on a postpetition basis in the same manner that they were operated on a prepetition basis.

### E. Motion for Order Prohibiting Utilities for Altering, Refusing, or Discontinuing Service

The Debtors cannot continue to operate without continued utility services. If any of the Utility Providers[8] alter, refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. In contrast, the Utility Companies will not be prejudiced by the continuation of their services. The Debtors are current on payment to the Utility Companies and continued payment of the Utility Companies is provided for in the Debtors' budget. The Utility Companies are further protected by the proposed Utility Deposits and the provisions granting them an expedited hearing if the Debtors fail to cure a payment default within twenty-one (21) days after written notice of such default. Finally, the rights of the Utility Companies will not be prejudiced should the relief requested in this Motion be granted because the Utility Companies are permitted to come before this Court and seek relief according to the Procedures proposed.

---

[8] Capitalized terms not defined in this section shall have the meanings used in the *Motion for Order Prohibiting Utilities for Altering, Refusing, or Discontinuing* Service (the "**Utility Motion**") filed contemporaneously herewith.

I believe that because the proposed procedures protect the Debtors without materially prejudicing the Utility Providers, the Utility Motion should be approved.

### F. Motion for Authority to Pay Sales Taxes

In connection with the normal operation of their businesses, the Debtors collect, withhold and incur Taxes[9] that include sales and use, business and regulatory fees, and other taxes and fees described in this Motion. The Debtors operate in the following states: Arizona, Texas, and California.[10] The Debtors remit the Taxes to the applicable government authorities (collectively, the "**Governmental Authorities**") in the ordinary course of their business. Taxes are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions (the "**Banks**").

Most of the Taxes collected prepetition are not property of the Debtors' estates, and must for that reason be turned over to the Governmental Authorities. To the extent that they are not actually the property of the Governmental Authorities, they may well give rise to priority claims or statutorily secured claims. I believe it is necessary to pay the Taxes to forestall Governmental Authorities from taking actions that might interfere with the Debtors' objectives in these cases, including possibly bringing personal liability actions against directors, officers and other employees in connection with non-payment of Taxes. Actions against the Debtors' directors, officers and other employees would likely distract key personnel, whose full-time attention to the Debtors' restructuring efforts is required, and would likely cause potential business disruptions. Any such business disruptions would likely erode the Debtors' customer base and negatively impact these chapter 11 cases. Payment now will avoid the accrual of additional interest or other penalties. Accordingly, I believe the proposed relief is necessary and in the best interest of the Debtors' estates and their creditors.

---

[9] Capitalized terms not defined in this section shall have the meanings used in the *Motion for Authority to Pay Sales and Use Taxes* (the "**Sales and Use Tax Motion**") filed contemporaneously herewith.

[10] As of the Petition Date, the Debtors no longer operate in Washington or Utah.

13

### G. Motion to Honor Customer Programs

By this Customer Program Motion,[11] the Debtors seek entry of an order authorizing, but not directing, the Debtors to (a) honor and perform, in their sole discretion, prepetition obligations related to the issuing of gift cards to customers in the ordinary course of its business described more fully below (the "**Customer Programs**") and (b) granting related relief.  Absent authorization from the Court, the Debtors would be unable in the ordinary course of their business to honor or perform certain obligations that arose in connection with the Customer Programs prior to the commencement of these Cases.  Honoring these Customer Programs is essential to business operations to (i) ensure that the Debtors remain competitive among their major competitors; and (ii) assist the Debtors in maintaining customer confidence and satisfaction—and therefore its ability to maximize the value of their assets for the benefit of all parties in interest.  A failure to continue the Customer Programs would result in deterioration in relationships with the Debtors' customers and significantly harm the Debtors' standing in their competitive business, thereby causing a material reduction in sales and jeopardizing the Debtors' ability to achieve the goals in these cases.

The Debtors seek authority to honor the prepetition obligations incurred under the Customer Programs.  The Debtors do not intend to sell new gift cards under their Customer Program during these cases until the closing of the sale.  At which time, the buyer will determine whether to resume the sale of gift cards.

The Debtors are seeking the relief requested herein in order to maintain customer confidence during the pendency of these cases. As set forth in greater detail in the Customer Program Motion, absent such relief, the Debtors' customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is extremely critical to the Debtors and the Debtors' ability to maximize value for the benefit of all of the parties in interest will be put in jeopardy.

---

[11] Capitalized terms not defined in this section shall have the meanings used in the *Motion to Honor Customer Programs* (the "**Customer Programs Motion**") filed contemporaneously herewith.

## H. Motion to Reject Leases

The Debtors are seeking entry of an order (a) approving the rejection of the unexpired leases; (the "**Rejected Leases**")[12] set forth on Exhibit A of the Rejection Motion, effective as of the Petition Date, (b) authorizing the Debtors to abandon any personal property located at the premises leased by Rejected Leases, and (c) fixing a bar date for claims, if any, of the counterparties (each a "**Counterparty**" and together, the "**Counterparties**") to the Rejected Leases arising out of such rejection.

The Rejected Leases relate to two restaurants that the Debtors operated prior to the Petition Date. The Debtors determined that the restaurants governed by the Rejected Leases were no longer profitable and such restaurants were closed prior to the Petition Date. As a result, the Debtors have no further use for the property that is the subject of the Rejected Leases on Exhibit A. The Debtors vacated the leased premises associated with the Rejected Leases prior to the Petition Date and handed over possession to the applicable landlords.

The Debtors seek to reject the Rejected Leases, in accordance with principles of sound business judgment, based on the belief that the Rejected Leases are burdensome to the Debtors' estates because they are no longer necessary to the Debtors' ongoing business.

Additionally, the Debtors have determined, in their reasonable business judgment, that there is no net benefit that can be realized from an attempt to market and assign the Rejected Leases. As a result, the Debtors have determined that the cost to the Debtors of continuing to occupy the leased premises governed by the Rejected Leases, and of performing their obligations under the Rejected Leases and incurring unnecessary administrative expenses, will exceed any realistic sales price, and that rejection of the Rejected Leases is thus in the best interests of the Debtors' estates and creditors. The Debtors do not believe that the value of the Rejected Leases will increase in the immediate future.

---

[12] Capitalized terms not defined in this section shall have the meanings used in the *Motion to Reject Leases and Executory Contracts* (the "**Rejection Motion**") filed contemporaneously herewith.

## I. Motion to Extend Time to File Schedules and Statement of Financial Affairs

By the Schedules Extension Motion,[13] the Debtors seek entry of an order for an extension of fourteen (14) days to file their Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "**Schedules**"), from August 5, 2015 to August 19, 2015.

Due to the demands on the Debtors created by (a) filing these chapter 11 cases and the financial difficulties giving rise thereto, (b) the need to maintain continuity in the Debtors' businesses, (c) the need to prepare and file numerous "First Day Motions," and (iv) the immediate need to comply with the filing requirements as set forth in the "Guidelines for Fulfilling the Requirements of the United States Trustee," the Debtors will not be able to complete the Schedules within the fourteen day statutory period. As such, given the foregoing, the Debtors require a modest extension to compile the requisite information necessary to ensure that accurate and complete Schedules will be filed.

I believe that because the requested extension of time (i) is short, (ii) will allow the Debtors to file more accurate Schedules, and (iii) will not prejudice creditors, the Debtors believe that cause has been shown for the requested 14- day extension from the current August 5, 2015 deadline to August 19, 2015.

*[Remainder of page intentionally left blank]*

---

[13] Capitalized terms not defined in this section shall have the meanings used in the *Motion to Extend Time to File Schedules and Statement of Financial Affairs* (the "**Schedules Extension Motion**") filed contemporaneously herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of July 2015 at Scottsdale, Arizona.

/s/ Steven Micheletti
Steven Micheletti

# Exhibit A

## Corporate Organizational Chart

