John W. Lucas (CA Bar No. 271038)
Jason H. Rosell (CA Bar No. 269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail:  jlucas@pszjlaw.com
         jrosell@pszjlaw.com

Randy Nussbaum (AZ Bar No. 6417)
Dean M. Dinner (AZ Bar No. 10216)
John Parzych (AZ Bar No. 26079)
NUSSBAUM GILLIS & DINNER, P.C.
14850 N. Scottsdale Road, Suite 450
Scottsdale, AZ 85254
Telephone: (480) 609-0011
Facsimile:  (480) 609-0016
Email:  rnussbaum@ngdlaw.com
        ddinner@ngdlaw.com
        jparzych@ngdlaw.com

Proposed Counsel to
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

In re:

Z'Tejas Scottsdale, LLC, et al.,

                              Debtors.

Joint Administration Pending With:

Z'Tejas 6th Street, LLC
Z'Tejas Avery Ranch, LLC
Z'Tejas Bellevue, LLC
Z'Tejas Bethany Home LLC
Z'Tejas Chandler, LLC
Z'Tejas Costa Mesa, LLC
Z'Tejas GP, LLC
Z'Tejas Grill Gateway, L.L.C.
Z'Tejas Holdings, Inc.
Z'Tejas, Inc.
Z'Tejas La Cantera, LLC
Z'Tejas LP, LLC
Z'Tejas of Arboretum, LLC
Z'Tejas Restaurant Holdings, LP
Z'Tejas Salt Lake City, LLC
Z'Tejas Summerlin, LLC
Z'Tejas Tempe, LLC
Taco Guild Osborn LLC

This Pleading applies to:

☑   All Debtors
☐   Specified Debtors

Case No.: 2:15-bk-09178-PS

Chapter 11

Joint Administration Pending With Case Nos.:

2:15-bk-0980-EPB
2:15-bk-09184-BKM
2:15-bk-09188-DPC
2:15-bk-09193-DPC
2:15-bk-09194-BKM
2:15-bk-09195-MCW
2:15-bk-09198-MCW
2:15-bk-09200-EPB
2:15-bk-09201-EPB
2:15-bk-09203-PS
2:15-bk-09205-BKM
2:15-bk-09207-MCW
2:15-bk-09208-PS
2:15-bk-09210-DPC
2:15-bk-09212-GBN
2:15-bk-09213-PS
2:15-bk-09214-BKM
2:15-bk-09215-MCW

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING; (B) AUTHORIZING USE OF CASH COLLATERAL; (C) GRANTING ADEQUATE PROTECTION; AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**") seeking (i) entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), (a) authorizing the Debtors to incur postpetition financing on an interim basis, (b) proscribing the form and manner of notice and scheduling a final hearing, and (c) granting certain related relief, and (ii) entry of a final order (a) authorizing the Debtors to incur postpetition financing on a final basis, and (b) granting certain related relief. In support of the Motion, the Debtors submit the *Declaration of Steven Micheletti in Support of Emergency First Day Motions* (the "**First Day Declaration**").

## I.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-4 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "**Local Rules**").

## II.

## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-4 DISCLOSURES

In accordance with the disclosure requirements of Bankruptcy Rules 4001(b)-(d) and Local Rule 4001-4(b), the material terms of the Interim Order are set forth below.[1]

| Provision | Description |
|---|---|
| **Borrowers** | Z'Tejas Scottsdale, LLC, joint and severally with its affiliates and subsidiaries (collectively, the "**Borrowers**" and, each individually, |

---

[1]    The following information is intended only for summary purposes and is qualified in its entirety by the provisions of the Interim Order.

| Provision | Description |
|---|---|
| | a "**Borrower**"). |
| **Lender** | Cornbread Ventures, LP ("**Lender**"). |
| **DIP Financing** | A senior secured postpetition term loan financing of up to $725,000, of which $320,000 will be available on an interim basis under the Interim Order (the "**DIP Financing**"). |
| **Maturity Date** | The Lender's commitment to fund borrowings under the DIP Loan expires, the DIP Loan matures, and all principal and accrued interest owing under the DIP Loan becomes due in full on the earliest to occur of (i) a sale of substantially all assets of the Debtors, (ii) a default under the DIP Financing, and (iii) December 31, 2015 (the earliest is the "**Maturity Date**"). Interim Order at ¶ 12(c). |
| **Interest Rate** | 12% per year. Interim Order at ¶ 12(b). |
| **Fees** | None. |
| **Milestone Requirements** | None. See Maturity Date. |
| **Use of Cash Collateral** | The Debtors' cash, including all cash and other amounts on deposit or maintained in any account and any amounts generated by the collection of accounts receivable, sale of inventory or other disposition of property, constitutes proceeds of KRI's or the Lender's prepetition collateral and, therefore, constitutes cash collateral within the meaning of § 363(a) (the "**Cash Collateral**"). The Debtors are authorized to use Cash Collateral strictly in accordance with the Budget and the provision of adequate protection under the Interim Order. The Debtors' right to use Cash Collateral automatically terminates on the Maturity Date. Interim Order at ¶ 13. |
| **Budget** | The Debtors may only use Cash Collateral in accordance with the Budget, with unused amounts for each weekly period being carried forward to the next weekly period cumulatively, and within a |

| Provision | Description |
| --- | --- |
| | variance of no more than 10% per line item in any monthly period without the Lender's and KRI's express written consent. Nonetheless, unused amounts in respect of the line item "U.S. Trustee Fees" may be used only for that line item and may not be used for any other purpose. The Debtors must pay U.S. Trustee fees under 28 U.S.C. § 1930 as and when due.  Interim Order at ¶ 14. |
| **Liens** | Superpriority Claims.  Under § 364(c)(1), the DIP Obligations constitute allowed claims against the Debtors with priority over all administrative expenses, diminution claims (including all Adequate Protection Obligations), and all other claims against the Debtors, including all administrative expenses specified in §§ 503(b) and 507(b) and any claims arising under §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1113, or 1114 (the "**Superpriority Claims**"), payable from all the Debtors' prepetition and postpetition property and all proceeds thereof, subject only to the Carveout. For the avoidance of doubt, the Superpriority Claims are not payable from Avoidance Actions.  Interim Order at ¶ 7.<br><br>Priming Liens. As security for the DIP Obligations, effective and perfected on entry of this Interim Order and without the execution or recordation of any security agreement, control agreement, pledge, financing statement, or other similar document, the following liens (the "**Priming Liens**") are granted to the Lender, not subject to §§ 510, 549, or 550 and subject only to the Carveout (Interim Order at ¶ 9):<br><br>(a)     First Lien on Unencumbered Property. Under § 364(c)(2), a valid, binding, continuing, enforceable, perfected first-priority lien on all Unencumbered Property;<br><br>(b)     Liens Priming the Lender's Prior Liens. Under § 364(d)(1), a valid, binding, continuing, enforceable, perfected first-priority priming lien on all the Debtors' prepetition and postpetition property (except Avoidance Actions) subject, as of the Petition Date, to the Prepetition Chandler Liens;<br><br>(c)     Liens Partially Priming KRI's Prior Liens. Under § 364(d)(1), a valid, binding, continuing, enforceable, perfected first-priority priming lien on all the Debtors' prepetition and postpetition property (except Avoidance Actions) subject, as of the Petition Date, to the Prepetition KRI Liens, except that $1,200,000 of the Prepetition KRI Liens remain senior to any Priming Lien granted |

| Provision | Description |
|---|---|
| | under this Interim Order; |
| |       (d) <u>Liens Junior to Tax Liens</u>. Under § 364(c)(3), a valid, binding, continuing, enforceable, perfected lien on all the Debtors' prepetition and postpetition property (except Avoidance Actions) subject, as of the Petition Date, to any valid and unavoidable lien arising by operation of statute or ordinance in favor of any federal, state, or municipal taxing authority (a "Tax Lien") such that, in each instance, the lien granted under this subparagraph is senior to all liens other than any Tax Lien; |
| |       (e) <u>Liens Senior to Certain Other Liens</u>. The Priming Liens are senior to any lien avoided and preserved for the benefit of the estates under § 551 or any lien arising after the Petition Date. |
| **Adequate Protection** | <u>Adequate Protection</u>. As a condition to their consent to the relief granted in the Interim Order, the Lender and KRI are entitled, under §§ 361, 363(c)(2), 363(e) and 364(d)(1), to adequate protection of their respective interests in their prepetition collateral in an amount equal to any aggregate diminution in value of that collateral, including any diminution resulting from the DIP Loan, the Priming Liens, the Debtors' use of the prepetition collateral and Cash Collateral, and the imposition of the automatic stay. As adequate protection, KRI and the Lender are granted the following (collectively, the "**Adequate Protection**") (Interim Order at ¶ 15): |
| | <u>Replacement Liens</u>. KRI and the Lender are each granted (effective and perfected on entry of this Interim Order) a valid, perfected replacement lien (the "**Replacement Liens**"), subject only to the Carveout, on all the Debtors' postpetition property (including Cash Collateral but excluding all Avoidance Actions) of a type in which each of KRI and the Lender had a respective perfected lien as of the Petition Date and all such property's proceeds, products, rents, and profits. Notwithstanding the foregoing, the Replacement Liens are subordinate to the Priming Liens and the Carveout. The Replacement Liens are valid and perfected as of the entry of the Interim Order without the need for the execution or filing of any further document. |
| **Stipulations** | Without prejudice to the estates or any other party's rights and subject to a Challenge, the Debtors stipulate that (Interim Order at ¶ 4): |

| Provision | Description |
|---|---|
|  | With respect to KRI, as of the Petition Date:<br><br>(i)     the Debtors were indebted to KRI in the outstanding principal amount of no less than $5,941,552 in respect of senior secured loans made by KRI or its predecessors, plus accrued and unpaid interest and fees, expenses, and other obligations incurred in connection with those loans (collectively, the "**KRI Loan**"; the amount due is the "**KRI Loan Claim**");<br><br>(ii)    the KRI Loan constitutes the Debtors' valid and binding obligation, enforceable in accordance with its terms (except as stayed under § 362), not subject to avoidance, recharacterization, or subordination;<br><br>(iii)    the Debtors do not have, and forever release on their own behalf but not on the estates' behalf, any claims, counterclaims, causes of action, defenses, or setoff rights, against KRI or its predecessors, affiliates, agents, officers, directors, employees, or attorneys and advisors with respect to the KRI Loan;<br><br>(iv)    the liens granted to KRI in connection with and to secure the Debtors' obligations under the KRI Loan are valid, binding, perfected, unavoidable, and enforceable first-priority liens on certain Prepetition Collateral (the "**Prepetition KRI Liens**"), subject and subordinate only to the Priming Lien granted under this Interim Order;<br><br>With respect to the Lender, as of the Petition Date:<br><br>(i)    the Debtors were indebted to the Lender in the outstanding principal amount of $663,662 in respect of senior secured loans made by the Lender or its predecessors, plus accrued and unpaid interest and fees, expenses, and other obligations incurred in connection with those loans (collectively, the "**Chandler Loan**"; the amount due is the "**Chandler Loan Claim**");<br><br>(ii)    the Chandler Loan constitutes the Debtors' valid and binding obligation, enforceable in accordance with its terms (except as stayed under § 362), not subject to avoidance, recharacterization, or subordination;<br><br>(iii)    the Debtors do not have, and forever release on their own behalf but not on the estates' behalf, any claims, counterclaims, causes of action, defenses, or setoff rights, against |

| Provision | Description |
|---|---|
| | the Lender or its predecessors, affiliates, agents, officers, directors, employees, or attorneys and advisors with respect to the Chandler Loan; |
| |      (iv)    the liens granted to the Lender or its predecessors in connection with and to secure the Debtors' obligations under the Chandler Loan are valid, binding, perfected, unavoidable, and enforceable first-priority liens on certain Prepetition Collateral (the "**Prepetition Chandler Liens**"), subject and subordinate only to the Priming Lien granted under this Interim Order. |
| **Carveout** | The Superpriority Claims and Priming Liens are subject to the payment of a carveout (the "**Carveout**"). The Carveout means a carveout for: (i) allowed, accrued, but unpaid professional fees and expenses of the Debtor and any official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), in each case as set forth in the Budget for each professional (on a cumulative basis with a rollover of any unused amounts to prior or subsequent weeks) incurred before a Default (defined below) not otherwise cured by the Debtors or waived by the Lender; (ii) allowed, accrued, but unpaid professional fees and expenses of the Debtors and the Committee incurred in the Bankruptcy Cases after a Default (that is not waived or cured) not to exceed an aggregate amount equal to $100,000; (iii) all accrued, but unpaid ordinary course operating expenses of the Debtors incurred before a Default, as set forth in the Budget (on a cumulative basis); and (iv) accrued but unpaid fees under 28 U.S.C. § 1930.  Interim Order at ¶ 8. |
| **Events of Default** | At any time during which any amount is outstanding under the DIP Loan, any of the following, other than a Challenge (defined below), constitutes a "Default" under the DIP Loan and this Interim Order (Interim Order at ¶ 12(e)):<br><br>     (i)    The entry of an order dismissing one or more of these cases or converting one or more of these cases to a case under Chapter 7, or a Debtor's filing of a motion or failing to oppose a motion seeking such relief;<br><br>     (ii)    Any Debtor's failure to comply with any of its material obligations under the Bankruptcy Code or contained in this Interim Order (including a failure to comply with the Budget, a failure to provide any financial reporting to KRI or the Lender as |

7

| Provision | Description |
|---|---|
| | required in this Interim Order, and a failure to time file any monthly operating report); |
| | (iii) Except for the Carveout or as permitted in this Interim Order or a final order on the Motion, the entry of any order in these cases granting a super-priority claim or lien pari passu with or senior to the Prepetition Chandler Liens or the Priming Liens; |
| | (iv) The entry of any order in these cases or any successor case constituting the stay, modification, appeal, or reversal of this Interim Order or otherwise undermining the effectiveness of this Interim Order; |
| | (v) The entry of an order in these cases appointing any examiner with expanded powers or a trustee to operate all or a substantial part of the Debtors' business; |
| | (vi) The entry of an order in these cases granting relief from the automatic stay allowing a third party (i) to proceed against any Debtor's property whose fair market value is reasonably expected to exceed $50,000, or (ii) to commence or continue any litigation against any Debtor involving potential liability not covered by insurance in excess of $250,000 in the aggregate; |
| | (vii) The entry of any judgment or order with respect to a postpetition event against any Debtor, not stayed by reason of appeal or otherwise for ten days following entry, that does or would reasonably be expected to (i) cause a material adverse change in the value of the Debtors' business, operations, assets, liabilities (contingent or otherwise), or financial condition or (ii) have a material adverse effect on the Lender's rights and remedies under this Interim Order; |
| | (viii) Any Debtor sells any of its assets subject to any lien in the Lender's favor for aggregate proceeds in excess of $100,000 without the Lender's written consent and without granting the Lender a right to credit bid under § 363(k), other than sales of inventory or other property in the ordinary course of business. |

## III.

## FACTUAL BACKGROUND

A.     General Background

As of the Petition Date, the Debtors operate nine (9) full-service restaurants known as "Z'Tejas" and "Z'Tejas Southwestern Grill" ("**Z'Tejas**") in Arizona, Texas, and California. The company was founded in 1989 and is currently based in Scottsdale, Arizona. Z'Tejas was born in an old Victorian house on Austin's historic 6th Street. Taking flavors from Spanish and Mexican cuisines and combining them with inspirations from Arizona, Louisiana, California, New Mexico and Texas, Z'Tejas created a rich blend of flavors that it has come to celebrate as Southwestern cuisine. In 1991, Z'Tejas opened its second location in Scottsdale, Arizona and today has nine restaurants in the Southwest United States. The Z'Tejas restaurant was designed to provide a comfortable and unique place to escape from the stress of everyday life, to relax and enjoy a fun, casual dining experience. In addition, the Debtors also operate a separate dining concept known as "Taco Guild." Taco Guild is a gastropub that uses farm fresh ingredients mixed with old and new world flavors to create a taste and atmosphere that dates back to old Western Europe.

In the years and months leading up to the Petition Date, the Debtors' overleveraged balance sheet and competitive industry has had and continues to have an adverse impact on the Debtors' financial performance. In addition, consumers' discretionary spending has dropped significantly leading to reduced consumer traffic and sales. Within the restaurant industry, the mid-scale sector suffered sale declines, which sector encompasses the Debtors' restaurant business.

In late 2014, as the Debtors' liquidity position continued to deteriorate, the Debtors struggled to meet their debt service obligations under their prepetition credit agreements, which resulted in defaults under the Debtors' financing facilities. Over the last six months, the Debtors have explored available restructuring alternatives as part of their overall turnaround efforts. These efforts have included various operational initiatives designed to increase operating performance and attempts to locate a strategic partner to invest additional money into the Debtors or acquire the Debtors' business operations as a going concern. After months of careful review the Debtors have determined that the sale of their business through a bankruptcy court supervised auction process is the best way to preserve the jobs of their employees and maximize

9

value for stakeholders. The Debtors have identified a stalking horse bidder and seek authorization to implement sale procedures as soon as practicable.

Additional factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the First Day Declaration filed contemporaneously with this Motion and incorporated herein by reference.

## B. Financial Background

During the course of the review of strategic alternatives, it became apparent that a new capital investment would be required for the Debtors to satisfy their working capital and liquidity requirements, whether in the context of an out-of-court or in-court restructuring. In connection with the extensive prepetition effort that the Debtors undertook to locate an investor for the Debtors, the Debtors and their advisors discussed potential debtor-in-possession financing with four (4) potential investors other than the Lender. None of these parties indicated an interest to provide financing, whether on a priming or junior basis to the Debtors existing lenders.

Concurrently with these efforts, the Debtor engaged in negotiations with the Lender for debtor in possession financing. After negotiating terms with the Lender, which were improved from its initial proposal, the Debtor, together with its advisors, determined that the Lender's proposal was within competitive market terms and provided the most advantageous terms to the Debtors under the circumstances. In addition, by accepting the Lender's proposal, the Debtors eliminated an unnecessary priming fight.

The Debtors do not believe that they are able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the loan and described in this Motion and related proposed orders. The loan was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors. The management of the Debtors believe that the proposed terms of the loan are fair and reasonable in light of current market conditions and is in the best interests of the Debtors' estates. As of the Petition Date, the Debtors have approximately

$300,000 cash on hand.  Accordingly, without access to the DIP Financing or cash collateral, the Debtors will not have sufficient working capital to continue operating as a going concern while they attempt to complete the sale process.  Absent immediate access to cash collateral, the Debtors would be forced to shut-down their business and convert these cases to chapter 7, which would have a tremendously adverse effect on the Debtors' estates and their employees, vendors, creditors and other constituents.

The financing to be provided under the loan and the use of cash collateral will allow the Debtor to, among other things:  (a) continue to operate its business in an orderly manner; (b) maintain its valuable relationships with vendors, suppliers, customers, and employees; and (c) support the Debtor's working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful restructuring.

## IV.

## RELIEF REQUESTED

By this Motion, the Debtors request entry of an interim order, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-4, (a) authorizing the Debtors to incur postpetition financing on an interim and final basis in an aggregate amount not to exceed $320,000 (on an interim basis), (b) authorizing the Debtors to execute and deliver any documents necessary to evidence the DIP Financing, (c) authorizing the Debtors' use of the proceeds of the DIP Loans, (c) vacating and modifying the automatic stay to the extent necessary to implement the DIP Financing, and (d) granting certain related relief.

## V.

## BASIS FOR RELIEF

As set forth in detail above, the DIP Financing is the best financing available to the Debtors at this time.  The Debtors have been unable to procure sufficient financing:  (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code; (ii) solely as

an administrative expense under sections 364(a) and (b) of the Bankruptcy Code; or (iii) in exchange solely for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

**A.  The Debtors Should be Authorized to Obtain**
**Postpetition Financing Under Section 364 of the Bankruptcy Code**

Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority, or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c); *In re Barbara K. Enters, Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (in order for a debtor to obtain postpetition secured credit under section 364, the debtor must prove that it was unable to reasonably obtain secure credit elsewhere); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

Courts have fashioned guidelines in applying these statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate postpetition financing agreements, which focuses on the transaction as a whole. As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

In *re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing: (a) is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for continued operation of the debtor's business; (b) is in the best interests of the debtor's creditors and estates; (c) is an exercise of the debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the lender on the other; and (e) contains terms that are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed postpetition lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003); *In re Lyondell Chem.* Co., No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Here, the Debtors propose to obtain the financing in the form provided for in the Interim Order by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1)-(3) and 364(d) of the Bankruptcy Code. For the reasons set forth below, the Debtors submit that entry into the DIP Financing satisfies these factors.

1.      **The DIP Financing was negotiated in good faith, and entry into the DIP Financing is in the best interests of the Debtors' creditors and estates, is necessary to preserve estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.**

A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g., Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del.

DOCS_SF:88157.4

1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Financing, the Court should consider the economic terms of the DIP Financing in light of current market conditions. *See, e.g.*, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as in the past). Moreover, it is appropriate for the Court to consider noneconomic benefits to the Debtors offered by a proposed postpetition financing facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

DOCS_SF:88157.4

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, the business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic factors. . . . This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable plan of reorganization. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

The Debtors' decision to enter into the proposed DIP Financing is an exercise of their sound business judgment that warrants approval by the Court. As described in more detail above, the Debtors' decision to enter into the DIP Financing is the culmination of an exhaustive process targeted at procuring the best available financing under the circumstances. The Debtors negotiated the DIP Financing with the Lender in good faith, at arm's length, and with the assistance of outside advisors to obtain the required postpetition financing on the most favorable terms possible to the Debtors.

Upon consultation with the Debtors' advisors, and through the Debtors' own analysis, the Debtors have determined, in their sound business judgment, that the DIP Financing provides for financing on more favorable terms than any other reasonably available alternative. In fact, the DIP Financing likely represents the only postpetition financing available to the Debtors.

Moreover, entry into the DIP Financing is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest. Specifically, entry into the DIP Financing is part of a comprehensive strategy that will enable the Debtors to preserve the value of their assets while pursuing a sale process pursuant to section 363 of the Bankruptcy Code. Given the Debtors' significantly constrained liquidity, the DIP Financing is of critical importance to preserving the Debtors' going concern value and maximizing value received through a section 363 sale. As discussed above, without access to the DIP Financing, the Debtors would likely deplete available cash within weeks (and possibly days)

DOCS_SF:88157.4

and likely be forced to cease their day-to-day operations. Such a result would have a devastating effect on the value of the Debtors' assets and substantially harm all parties in interest.

Additionally, the Debtors' access to the DIP Financing will ensure that the value of their assets is preserved, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to engage in a fire-sale liquidation of their assets under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors submit that the availability of credit under the DIP Financing is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

For these reasons, the Debtors submit that the terms of the DIP Financing were negotiated in good faith, and that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

2. **The terms of the DIP Financing are fair, reasonable, and appropriate in light of the Debtors' needs and the current market environment.**

It is well recognized that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009); *Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable). Indeed, courts often recognize that, where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender"). This is especially true when time is of the essence. *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other

DOCS_SF:88157.4

sources available under sections 364(a) and (b) of the Bankruptcy. *See Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus.*, *Inc v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met its burden under section 364(d) of the Bankruptcy Code).

Though the current market for financing has improved in recent years, it is still strained in certain distressed industries. In the distressed quick-service restaurant market, there is a limited market for financing, including debtor in possession financing or otherwise, and provisions once considered "extraordinary" in debtor in possession financing arrangements have, for the time being, become standard. Fortunately, such "extraordinary" provisions are not present in the current DIP Financing. For example, there is no "roll-up" of prepetition debt and no financing fees associated with the DIP Financing. Accordingly, the Debtors believe that the terms that they have negotiated with respect to the DIP Financing are favorable, fair, and appropriate.

**B.      The Priming Liens are Appropriate Under Section 364(d) of the Bankruptcy Code**

Section 364(d)(1) of the Bankruptcy Code provides that a court may grant a priming lien if (a) debtor in possession financing cannot be obtained otherwise, and (b) there is adequate protection of the interest of the holder of such lien. See 11 U.S.C. § 364(d)(1). As explained above, the Debtors are unable to otherwise obtain financing from an alternative source without priming the Prior Liens in favor of the Lender or, except to the extent of $1.2 million, KRI. Further, the Lender and KRI consent to the priming of their Prior Liens pursuant to the Interim Order and agree that their interests are adequately protected under the terms of the Interim Order. Specifically, as set forth above and in the Interim Order, the Lender and KRI are to receive adequate protection in the form of the Replacement Liens that are junior only to the Carveout and the Priming Liens. Therefore, the Debtors submit that priming the Prior Liens of the Lender and KRI is appropriate.

C.    **The DIP Financing Was Negotiated in Good Faith and Should**
      **be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) of the Bankruptcy Code provides that any "reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." 11 U.S.C. § 364(e).

Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees, and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal. *Id.* at 737:10-14.

As explained in detail herein, the terms of the DIP Financing were negotiated in good faith and at arm's length between the Debtors and the Lender, and all of the DIP Loan obligations will be extended by the Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to the obligations arising under the DIP Financing, other than as set forth herein. Moreover, the DIP Financing has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the Lender should be entitled to the full protection of section 364(e) of the

18

Bankruptcy Code in the event that either of the orders granting the Motion (or any provision thereof) are vacated, reversed, modified on appeal, or otherwise.

**D.     Modification of the Automatic Stay is Appropriate Under the Circumstances**

Paragraph 10(b) of the Interim Order requires that the automatic stay imposed under section 362 of the Bankruptcy Code be modified as necessary to permit the Lender to (i) implement the DIP Loan, (ii) take any act to create, validate, evidence, or perfect any lien granted or authorized under this Interim Order (although nothing in this Interim Order requires any such act), and, among other things, (iii) to charge, collect, advance, and receive payments under the DIP Loan.

Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Innkeepers USA Trust*, Case No. 10-13800 (Bankr. S.D.N.Y. Sept. 2, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-1197 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009). Accordingly, the Court should modify the automatic stay to the extent contemplated by the Debtors and the Lender.

## VI.

## WAIVER OF BANKRUPTCY RULE 6004(H)

The Debtors further seek a waiver of any stay of the effectiveness of the Interim Order (and Final Order) approving the Motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtors' business, value, and ability to conduct an orderly sale process. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

DOCS_SF:88157.4

# VII.

## RESERVATION OF RIGHTS

Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankrupty Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. In addition, the Debtors reserve the right to seek additional relief from this Court as relates to any of the relief requested pursuant to the Motion.

# VIII.

## NOTICE

No trustee, examiner, or statutory committee has been appointed in the Debtors' chapter 11 cases. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee for the District of Arizona; (ii) the parties listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the District of Arizona; (v) all parties known by the Debtors claiming to have Liens on or security interests in any of the Debtors' property; and (vi) any party that has requested notice pursuant to Bankruptcy Rule 2002. In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtors respectfully submit that such notice is sufficient and that no further notice need be given.

DOCS_SF:88157.4

# IX.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (a) enter an order granting the relief requested in the Motion, and (b) grant such other and further relief as the Court may deem appropriate.

Dated:   July 22, 2015         NUSSBAUM GILLIS & DINNER, P.C.

By:*/s/ Randy Nussbaum*
    Randy Nussbaum
    Dean M. Dinner
    John Parzych
    14850 N. Scottsdale Road, Suite 450
    Scottsdale, AZ 85254
    Telephone: (480) 609-0011
    Facsimile:  (480) 609-0016
    Email:    rnussbaum@ngdlaw.com
             ddinner@ngdlaw.com
             jparzych@ngdlaw.com

    and

    John W. Lucas
    Jason H. Rosell
    PACHULSKI STANG ZIEHL & JONES LLP
    150 California Street, 15th Floor
    San Francisco, CA 94111
    Telephone: (415) 263-7000
    Facsimile:  (415) 263-7010
    E-mail:    jlucas@pszjlaw.com
             jrosell@pszjlaw.com

    Proposed Counsel to Debtors and Debtors in Possession