**ASSET PURCHASE AGREEMENT**

by and among

**Cornbread Ventures, LP, a
Texas limited partnership**

**as Purchaser,**

**and**

**Z'Tejas Holdings, Inc., a Delaware corporation and Z'Tejas Restaurant Holdings, LP, a
Delaware limited partnership and their Subsidiaries who are Signatories hereof,**

as Sellers

DOCS_SF:87686.15 98003/001

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is made and entered into as of July 22, 2015 (the "***Effective Date***") by and among Z'Tejas Holdings, Inc., a Delaware corporation ("***Z'Tejas Holdings***"), Z'Tejas Restaurant Holdings, LP, a Delaware limited partnership ("***ZT LP***") and those subsidiaries of Z'Tejas Holdings and ZT LP who are signatories of this Agreement (each of the foregoing a **"Seller"** and collectively, the **"Sellers"**) and Cornbread Ventures, LP, a Texas limited partnership (the "***Purchaser***"). Sellers and Purchaser are sometimes collectively referred to as the "***Parties***."

## RECITALS

The Parties hereby acknowledge that:

A.     Sellers are engaged in the business of owning and operating restaurants in Arizona and Texas (such restaurants located in such states, the "***Restaurants***" and such business as conducted in such states, the "***Business***").

B.     Following the mutual execution and delivery of this Agreement, each of the Sellers will be filing Petitions to initiate chapter 11 bankruptcy cases (the **"*Chapter 11 Cases*"**) under chapter 11 of title 11 of the United States Code, 11 U.S.C. sections 101 *et seq.* (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Arizona (the "***Bankruptcy Court***").

C.     On the terms and conditions of this Agreement, and pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, certain of the assets and properties of Sellers relating to the Business, and the assumption and assignment of certain executory contracts and unexpired leases pursuant to the terms hereof, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such transactions, the "***Contemplated Transactions***").

## AGREEMENT

In consideration of their respective covenants set forth herein, the Parties agree as follows:

1.     <u>Transfer of Assets</u>.

1.1     <u>Purchase and Sale of Assets</u>On the Closing Date and on the terms and conditions hereinafter set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Sellers, free and clear of all Encumbrances to the extent provided in the Sale Order, all of each Seller's respective right, title and interest as of the Closing Date in and to the following assets and properties used by Sellers in connection with the operation of the Business including the Schedules referenced herein, other than any Excluded Assets (such assets and properties described below, other than the Excluded Assets, are collectively referred to herein as the "***Purchased Assets***"):

(a)     all Furniture and Equipment of Sellers identified on Schedule 1.1(a), to the extent located at any of the Acquired Restaurants as of the Closing Date;

(b)     all Inventory that is located at (or in transit to) any of the Acquired Restaurants as of the Closing Date, and all rights of Sellers to take delivery of any Inventory ordered by Sellers before the Closing Date for delivery to any of the Acquired Restaurants, which Inventory has not been delivered as of the Closing Date;

(c)     All cash net of cash reasonably required by the Debtors to satisfy post-Petition Date operating expenses of the Business through the Closing Date

(d)     all Restaurant Petty Cash;

(e)     all Large Party Deposits;

(f)     all Intangible Property Assets identified on Schedule 1.1(f) hereto;

(g)     any interest of Sellers under the Restaurant Leases for the Acquired Restaurants and the other Contracts of Sellers that are described on Schedule 1.1(g) hereto (collectively, the **"Purchased Contracts"**) subject to Section 2.7;

(h)     all Avoidance Actions; and

(i)     to the extent transferable and assignable, all of the Sellers' interest in those Business Permits and all Liquor License held by Sellers relating to the Acquired Restaurants that are described on Schedule 1.1(i) hereto, in each case to the extent transferable, other than alcohol Business Permits (including Liquor Licenses) in jurisdictions where the law does not permit Purchaser to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Body; Sellers shall transfer, assign convey and deliver to Purchaser such Business Permits in each instance only upon issuance of the requisite approvals from the relevant Governmental Body (collectively, the "*Business Permits*").

1.2     Excluded Assets The Purchased Assets shall include only those assets and interested specifically listed in Section 1.1 above and shall in all events exclude all right, title or interest of Sellers in or to any of the following (collectively, the "*Excluded Assets*"):

(a)     any bank accounts of Sellers;

(b)     all accounts receivable (whether current or non-current) of the Business attributable to the operation of the Acquired Restaurants as of the Closing even if such accounts receivable becomes due and payable after the Closing and all causes of action specifically pertaining to the collection of the foregoing (collectively, the "*Receivables*");

(c)     the Purchase Price and Sellers' rights under this Agreement;

(d)     any Excluded Contracts, including any refund, rebate, credit or payment due to Sellers thereunder;

(e)     any Claims with respect to or arising in connection with any Excluded Contract or Excluded Asset;

(f)     any books and records relating to any pre-Closing Period that the Sellers are under Legal Requirement to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other Entity filings (*provided, however*, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock certificates of any Subsidiaries of Sellers, and (iii) documents relating to proposals to acquire the Business by Persons other than Purchaser;

(g)     all securities, whether capital stock or debt, and other ownership interests issued by any of the Sellers;

(h)     all assets of any Section 401(k) or other Seller benefit plan;

(i)     all intercompany claims by any Seller against any other Seller or any Subsidiary or other Affiliate of any Seller;

(j)     any item expressly excluded pursuant to the provisions of Section 1.1 above; and

(k)     any asset, right, or interest described or listed on Schedule 1.2(k) hereto.

1.3     Executory Contracts

(a)     All Purchased Contracts shall be assumed by Sellers and assigned to Purchaser at the Closing.  Any Contract of any Seller that is as an Excluded Contract may be assumed or rejected by Sellers in Sellers' sole discretion and shall be deemed an Excluded Asset.

(b)     As part of the Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all Purchased Contracts.  Sellers shall serve the Sale Motion on all counterparties to all such Purchased Contracts along with a notice specifically stating that Sellers are or may be seeking the sale, assumption and assignment of such Purchased Contracts and shall notify such parties of the deadline for objecting to the Cure Costs listed on Schedule 1.3(b) (collectively, the **"Cure Costs"**) hereto, which deadline shall be not less than three (3) Business Days prior to the Sale Hearing.  As part of the Sale Motion, Sellers shall seek authority to file with the Bankruptcy Court the list identifying Purchased Contracts and the amounts necessary to cure defaults under each as determined by Sellers in accordance with Schedule 1.3(b) hereto, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably

3

possible. The Cure Costs shall be paid by the Sellers with revenues generated prior to the Closing and with the proceeds from the Purchase Price in connection with the Closing.

2.    Consideration.

    2.1    Purchase PriceIn consideration of the transfer of the Purchased Assets to Purchaser and the other undertakings set forth herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall be (i) $663,662 (the "**Chandler Debt**"), to be satisfied in the form of a credit against Chandler Debt Obligations pursuant to section 363(k) of the Bankruptcy Code, plus (ii) the cancellation in full of postpetition, secured indebtedness of Sellers held by Purchaser in the amount of $725,000 (the amount of indebtedness so cancelled (including all principal and interest), the "**Postpetition Debt**" and combined with the Chandler Debt, the "**Credit Bid Amount**"), plus (iii) cash in an amount equal to $2,338,572 (the "**Cash Purchase Price**"), of which $1,200,000 will be used to satisfy the Prepetition First Lien Debt, plus (iv) the assumption by Purchaser of the Assumed Liabilities.

    2.2    Deposit.

        (a)    Purchaser hereby agrees to pledge, for the benefit of Sellers and in accordance with the Procedures Order, a portion of the allowed postpetition financing claims granted to the Purchaser as lender in an amount equal to $280,000 (the "**Deposit**"), within five (5) Business Days following the date hereof. If the Closing occurs, the Buyer Deposit shall be applied to the Credit Bid Amount.

        (b)    At Closing, the Deposit shall be credited and applied toward the Credit Bid Amount.

        (c)    Except as set forth in Section 2.2(d) hereof, if this Agreement terminates without a Closing, the Seller shall release its pledge of the Deposit to Purchaser.

        (d)    If this Agreement is terminated without a Closing by Sellers pursuant to Section 14.3(a) or by Purchaser other than in accordance with this Agreement, the Deposit shall constitute a setoff against the Purchaser's allowed postpetition financing claims.

    2.3    Assumed LiabilitiesEffective as of the Closing Date, Purchaser shall assume the following Liabilities of Sellers (collectively, the "**Assumed Liabilities**"):

        (a)    any obligation of Sellers to honor Gift Certificates issued in the ordinary course of Sellers' business that remain outstanding as of the Closing Date whether or not such Gift Certificates were issued prior to or after the commencement of the Chapter 11 Cases of the Sellers. A historical summary of the Seller's liabilities relating to Gift Certificates is listed on Schedule 2.3(a); *provided*, *however*, the Purchaser's assumption of the liabilities arising from the Gift Certificates shall include all such liabilities even if they are greater than the historical amounts on Schedule 2.3(a);

4

(b)     Liabilities relating to the ownership or operation of the Purchased Assets after the Closing Date;

(c)     there shall be an adjustment between Sellers and Purchaser at the Closing such that (regardless of when the same become due and payable) Sellers shall bear and be responsible for all Liabilities relating to the ownership and operation of the Purchased Assets that are attributable to the period prior to the Closing Date (including, without limitation, Liabilities for sales tax relating to the operation of the Business and real property or ad valorem Taxes, and personal property Taxes applicable to the Purchased Assets) and Purchaser shall bear and be responsible for all such Liabilities to the extent such Liabilities are attributable to the period from and after the Closing Date;

(d)     Liabilities of Sellers under any of the Purchased Contracts, to the extent such Liabilities arise and are payable (whether as part of a reconciliation under such Purchased Contract or otherwise) after the Closing Date, including but not limited to, in the case of any Restaurant Leases for Acquired Restaurants included among the Purchased Assets, any rent, common area maintenance, Tax, and Utilities;

(e)     All Liabilities of Sellers under any Large Party Reservation made with the payment of a Large Party Deposit at any time before the Closing Date and scheduled to be honored after the Closing Date

(f)     all environmental Liabilities arising from and after the Closing Date under federal, state and local law relating to or arising out of or in connection with the Purchased Assets or the Business;

(g)     accrued vacation, sick pay, and other paid time off of the Transferred Employees as set forth on Schedule 2.3(g), as such amounts may change (increase or decrease) in the ordinary course of the Business pending the Closing Date;

(h)     Post-Petition trade payables of the Business that come due after the Closing and post-Petition obligations to customers of Sellers for refunds, rebates, returns, discounts and the like as of the Closing Date, but in each of the foregoing cases described in this clause only to the extent the same were incurred by Sellers in the ordinary course of the Business from and after the commencement of the Chapter 11 Cases; and

(i)     Accrued ordinary course payroll of Transferred Employees coming due after the Closing attributable to the regular two-week payroll period immediately preceding the Closing Date and any pre-Closing Date portion of the regular two-week payroll period during which the Closing Date occurs.

2.4     Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, other than the Assumed Liabilities, Purchaser shall not be obligated to assume or to perform or discharge any Liability of Sellers (such Liabilities not assumed by Purchaser, the "***Excluded Liabilities***"), which for the avoidance of doubt shall not include those listed on Schedule 2.4 and the following:

(a)     claims arising under section 503(b)(9) of the Bankruptcy Code;

(b)     claims or liabilities arising under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.,* the Packers and Stockyards Act, 7 U.S.C. §181 *et seq., or their state law correlates;*

(c)     any costs or expenses incurred in connection with, or related to, the administration of the Chapter 11 Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Chapter 11 Cases;

2.5     <u>Payment of Cure Costs</u>All Cure Costs shall be the responsibility of the Seller and shall be paid with the revenues generated by the Business or proceeds of the Cash Purchase Price in connection with the Closing Date.

2.6     <u>Utilities Transition</u>Before the Closing Date, Sellers and Purchaser shall make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities at the Acquired Restaurants (the "*Utilities*"); *provided*, *however*, that to the extent any post-Petition claims for Utilities services comes due after the Closing, such claims shall be the responsibility of the Purchaser.

2.7     <u>Transitional Matters</u>From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)     From and after the Closing, Purchaser will retain and make available to Sellers or any trustee or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, during normal business hours and upon reasonable advance notice to Purchaser and for a period of one (1) year following the Closing Date, the Documents delivered by Sellers to Purchaser, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Purchaser.  Further, during the same period, Purchaser shall promptly provide such reports as Sellers may reasonably request to facilitate Sellers' post-Closing activities for the purposes described above in this <u>Section 2.7(b)</u>.

(c)     <u>Designation Rights</u>.

(i)     During the Designation Rights Period, Sellers shall (A) not reject any Contract unless such Contract is expressly designated by Purchaser in writing as an Excluded Contract or unless otherwise agreed to in writing by Purchaser and (B) hold all Permits and other assets specified by Purchaser in writing in abeyance pending designation for assignment or exclusion by Purchaser in accordance with this <u>Section 2.7(c)</u>.

(ii)     Any Contract set forth on <u>Schedule 2.7(c)</u>, and any Permits and other assets designated in writing by Purchaser on <u>Schedule 2.7(c)</u>, in each case prior to Closing, shall constitute a "**Designation Rights Asset**."  Purchaser shall have the right, by written notice to Sellers within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Sellers and not rejected pursuant to section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in this

6

Section 2.7(c), and (B) any Designation Rights Asset that is not a Contract shall be held by Sellers in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Purchaser in accordance with this Section 2.7(c). With respect to any Designation Rights Asset, (i) Purchaser shall advance to Sellers and thereby be solely responsible for all costs associated with the continuation or holding by Sellers of such Designation Rights Asset for the period from the Closing through the earlier of (A) the end of the Designation Rights Period and (B) the date that is thirty (30) calendar days following Sellers' receipt of written notice from Purchaser designating the assignment or exclusion of such Designation Rights Asset, (ii) for the avoidance of doubt, all consideration received by Sellers in respect of, and other benefits deriving from, such Designation Rights Asset (including Designation Rights Assets sold or assigned to third parties in accordance with clause (iii) below) shall be promptly delivered to Purchaser, and (iii) the foregoing shall not affect the validity of the transfer to Purchaser of any other Purchased Asset whether or not related to such Designation Rights Asset. For the avoidance of doubt, Purchaser shall retain the right to use all Furniture and Equipment, supplies and Inventory at any Designation Rights Restaurant (as defined in the Management Agreement), and to receive one hundred percent (100%) of the proceeds from the sale or use of such Furniture and Equipment, supplies and Inventory, in each case during the Designation Rights Period.

(iii)     As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "**Designation Notice**") from Purchaser during the Designation Rights Period requesting assumption, assignment and sale of any Designation Rights Asset to Purchaser or a third party, Sellers shall, subject to Purchaser or such third party demonstrating adequate assurance of future performance thereunder and paying all Cure Costs to the extent required by section 365 of the Bankruptcy Code, take all actions required by the Sale Order or otherwise that are reasonably necessary, all at Purchaser's sole cost and expense, to seek to assume, assign and sell to Purchaser or such third party the applicable Designation Rights Asset pursuant to section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, section 365 of the Bankruptcy Code. Following the earlier of (A) the end of the Designation Rights Period and (B) the date that is thirty (30) calendar days following Sellers' receipt of written notice from Purchaser designating the exclusion of a Designation Rights Asset, and full satisfaction of Purchaser's obligation with respect to the payment of the costs associated with the applicable Designation Rights Asset, a Designation Rights Asset shall thereafter be deemed to be an Excluded Asset for all purposes under this Agreement.

(iv)     Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 2.7(c) shall survive the Closing.

(v)     Notwithstanding anything in this Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Purchaser or its designee pursuant to this Section 2.7(c), such Designation Rights Asset shall be deemed a Purchased Asset for all purposes under this Agreement and no further consideration (except for Purchaser's payment of any Transfer Taxes applicable to the transfer) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Purchaser or its designee.

(vi)     Subject to Purchaser's obligation to bear and pay all costs associated with Sellers' retention of such Restaurant Leases and other Contracts post-Closing, Sellers shall use commercially reasonable efforts to extend the deadline for assumption or

7

rejection of any Designation Rights Asset that is a Restaurant Lease for the maximum permitted period of time under section 365 of the Bankruptcy Code.

(d)  Previously Omitted Contracts.

(i)  If prior to or following Closing it is discovered that a Contract should have been listed on Schedule 1.1(g) but was not listed on Schedule 1.1(g) (any such Contract, a "**Previously Omitted Contract**"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**").  A Previously Omitted Contract designated in accordance with this Section 2.7(d)(i) as "Rejected," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)  If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.7(d)(i), (A) Schedule 1.1(g) shall be amended to include such Previously Omitted Contract and (ii) Sellers shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.7(d) with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in writing to the Sellers and Purchaser, to the Cure Cost and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption, assignment and sale.  If no objection is timely served on Sellers and Purchaser, Sellers shall seek an Order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

(e)  To the extent that the assignment to Purchaser of any Purchased Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, the Parties will use commercially reasonable efforts to obtain consent prior to the Closing.  If such consent is not obtained by the Closing, each Seller will, with respect to each such Contract, from and after the Closing and until the earlier to occur of (x) the date on which such applicable consent is obtained and (y) the date on which such Seller liquidates and ceases to exist, use commercially reasonable efforts (subject to restrictions under Law) during the term of such Contract to (i) provide to Purchaser the benefits under such Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Purchaser, pending receipt of the required consent) designed to provide such benefits to Purchaser, and (iii) enforce for the account of Purchaser any rights of such Seller under such Contract (including the right to elect to terminate such Contract in accordance with the terms thereof upon the direction of Purchaser).  Purchaser will cooperate with the applicable Sellers in

8

order to enable Sellers to provide to Purchaser the benefits contemplated by this <u>Section 2.7(e)</u>. Purchaser will pay any amount it would have been required to pay under any such Contract had the Contract been assigned (after obtaining the requisite consent) to Purchaser at the Closing in accordance with this Agreement. For the avoidance of doubt, the efforts contemplated by this <u>Section 2.7(e)</u> shall not include any obligation by Sellers to pay money (advance or otherwise) to any third party or to incur out of pocket expenses unless Purchaser advances such amounts.

2.8 <u>Purchase Price Allocation</u>Not later than twenty-eight (28) days following the Closing Date, Purchaser shall prepare and deliver to Sellers for their review and consideration a schedule (the **"Allocation Schedule"**) allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If Sellers disagree with or raise objections to the Allocation Schedule, Purchaser and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Purchaser and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Purchaser and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Purchaser and Sellers shall be free to make their own respective allocations of the Purchase Price for tax purposes. Notwithstanding any other provisions of this Agreement, in the event the Parties mutually agree upon the allocation of the Purchase Price, the provisions of this Section 2.7 shall survive the Closing.

3. <u>Closing Transactions</u>

3.1 <u>Closing</u>The Closing of the Contemplated Transactions (the "**Closing**") shall take place at 10:00 a.m. on or before the third (3rd) business day following the satisfaction or waiver by the appropriate Party of all the conditions contained in <u>Section 4</u>, or on such other date (no later than the Outside Date) as may be agreed to by the Parties hereto (the date on which the Closing occurs, hereinafter the "***Closing Date***").

3.2 <u>Sellers' Deliveries to Purchaser at Closing</u>On the Closing Date, Sellers shall make the following deliveries to or for the benefit of Purchaser:

(a) direct payment of a portion(s) of the Cash Purchase Price to be paid at Closing in accordance with <u>Schedule 3.2(a)</u> hereto in an amount(s) sufficient to satisfy the "Claim Amount" listed in Schedule 3.2(a) and the other Liabilities to be satisfied with the proceeds from the Cash Purchase Price as set forth herein, including the consent of the holder of the Prepetition First Lien Debt and release of its collateral as set forth herein in amount equal to $1,200,000;

(b) deliver one or more Assignments and Assumption of Restaurant Lease substantially in the form attached as <u>Exhibit "A"</u> hereto, duly executed by Sellers,

9

with respect to the Restaurant Leases for the Acquired Restaurants (the "***Assignments of Restaurant Leases***");

(c)     deliver an Assignment and Assumption of Leases and Contracts substantially in the form attached as <u>Exhibit "B"</u> hereto, duly executed by Sellers, pursuant to which Sellers' interest in all Purchased Contracts (other than any Restaurant Leases) shall be assigned to Purchaser (the "***Assignment of Other Contracts***");

(d)     deliver an Assignment of Intangible Property Assets, duly executed by Sellers, in the form and content of the assignment of intangible property attached as <u>Exhibit "C"</u> hereto, pursuant to which Sellers' interest all the Intangible Property Assets shall be assigned to Purchaser (the "***Assignment of Intangible Property Assets***");

(e)     deliver a Bill of Sale and Assignment, substantially in the form attached as <u>Exhibit "D"</u> hereto, duly executed by Sellers, pursuant to which Sellers' interest in any Purchased Assets not otherwise assigned at the Closing shall be assigned to Purchaser (the "***Bill of Sale***");

(f)     the duly executed Management Agreement attached as <u>Exhibit G</u>;

(g)     deliver certificates of title, duly executed by Sellers, required to convey ownership of any motor vehicles or similar equipment included within the Purchased Assets;

(h)     deliver the certificate contemplated by <u>Section 4.1(a)</u>, duly-executed by Sellers; and

(i)     deliver any such other documents, funds or other things reasonably requested by Purchaser or contemplated by this Agreement to be delivered by Sellers to Purchaser at the Closing.

3.3     <u>Purchaser's Deliveries to Sellers at Closing</u>On the Closing Date, Purchaser shall make the following deliveries to or for the benefit of Sellers:

(a)     pay, by wire transfer of immediately available funds, all Cure Costs to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made under the Sale Order from the proceeds of the Cash Purchase Price;

(b)     instruct the Seller's advisors in writing to release to Sellers, by wire transfer of immediately available funds, the Deposit as a credit against the Cash Purchase Price;

(c)     pay to Sellers, by wire transfer of immediately available funds an amount equal to the Cash Purchase Price, <u>less</u> the funds to be released pursuant to <u>Section 3.3(b)</u>;

DOCS_SF:87686.15 98003/001

(d) deliver the certificate contemplated by <u>Section 4.1(a)</u>, duly executed by Purchaser;

(e) deliver a counterpart of the Assignments of Restaurant Leases, duly executed by Purchaser;

(f) deliver a counterpart of the Assignment of Other Contracts, duly executed by Purchaser;

(g) deliver an Assumption of Liabilities with respect to the Assumed Liabilities, substantially in the form attached as <u>Exhibit "E"</u> hereto, duly executed by Purchaser (the "***Assumption of Liabilities***");

(h) deliver any certificates of title required to convey ownership of any motor vehicles or similar equipment owned by Sellers, if acknowledgement or endorsement thereof is required by Purchaser;

(i) deliver appropriate evidence of all necessary Entity action by Purchaser in connection with the Contemplated Transactions, including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's general partner(s) approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement; and (ii) a certificate as to the incumbency of those officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions; and

(j) deliver any such other documents, funds or other things reasonably requested by Sellers or contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

3.4 <u>Sales, Use and Other Taxes</u>Any and all sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (collectively, the "***Transfer Taxes***") shall be in addition to the Purchase Price and borne and paid by Purchaser.

3.5 <u>Possession and Risk of Loss</u>Right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date. Sellers shall transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Purchased Assets, and shall also make available to Purchaser at their then existing locations the originals of all documents in Sellers' actual possession that are required to be transferred to Purchaser by this Agreement. The risk of loss of or damage or destruction to any of the Acquired Restaurants to be conveyed to Purchaser under this Agreement shall be borne by Sellers to the time of Closing.

3.6 <u>Closing Date</u>All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or

DOCS_SF:87686.15 98003/001

Case 2:15-bk-09178-PS Doc 13-1 Filed 07/22/15 Entered 07/22/15 21:32:12 Desc
Exhibit B Page 13 of 57

transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected. Unless provide otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

4.      Conditions Precedent to Closing.

        4.1      Conditions to Sellers' Obligations Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Sellers):

                (a)      All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects, and Purchaser shall have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing, and Sellers shall have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.2 either have been satisfied or have been waived by Purchaser.

                (b)      Purchaser shall have tendered delivery of all items required to be delivered by Purchaser under Section 3.3.

                (c)      No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a Claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

                (d)      The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with Section 9 below and the Sale Order shall not have been stayed as of the Closing Date.

        4.2      Conditions to Purchaser's Obligations Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Purchaser):

                (a)      All of the representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects, and Sellers shall have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is required to be performed at or before the Closing (provided, however, that Sellers shall have performed in all respects its covenants hereunder to sell, assign, transfer, convey and deliver to Purchaser all of the Sellers' right, title and interest in and to all Purchased Assets free and clear of all Encumbrances), and Purchaser shall have received a certificate by officers of Sellers,

12

dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in <u>Section 4.1</u> either have been satisfied or have been waived by Sellers.

(b)     Sellers shall have tendered delivery of all items required to be delivered by Sellers under <u>Section 3.2</u>.

(c)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)     The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with <u>Section 9</u> below and the Sale Order shall not have been stayed as of the Closing Date.

5.     <u>Sellers' Representations and Warranties.</u>

Each of the Sellers hereby makes the following representations and warranties to Purchaser:

5.1     <u>Organization</u>Each of the Sellers has all requisite entity power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, to operate its properties, carry on the Business as now being conducted, and to enter into this Agreement and to consummate the Contemplated Transactions.

5.2     <u>Validity and Enforceability</u>The execution, delivery and performance of this Agreement by each of the Sellers and the consummation by each of the Sellers of the Contemplated Transactions have been duly authorized by all requisite corporate action. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by each of the Sellers and (assuming this Agreement constitutes a valid and binding agreement of Purchaser) constitutes a valid and binding agreement of each of the Sellers, enforceable against each of the Sellers in accordance with its terms, except as to the effect, if any, of the Standard Exceptions to Enforceability.

5.3     <u>No Conflict</u>Subject to the entry of the Sale Order, neither the execution, delivery or performance of this Agreement by any of the Sellers, nor the consummation by any of the Sellers of the Contemplated Transactions, nor compliance by any the Sellers with any of the provisions hereof, (a) conflict with or result in any breach of the articles of incorporation or bylaws of Sellers, (b) result in a violation or breach of, or constitute (with or without notice or lapse of time) a default (or give rise to any right of termination, cancellation, vesting, payment, exercise, acceleration, suspension or revocation) under, any of the terms, conditions or provisions of, any note, bond, mortgage, deed of trust, security interest, or Contract to which any of the Sellers is a party or by which any of the Sellers' properties or assets may be bound or affected, (c) violate any Legal Requirement applicable to the Sellers or to the Sellers' properties

DOCS_SF:87686.15 98003/001

or assets, (d) result in the creation or imposition of any Encumbrance on any asset of the Sellers, or (e) cause the suspension or revocation of any Business Permits or Licenses.

5.4　Litigation Except for the contemplated Chapter 11 Case and except as set forth in Schedule 5.4 hereto, there is no material Legal Proceeding pending that, once the Sale Order is given effect, will result in any Liability on Purchaser or, to the Sellers' Knowledge, threatened against or affecting any of the Sellers that would likely result in the imposition of any Liability on Purchaser or in respect of the Purchased Assets, nor is there any material judgment or Order of any Governmental Body outstanding against Sellers.

5.5　Broker's or Finder's Fees No agent, broker, person or firm acting on behalf of any of the Sellers is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions; *provided*, *however*, the Seller's investment banker, Mastodon Ventures, Inc. shall seek the Bankruptcy Court's approval to receive a transaction fee in accordance with the terms its retention application and upon notice and hearing, which, if approved, shall be paid with the Proceeds of the Cash Purchase Price.

6.　Purchaser's Warranties and Representations.

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser hereby makes the following representations and warranties to Sellers as of the Closing Date:

6.1　Organization Purchaser is a limited partnership duly formed, validly existing and in good standing under the laws of Texas. Purchaser has all requisite limited partnership power and authority to own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2　Validity and Enforceability This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by the Standard Exceptions to Enforceability.

6.3　No Conflict The execution, delivery and performance of this Agreement and all writings relating hereto by Purchaser have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser; (ii) violate any Legal Requirement; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4　Financial Resources The Purchaser has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constraints, conditions or

contingencies that could in any way materially affect the Purchaser's ability to consummate the Contemplated Transactions or perform hereunder.

6.5 <u>Broker's or Finder's Fees</u>No agent, broker, person or firm acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Sellers in connection with the Contemplated Transactions.

7. <u>"AS IS" Transaction</u>

Purchaser hereby acknowledges and agrees that, except only as provided in <u>Section 5</u> above, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Restaurant Lease, the zoning of any real property or improvements which are the subject of any Restaurant Lease, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Sellers' Contract, the merchantability or fitness of the Furniture and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof). Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in <u>Section 5</u> above, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

8. <u>Covenants</u>

8.1 <u>Liquor License Approvals</u>. Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's filings with any Governmental Body or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer and/or issuance of the Liquor Licenses to Purchaser ("**Liquor License Approvals**"), including by entering into the Management Agreement and, if reasonably requested by Purchaser, initiating and/or participating, at no cost or expense to Sellers and with reasonable assurances from Purchaser against any potential Liability in connection therewith, in such Legal Proceedings reasonably requested by Purchaser to obtain such Liquor License Approvals.

8.2 <u>Adequate Assurance Regarding Purchased Contracts</u>. With respect to each Purchased Contract and Restaurant Lease set forth on <u>Schedule 1.1(g)</u>, Purchaser shall provide adequate assurance of the future performance of such Purchased Contract and

15

Restaurant Lease by Purchaser as required by sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable and Purchaser shall bear all risk associated with any failure by Purchaser to make such showing to the Bankruptcy Court's satisfaction.

8.3     Personally Identifiable Information. Purchaser shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

9.     Bankruptcy Court Approvals.

9.1     Promptly following the Effective Date (and in no event later than five (5) days thereafter), Sellers shall make a motion (the "*Sale Motion*") for an order by the Bankruptcy Court, substantially in the form attached hereto as Exhibit "H," approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement (the "*Sale Order*").  Any material changes to the form of the Sale Order must be approved by Purchaser and Sellers in their respective sole discretion.  If requested by Sellers or the Bankruptcy Court, Purchaser shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Sellers' Contracts.

9.2     As part of the Sale Motion (or pursuant to a separate motion in the Sellers' sole discretion), Sellers shall also request and use commercially reasonable efforts to obtain from the Bankruptcy Court an order (the **"Procedures Order"**) in the form and content attached as Exhibit "I."

9.3     Following the filing of the Sale Motion, Sellers shall use commercially reasonable efforts to obtain both the Procedures Order and the Sale Order.

10.     Commercially Reasonable Efforts. Subject to the terms and conditions of this Agreement:

10.1     During the period prior to Closing, Sellers and Purchaser shall (a) use their commercially reasonable efforts (i) to cause the conditions in Section 4 to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Sellers and Purchaser pursuant to Section 3.2 and Section 3.3, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

10.2     From and after the Closing, Sellers and Purchaser shall use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the Contemplated transactions and to carry out the provisions hereof; provided that nothing herein shall require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this Agreement, (ii) involve any cost or expense (individually or in the aggregate) that is not

16

nominal in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

10.3    From and after the Closing, Purchaser and Sellers shall reasonably cooperate in the transition of the Business from Sellers to Purchaser, provided that neither Party shall be required to expend other than nominal unreimbursed costs in providing such cooperation.

11.    <u>Conduct Pending Closing.</u>

11.1    Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, from the Effective Date until the Closing Date, Sellers shall operate the Business in the ordinary course of business (taking into account Sellers' status as debtors-in-possession) and consistent with good industry practices, comply with all Legal Requirements applicable to the operation of its business and preserve its present business organization intact.

11.2    Sellers shall promptly inform Purchaser in writing of the occurrence or non-occurrence of any event actually known by Sellers that would cause any condition set forth in <u>Section 4.2</u> not to be satisfied or the breach of any covenant hereunder by Sellers.

11.3    Purchaser and Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives shall be authorized and entitled, in Purchaser's discretion and without the involvement or presence of Sellers or their agents, to contact and to enter into discussions and negotiate with Sellers' landlords, lenders, bankers, vendors, suppliers, strategic business partners and other third parties, including but not limited to Governmental Bodies, regarding the Contemplated Transactions and Purchaser's potential business relationships with such persons following the Closing, and Sellers shall provide contact information and other reasonable cooperation to Purchaser in connection with such activities.  From the date of this Agreement through the Closing Date, Sellers shall afford Purchaser and such persons reasonable access during ordinary business hours to Sellers employees, consultants and independent contractors and to all the books and records of Sellers relating to the Business or to the assets or Liabilities of Sellers and shall furnish to Purchaser and such persons, as promptly as practicable, all other information as Purchaser or any of such persons may reasonably request in furtherance of the Contemplated Transactions.

11.4    Each Party agrees that it will not make any public announcement or issue any press release or respond to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the other Party (which approval will not be unreasonably withheld), except as may be required (i) by any applicable Legal Requirement, or (ii) to administer the Chapter 11 Cases.

12.    <u>Break Up Fee and Expense Reimbursement.</u>

12.1    Sellers agree and acknowledge that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant

17

commitment of resources by Purchaser, and that the negotiation and execution of this Agreement have provided value to Sellers. Therefore, on the terms and expressly subject to the conditions precedent set forth in this Section 12 and the Procedures Order, Sellers shall pay or cause Purchaser to be paid cash in an amount equal to 4% of the Purchase Price as a break-up fee (the "***Break-Up Fee***"), to be paid after the closing from the proceeds of an Alternative Transaction.

12.2    Sellers' payment obligations under Section 12.1 with respect to the Break-Up Fee shall be payable to Purchaser as and when provided in the Procedures Order and expressly subject to the conditions precedent set forth in the Procedures Order.  As provided in the Procedures Order, the Break-Up Fee shall be paid from and out of (and only from and out of) the proceeds of an Alternative Transaction occurring within sixty (60) days following the termination of the Contemplated Transactions.

12.3    Sellers' obligation to pay the Break-Up Fee in accordance with the terms and conditions of the Procedures Order shall survive the termination of this Agreement.

12.4    As used in this Agreement, "***Alternative Transaction***" means any one of the following: (a) a sale of all or substantially all the Purchased Assets to a buyer or buyers not affiliated with Purchaser, either under section 363 of the Bankruptcy Code, a plan under Chapter 11 of the Bankruptcy Code, or otherwise; (b) the confirmation of a Chapter 11 plan in the Chapter 11 Cases contemplating one or more transactions involving the Purchased Assets materially inconsistent with the Contemplated Transactions; (c) any transaction involving the Purchased Assets materially exclusive, legally or practically, with the consummation of the Contemplated Transactions.

13.    Employee Matters.

13.1    Prior to the Closing, Purchaser shall offer to employ, commencing immediately following the Closing, all employees of Seller at their salaries, wages, compensation levels, benefits, and terms and conditions of employment applicable to their employment by Sellers immediately prior to the Closing, except those employees listed on Schedule 13.1. Such employees who become employees of Purchaser shall be collectively referred to as the **"Transferred Employees"** and shall be terminated by Sellers effective immediately prior to the Closing.  Purchaser shall give Transferred Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by the Purchaser in which such Transferred Employees participate for such Transferred Employees' service with the Seller.

13.2    From the Effective Date until the Closing Date, Sellers may not materially alter the salary, wages, compensation level, benefits, terms or conditions of employment for any employee, irrespective of whether the employee is a Transferred Employee or not.

13.3    With respect to any welfare benefit plans maintained by Purchaser for the benefit of Transferred Employees on and after the Closing Date, Purchaser shall (i) cause there to be waived any eligibility requirements or pre-existing condition limitations, and (ii) give effect, in determining any deductible and maximum out-of-pocket limitations,

DOCS_SF:87686.15 98003/001

amounts paid by such Transferred Employees with respect to benefit plans maintained by Sellers.

13.4    Sellers shall retain and shall be responsible for paying and discharging all liabilities for vacation time, sick leave, personal leave and other compensated time off accrued by those of Sellers' employees who do not become Transferred Employees at the Closing.

13.5    Purchaser shall provide group health plan continuation coverage, pursuant to the requirements of COBRA, to all Sellers employees, former employees of Sellers receiving group health plan continuation coverage from Sellers on the Closing Date, and former employees of Sellers who are in a COBRA-election period on the Closing Date, each only to the extent that such persons:  (i) properly request such coverage; (ii) will not be hired by Purchaser; and (C) timely pay for such coverage.

13.6    Sellers shall be solely liable for complying with the WARN Act and any and all comparable state law obligations (and for any failures to so comply), in any case, applicable to employees of Sellers who do not become Transferred Employees for any reason (including, for the avoidance of doubt, any employees of Sellers who do not accept and commence employment with Purchaser).  Purchaser shall be solely liable for complying with the WARN Act and any and all comparable state law obligations (and for any failures to so comply), that become applicable to any Transferred Employees with respect to events occurring after the Closing Date. Purchaser shall be solely responsible for all Liabilities relating to or arising in connection with any actual, constructive or deemed termination of employment by Purchaser of any Transferred Employee after the Closing Date.

14.    Termination.

14.1    Termination by Mutual Consent. This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

14.2    Termination by Either Purchaser or Sellers. This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Sellers if any Governmental Body shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and either (i) thirty (30) days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

14.3    Termination by Sellers. This Agreement may be terminated at any time prior to the Closing Date by Sellers as follows:

(a)    if there has been a material breach by Purchaser, which breach Purchaser has failed to cure within fourteen (14) days following its receipt of written notice thereof from Sellers;

(b)    if any condition precedent of Sellers specified in Section 4.1 shall not have been satisfied or waived and shall have become impossible to satisfy, unless the

19

failure of such condition to have been satisfied was caused primarily by a material breach by Sellers;

        (c)     if the Procedures Order is not entered by the Bankruptcy Court by twenty-one (21) days after the Petition Date; or

        (d)     the Sale Order is not entered by the Bankruptcy Court by forty-nine (49) days after the entry of the Procedures Order;

        (e)     if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Sellers' failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Sale Order by the dates set forth herein.

       14.4    <u>Termination by Purchaser</u>This Agreement may be terminated at any time prior to the Closing Date by Purchaser as follows:

        (a)     If the Petitions initiating the Chapter 11 Cases have not been filed by July 22, 2015;

        (b)     if the Procedures Order is not entered by the Bankruptcy Court by twenty-one (21) days after the Petition Date;

        (c)     the Sale Order is not entered by the Bankruptcy Court by forty-nine (49) days after the entry of the Procedures Order;

        (d)     if there has been a material breach by Sellers, which breach Sellers have failed to cure within fourteen (14) days following its receipt of written notice thereof from Purchaser;

        (e)     if any condition precedent of Purchaser specified in <u>Section 4.2</u> shall not have been satisfied or waived or, in the reasonable judgment of Purchaser, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser;

        (f)     if the Bankruptcy Court enters any Order approving any Alternative Transaction or confirming any Chapter 11 Plan involving any Alternative Transaction; or

        (g)     if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Purchaser's failure to meet its obligations hereunder;

        (h)     if the Chapter 11 Case shall be dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Chapter 11 Case; or

DOCS_SF:87686.15 98003/001

(i)     if for any reason (other than Purchaser's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of section 365 of the Bankruptcy Code or applicable nonbankruptcy law and section 365(c)(1) prohibits assignment without the counterparty's consent) Sellers are unable, or fail, to assume and assign to Purchaser at the Closing all Purchased Contracts.

14.5    Effect of Termination In the event of termination by either Party of this Agreement pursuant to this <u>Section 14</u>, written notice thereof shall as promptly as practicable be given to the other Party and thereupon this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by the Parties hereto.  Upon termination of this Agreement, (a) except as otherwise provided in this Agreement, this Agreement shall cease to have any force or effect, (b) the Parties shall not have any liability to each other, except for fraud occurring on or before the date of such termination; <u>provided</u>, <u>however</u>, that if this Agreement is terminated by reason of (i) any material breach hereof by the non-terminating Party or (ii) any material non-compliance by the non-terminating Party with its obligations under this Agreement, which non-compliance shall have been the cause of the failure of one or more of the conditions to the terminating Party's obligations to effect the Contemplated Transactions to have been satisfied, the terminating Party's right to pursue any available remedies at law will survive such termination unimpaired, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to <u>Sections 2.2</u>, <u>12</u>, <u>14.5</u>, <u>16.1</u>, <u>16.2</u>, <u>16.3</u>, <u>16.4</u>, <u>16.5</u>, <u>16.6</u>, <u>16.7</u>, <u>16.8</u>, <u>16.9</u>, <u>16.11</u>, <u>16.12</u>, <u>16.13</u>, <u>16.14</u>, <u>16.15</u>, <u>16.16</u>, <u>16.17</u>, <u>16.18</u>, <u>16.19</u>, <u>16.20</u>, and <u>16.21</u> (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the government authority or person to which made.

14.6    Notification of Certain Events Sellers shall give notice to Purchaser promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Purchaser to effect the Contemplated Transactions not to be satisfied.  If Sellers give Purchaser a notice pursuant to this <u>Section 14.6</u>, then Purchaser shall be permitted to terminate this Agreement pursuant to <u>Section 14.4</u>.

15.     <u>Post-Closing Matters.</u>

15.1    <u>Further Conveyances and Assumptions</u>.

(a)     From time to time following the Closing, Sellers shall make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be

DOCS_SF:87686.15 98003/001

conveyed to Purchaser under this Agreement and to assure fully to each of the Sellers and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions. For the avoidance of all doubt, nothing herein shall require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this Agreement, (ii) involve any cost or expense (individually or in the aggregate) that is not nominal in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

15.2 <u>Reasonable Access to Records and Certain Personnel</u>For a period of one (1) year following the Closing, (i) the Purchaser shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and their respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include (xx) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Purchaser's business operations.

16. <u>Miscellaneous.</u>

16.1 <u>Attorneys' Fees</u>In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

16.2 <u>Notices</u>Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other shall be deemed effected upon personal delivery in writing, one Business Day after being dispatched by reputable overnight courier (*e.g.*, FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission) or in the case of delivery by email, as of the date of the email transmission (with read-receipt enabled). Notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this <u>Section 16.2</u>.

To Seller(s):    Z'Tejas Holdings, Inc.
                  6909 E. Greenway Parkway
                  Suite 195
                  Scottsdale, AZ 85254

Facsimile: 480.612.6392
Attn: Steven Micheletti
Email: stevenm@ztejas.com

With a copy to (which shall not constitute notice):

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
Thirteenth Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz
John W. Lucas
Email: jpomerantz@pszjlaw.com
jlucas@pszjlaw.com
Facsimile: (310) 201-0760


To Purchaser: Cornbread Ventures, LP
12912 Hill Country Boulevard
Building F-201
Austin, TX 78738
Attn: Michael Stone
Email: mstone@thestonegroupcre.com

With a copy to (which shall not constitute notice):

Perkins Coie LLP
2901 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
Attn: Jordan A. Kroop
Email: jkroop@perkinscoie.com


16.3    Entire AgreementThis Agreement and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Business and replace the Letter of Intent in its entirety. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

16.4    ModificationThis Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

16.5    SeverabilityShould any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

16.6    CaptionsAll captions, Section titles and headings contained in this Agreement are for convenience of reference only and shall be without substantive meaning or

DOCS_SF:87686.15 98003/001

context of any kind whatsoever and shall not be construed to limit or extend the terms or conditions of this Agreement.

16.7    Waiver    No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver; *provided, however*, that the Consent of a Party to the Closing shall constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

16.8    Payment of Fees and Expenses    Except as provided in Sections 12 and 16.1 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

16.9    Survival    The respective representations and warranties of Purchaser and Sellers under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.  Except as provided in the immediately preceding sentence, the covenants and agreements of Sellers and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

16.10    Assignments    This Agreement shall not be assigned by Sellers or Purchaser without the prior written consent of the other(s), which consent Purchaser or Sellers may grant or withhold in their respective sole and absolute discretion.

16.11    Binding Effect    This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

16.12    Applicable Law    This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of Arizona applicable to contracts made and performed in such State.

16.13    Construction    In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

16.14    CONSENT TO JURISDICTION    THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN A FEDERAL COURT OF THE UNITED STATES SITTING IN THE CITY OF PHOENIX, ARIZONA, (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C)

DOCS_SF:87686.15 98003/001

CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN <u>SECTION 16.2</u> (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY ARIZONA LAW).

16.15   <u>Counterparts</u>This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

16.16   <u>Non-Recourse</u>No past, present or future stockholder, director, officer, employee, or incorporator of Sellers or Purchaser shall have any liability for any obligation or liability of Sellers or Purchaser, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the Contemplated Transactions except for any claim against any individual based on the fraud or gross negligence of such individual in connection with any representations of Sellers or Purchaser hereunder, as the case may be.

16.17   <u>Time is of the Essence</u>Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

16.18   <u>Interpretation and Rules of Construction</u>In this Agreement, except to the extent that the context otherwise requires:

(a)   when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)   the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)   the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)   all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)     references to a person are also to its permitted successors and assigns; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

16.19   <u>Third Party Beneficiaries</u>This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any person or entity other than the Parties hereto, and their respective permitted assigns.

16.20   <u>Liquidated Damages as Sole Remedy of Sellers</u>**THE PARTIES ACKNOWLEDGE THAT SELLERS' ACTUAL DAMAGES IN THE EVENT THAT THE CONTEMPLATED TRANSACTIONS ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY SEPARATELY EXECUTING THIS <u>SECTION 16.20</u> BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE DEPOSIT THAT IS THE SUBJECT OF <u>SECTION 2.2</u> OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF THE SELLERS' DAMAGES, AND AS THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST THE PURCHASER (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD), WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF THE PURCHASER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.**

(b)     **BY SEPARATELY EXECUTING THIS <u>SECTION 16.20</u> BELOW THE PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.**

**SELLERS:**          _____

**PURCHASER:**     _____

DOCS_SF:87686.15 98003/001

16.21    <u>Liquidated Damages as Sole Remedy of Purchaser</u>.

(a)    **THE PARTIES ACKNOWLEDGE THAT PURCHASER'S ACTUAL DAMAGES IN THE EVENT THAT THE CONTEMPLATED TRANSACTIONS ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.    THEREFORE, BY SEPARATELY EXECUTING THIS <u>SECTION 16.21</u> BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE BREAK-UP FEE, WHICH IS THE SUBJECT OF <u>SECTION 12</u> OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF THE PURCHASER'S DAMAGES, AND AS THE PURCHASER'S SOLE AND EXCLUSIVE REMEDY (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD) AGAINST THE SELLER, WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF THE SELLERS TO PERFORM ANY OF THEIR OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.**

(b)    **BY SEPARATELY EXECUTING THIS <u>SECTION 16.21</u> BELOW THE PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.**

**SELLERS:**    _____

**PURCHASER:**    _____

17.    <u>Definitions</u>In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms shall have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined).    The exhibits and schedules referenced in this <u>Section 17</u> and throughout the Agreement are deemed to be part of the Agreement and are incorporated herein by reference.

"***Acquired Restaurant***" means those restaurants which are operated at the premises leased pursuant to a Restaurant Lease.

"***Affiliate***" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

27

"***Agreement***" shall have the meaning provided for in the preamble.

"***Allocation Schedule***" shall have the meaning provided for under Section 2.7.

"***Alternative Transaction***" shall have the meaning provided for under Section 12.4.

"***Assignment of Restaurant Leases***" shall have the meaning provided for under Section 3.2(b).

"***Assignment of Intangible Property Assets***" shall have the meaning provided for under Section 3.2(d).

"***Assignment of Other Contracts***" shall have the meaning provided for under Section 3.2(c).

"***Assumed Liabilities***" shall have the meaning provided for under Section 2.3.

"***Assumption of Liabilities***" shall have the meaning provided for under Section 3.3(h).

"***Avoidance Action***" means all preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"***Bankruptcy Code***" shall have the meaning provided for under Recital B.

"***Bankruptcy Court***" shall have the meaning provided for under Recital B.

"***Bill of Sale***" shall have the meaning provided for under Section 3.2(e).

"***Break-Up Fee***" shall have the meaning provided for under Section 12.1.

"***Business***" shall have the meaning provided for under Recital A.

"***Business Day***" means any day other than a Saturday or Sunday or a legal holiday on which banks in Arizona are closed.

"***Business Permit***" means any business permit, license, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted by any Governmental Body having jurisdiction over the Business.

"***Cancelled Debt***" shall have the meaning provided for under Section 2.1.

"***Cash Purchase Price***" shall have the meaning provided for under Section 2.1(a).

"***Chandler Debt***" has the meaning ascribed in Section 2.1.

"***Chandler Debt Obligations***" means the prepetition secured claims arising under that certain Loan Agreement between Z'Tejas Chandler, Inc. (the predecessor in interest to Debtor Z'Tejas, Inc.) and GE Capital Franchise Finance Corporation (or its assignee or purchaser) and the judgment therefor.

"***Chapter 11 Cases***" shall have the meaning provided for under Recital B.

"***Chapter 11 Plan***" shall have the meaning provided for under Section 11.6.

"***Claim***" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements.

DOCS_SF:87686.15 98003/001

"***Closing***" shall have the meaning provided for under <u>Section 3.1</u>.

"***Closing Date***" shall have the meaning provided for under <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Consent***" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

"***Contemplated Transactions***" shall have the meaning provided for under <u>Recital C</u>.

"***Contract***" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

"***Copyright***" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Credit Bid Amount***" has the meaning ascribed in Section 2.1.

"***Cure Cost***" means the amount required to be paid as a cure amount under Section 365 of the Bankruptcy Code so that Sellers may sell, assume and assign any Purchased Contract to Purchaser.

"***Deposit***" shall have the meaning provided for under <u>Section 2.2(a)</u>.

"**Designation Notice**" has the meaning set forth in <u>Section 2.7(c)</u>.

"**Designation Rights Asset**" has the meaning set forth in <u>Section 2.7(c)</u>.

"**Designation Rights Period**" means the period commencing on the Closing Date and ending six (6) months after the Closing Date; *provided*, *however*, that such period shall end 210 days after the Petition Date for any Designation Rights Asset that is a Restaurant Lease, pursuant to section 365 of the Bankruptcy Code, unless such deadline is extended by the applicable landlord.

"***Domain Name***" means the internet domain names owned by Sellers, and all registrations, applications and renewals related to the foregoing.

"***Effective Date***" shall have the meaning provided for in the preamble.

"***Encumbrance***" means any claim, lien, pledge, option, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"***Entity***" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"***Excluded Assets***" shall have the meaning provided for under <u>Section 1.2</u>.

29

"***Excluded Contract***" means any Sellers' Contract that is not a Purchased Contract.

"***Excluded Liability***" shall have the meaning provided for under <u>Section 2.4</u>.

"***Expense Reimbursement***" shall have the meaning provided for under <u>Section 11.1</u>.

"***Final Order***" means an Order of the Bankruptcy Court the operation or effect of which has not been stayed, reversed or amended, and as to which Order the time to appeal or to seek review or rehearing has expired and as to which (i) no appeal or request for review or rehearing was filed, or (ii) if an appeal or request for review or rehearing was filed, such appeal or request for review or rehearing is no longer pending.

"***Furniture and Equipment***" means all fixtures and other Leasehold Improvements, counters, POS system, hoods, washers, disposal systems, ovens, grills, friers, refrigeration units, artwork, racks, stands, displays, counters, desks, chairs, tables, dispensers, and other furniture and furnishings, Hardware, vehicles, tools, smallware, and other equipment (copiers, fax machines, telephone lines and numbers, and other telecommunication equipment), and miscellaneous office and store supplies and other items of tangible personal property owned or used by the Sellers in the conduct of the Business. As used herein, the Furniture and Equipment does not include any tangible property held by the Sellers pursuant to a Contract where Purchaser does not assume at the Closing the underlying Contract relating to such property.

"***Gift Certificates***" means any gift certificates, gift cards, or food/beverage credits that are issued by Seller and required to be honored by Sellers in the ordinary course of business prior to the Closing Date.

"***Governmental Body***" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multinational organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"***Intangible Property Assets***" means any Intellectual Property Assets or Other Intangible Property owned or held by the Sellers. As used in this Agreement, Intangible Property Assets shall in all events exclude: (i) any materials containing information about employees (other than Transferred Employees), disclosure of which is prohibited under applicable law, and (ii) any software or other item of intangible property held by the Sellers pursuant to a license or other Contract where Purchaser does not assume the underlying Contract relating to such intangible personal property at the Closing.

"***Intellectual Property Assets***" means intellectual property or other proprietary rights of Sellers of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Trademark Rights, Copyrights, Domain Names, Technology and trade secrets.

"***Inventory***" means all food, paper products, and other items of inventory owned and held by Sellers or used in connection with the Business, wherever located.

"**_Knowledge_**" of a Person means such Person's actual, current knowledge and, with respect to Sellers' knowledge, refers only to the knowledge of Steven Micheletti.

"**_Large Party Deposit_**" means any cash deposit, prepayment, down-payment, or reservation fee made to the Sellers in connection with a Large Party Reservation.

"**_Large Party Reservation_**" means a reservation for space, food, beverage, and associated service for any party larger than 12 people at any Acquired Restaurant made with the payment of a Large Party Deposit for a date and time after the Closing Date including, for example, a large family party or gathering, a corporate party or function, or a similar group function planned in advance.

"**_Leasehold Improvements_**" means any leasehold improvements or appurtenances to such improvements (including, without limitation, buildings, structures, storage areas, driveways, walkways, planters, landscaping and parking areas).

"**_Legal Requirement_**" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, notice requirement, guideline, Order, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"**_Liability_**" means any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

"**_Liquor License_**" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller.

"**_Management Agreement_**" means the agreement substantially in the form attached as Exhibit G.

"**_Order_**" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Body that is binding on any Person or its property under applicable law.

"**_Other Contract_**" means any Sellers' Contract other than the Restaurant Leases.

"**_Other Intangible Property Assets_**" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Sellers, including, without limitation, (A) the books and records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone numbers identified with the Business; and (C) all goodwill of the Business.

"**_Other Lease_**" means any Sellers' Contract that is a lease other than a Restaurant Lease.

"**_Outside Date_**" means September 30, 2015.

"**_Parties_**" shall have the meaning provided for in the preamble.

"**_Patent_**" means the United States patents and patent applications owned by the Sellers,

including, any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Person*" means an individual, Entity or Governmental Body.

"*Petition*" means the petition that commenced the Chapter 11 Cases.

"*Petition Date*" means the date of the filing of the Petition with the Bankruptcy Court.

"*Postpetition Debt*" has the meaning ascribed in Section 2.1.

"*Prepetition First Lien Debt*" means the obligations arising under those promissory notes, dated November 16, 2011, with an original principal amount of $7,500,000 in the aggregate, issued by the Debtors to Northern Bank of Arizona and currently held and owned by KarpReilly Investments, LLC or any subsequent purchaser thereof..

"*Prepetition Secured Debt*" means the Prepetition First Lien Debt and Chandler Debt Obligations.

"*Purchase Price*" shall have the meaning provided for under Section 2.1(a).

"*Purchased Assets*" shall have the meaning provided for under Section 1.1.

"*Purchased Contract*" is defined in Section 1.1(e) hereof.

"*Purchaser*" shall have the meaning provided for in the preamble.

"*Receivables*" shall have the meaning provided for under Section 1.1(f).

"*Restaurant Lease*" means any real property lease set forth on Schedule 1.1(g) by any of the Sellers under which a Restaurant is the leased premises, together with all rights and interests of the Sellers relating thereto, whether held directly by the Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, all buildings and improvements thereon or forming a part thereof and all easements, licenses, rights and appurtenances thereto and associated with such Purchased Lease).

"*Restaurant Petty Cash*" shall mean petty cash of Sellers on the premises of the Acquired Restaurants, other than Excluded Petty Cash.

"*Sale Hearing*" means the hearing conducted by the Bankruptcy Court to approve the Contemplated Transactions.

"*Sale Motion*" shall have the meaning provided for under Section 9.1.

"*Sale Order*" shall have the meaning provided for under Section 9.1.

"*Sellers*" shall have the meaning provided for in the preamble.

"*Sellers' Contract*" means any Contract (a) to which any of the Sellers is a party or by which any of the Sellers is bound and (b) that is related to the Business.

"*Standard Exceptions to Enforceability*" means any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or

by equitable principles (regardless of whether considered in a proceeding at law or in equity).

"***Subsidiary***" means, with respect to any Person, (a) any corporation of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation, is held, directly or indirectly by such Person and (b) any partnership or limited liability company of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership or limited liability company.

"***Tax***" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Return***" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Technology***" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"***Trademarks***" means all trademark registrations and applications for trademark registration owned by Sellers, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Trademark Rights***" means all common law rights in the United States in any trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Sellers, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

"***Transaction Expenses***" shall have the meaning provided for under <u>Section 12.7</u>.

"***Transfer Taxes***" shall have the meaning provided for under <u>Section 3.4</u>.

"***Transferred Employee***" means any employee of any of the Sellers, upon accepting an offer of employment from Purchaser.

"***Utilities***" shall have the meaning provided for under <u>Section 2.6</u>.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder, or any formulation of similar rights arising under applicable state law.

DOCS_SF:87686.15 98003/001

*[SIGNATURE PAGES FOLLOW; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

DOCS_SF:87686.15 98003/001

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**PURCHASER:**

Cornbread Ventures, LP    ,
a Texas limited partnership

By: _____
Name: Michael Stone
Its:    President

**SELLERS:**

**Z'Tejas, Inc., a Delaware corporation**

By: _____
Name: Steven Micheletti
Its:    President and Chief Financial Officer

**Z'Tejas Restaurant Holdings, LP, a Delaware Limited partnership**

By: _____
Name: Steven Micheletti
Its:    Manager

**Z'Tejas 6th Street, LLC, a Texas limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager

**Z'Tejas Scottsdale, LLC, an Arizona limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager

**Z'Tejas of Arboretum, LLC, a Texas
limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager


**Z'Tejas Grill Gateway, LLC, an Arizona
limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager


**Z'Tejas Summerlin, LLC, an Arizona
limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager


**Z'Tejas Tempe, LLC, an Arizona
limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager


**Z'Tejas Chandler, LLC, an Arizona
limited liability company**

By: _____
Name: Steven Micheletti
Its:    Manager

**Z'Tejas Costa Mesa, LLC, a California limited liability company**

By: _____
Name: Steven Micheletti
Its: Manager

**Z'Tejas Salt Lake City, LLC, a Utah limited liability company**

By: _____
Name: Steven Micheletti
Its: Manager

**Z'Tejas Avery Ranch, LLC, a Texas limited liability company**

By: _____
Name: Steven Micheletti
Its: Manager

**Z'Tejas La Cantera, LLC, a Texas limited liability company**

By: _____
Name: Steven Micheletti
Its: Manager

**Z'Tejas Bethany Home LLC, an Arizona limited liability company**

By: _____
Name: Steven Micheletti
Its: Manager

**Taco Guild Osborne LLC, a Arizona
limited liability company**

By: _____

Name: Steven Micheletti

Its:     Manager

## SCHEDULES

**[To be attached]**

DOCS_SF:87686.15 98003/001

**Exhibit "A"**


**ASSIGNMENT AND ASSUMPTION OF RESTAURANT LEASE**

This Assignment and Assumption of Restaurant Lease (this "*Assignment*") made and entered into as of _____, 2015 by and between [*Insert name of applicable Seller*], each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (the "*Assignor*") and _____, a _____ (the "*Assignee*").

Assignors and Assignee acknowledge that:

A.   Assignor is the tenant(s) of certain real property premises located at _____ (the "*Restaurant*") under that certain real property lease dated _____ between such Assignor, as lessee, and _____, as lessor (the "*Landlord*"), as amended _____ (as so amended, the "*Lease*").

C.   Assignor and various Affiliates of Assignor, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated May \_\_\_, 2015 (the "*Purchase Agreement*"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

D.   Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the Contemplated Transactions. Assignor and Assignee are executing and delivering this Assignment in satisfaction of certain obligations of Assignor and Purchaser pursuant to Sections 3.2 and 3.3 of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, and intending to be legally bound hereby, Assignors and Assignee hereby agree as follows:

**Assignment**.   Assignor hereby sells, assigns and transfers to Assignee, all interest of Assignors, as tenant(s), in and to the Restaurant and the Lease, a copy of which Lease is attached hereto as *Exhibit "A."* Assignor makes no representations and warranties of any kind whatsoever with respect to the Lease.

**Assumption**.   Assignee hereby accepts the foregoing assignment of the Lease, and does hereby assume the duties and obligations of tenant under the Lease, thereunder accruing from and after the Effective Date, and does hereby agree to be bound by and to perform or cause to be performed, as a direct obligation to Landlord, each and all of the terms, conditions, covenants and provisions to be done, kept and performed under such Lease accruing from and after the Effective Date, to the same extent as if Assignee had been an original party thereto.

**Assignee's Indemnification**.   Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignors) and hold Assignors free, clear and harmless from and against any and

all claims, demands, suits, causes of actions, penalties, liabilities, costs, fees and expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and costs for the performance or nonperformance of Assignee's obligations under the Lease, which accrued from and after the Effective Date.

**Attorneys' Fees.**   In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**Amendments.**   This Assignment may only be amended by a writing signed by both Assignor and Assignee.

**Delivery Pursuant to Purchase Agreement.**   Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

**Governing Law.**   This Assignment shall be governed by and construed and enforced in accordance with the laws of [_____], without giving effect to the conflicts of laws provisions thereof.

**Counterparts**.   This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original, but both of which, taken together, shall be deemed one original document.

**Execution in Counterparts.**   This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

3

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

**ASSIGNOR:**

_____, a
_____,
Chapter 11 Debtor and Debtor in
Possession


By: _____
Name: _____
Its: _____

**ASSIGNEE:**

_____,
a _____


By: _____
Name: _____
Its: _____

**Exhibit "C"**

**ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS**

This Assignment and Assumption of Leases and Contracts (this "***Assignment***") is entered into as of _____, 2015, by and among _____, a _____ and _____, a _____, each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (collectively, the "***Assignors***"), and _____, a _____ (the "***Assignee***").

Assignors and Assignee acknowledge that:

A.     Assignors, as Sellers, and Assignee, as Purchaser, have heretofore entered into that certain Asset Purchase Agreement dated as of May ____, 2015 (the "***Purchase Agreement***").  Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.     Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the Contemplated Transactions.  Assignors and Assignee are executing and delivering this Assignment in satisfaction of certain obligations pursuant to Sections 3.2 and 3.3 of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignors and Assignee hereby acknowledge, Assignors and Assignee hereby agree as follows:

1.     <u>Assignment</u>.  Effective as of the Closing Date, each of the Assignors hereby assigns to Assignee all of its respective right, title and interest in and to the those of the Purchased Contracts described on **Schedule 1** attached hereto and incorporated herein by this reference (collectively, the "***Assigned Contracts***").

2.     <u>Assumption</u>.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to perform all of Assignors' obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.     <u>Amendments</u>.  This Assignment may only be amended by a writing signed by both Assignors and Assignee.

4.     <u>Execution in Counterparts</u>.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange

5

facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

5. <u>Delivery Pursuant to Purchase Agreement</u>. Notwithstanding anything to the contrary herein, Assignors and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

6. <u>Governing Law</u>. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of [_____].

6

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment as of the day and year first set forth above.

**ASSIGNORS:**

_____, a
_____ and
Debtor and Debtor in Possession


By: _____
Name: _____
Its: _____


_____, a
_____ and
Debtor and Debtor in Possession


By: _____
Name: _____
Its: _____


**[INSERT SIGNATURE BLOCKS FOR ALL APPLICABLE ASSIGNORS]**


**ASSIGNEE:**

_____,
a _____

By: _____
Name: _____
Its: _____


*[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS]*

**Exhibit "D"**

## BILL OF SALE AND ASSIGNMENT

Reference is hereby made to that certain Asset Purchase Agreement, dated May \_\_\_, 2015 (the "***Purchase Agreement***"), by and among _____, a _____ and _____, a _____, each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (collectively, the "***Sellers***") and _____, a _____ (the "***Purchaser***").  Except for terms specifically defined in this Bill of Sale and Assignment, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, each of the Sellers hereby sells, transfers, assigns and delivers to Purchaser all of its respective right, title and interest in and to the Purchased Assets.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

**IN WITNESS WHEREOF**, Sellers have caused this Bill of Sale and Assignment to be executed as of the _____ day of _____, 2015.

**SELLERS:**

_____, a
_____ and
Debtor and Debtor in Possession

By:    _____
Name: _____
Its:     _____

_____, a
_____ and
Debtor and Debtor in Possession

By:    _____
Name: _____
Its:     _____

**[INSERT SIGNATURE BLOCKS FOR ALL APPLICABLE ASSIGNORS]**

**Exhibit "E"**

## ASSIGNMENT OF INTANGIBLE PROPERTY

_____, a _____ and _____ _____, a _____, each of the foregoing being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (collectively, the "***Assignors***") are executing this Assignment of Intangible Property Assets (this "***Assignment***") in favor of _____ (the "***Assignee***"), with respect to the following facts and circumstances:

(A)     Assignors and Assignee have heretofore entered into that certain Asset Purchase Agreement dated as of May ___, 2015 (the "***Purchase Agreement***").   Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Purchase Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignors and Assignee are consummating the transactions contemplated by the Purchase Agreement.  Pursuant to the Purchase Agreement, Assignors are required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignors hereby expressly acknowledge, each of the Assignors hereby assigns, conveys, transfers and sets over unto Assignee, all of its respective right, title and interest, if any, in and to all Intangible Property Assets.  This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignors and Assignee.

Notwithstanding anything to the contrary herein, Assignors are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of [_____].

**IN WITNESS WHEREOF**, Assignors and Assignee have executed this Assignment as of the ___ day of _____, 2015.

**ASSIGNORS:**

_____, a
_____ and
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

_____, a
_____ and
Debtor and Debtor in Possession

By: _____
Name: _____
Its: _____

**[INSERT SIGNATURE BLOCKS FOR ALL
APPLICABLE ASSIGNORS]**

**ASSIGNEE:**

_____,
a _____

By: _____
Name: _____
Its: _____

**Exhibit "F"**

## ASSUMPTION AGREEMENT

This Assumption Agreement (this "***Assumption***") is entered into as of this _____ day of May, 2015, by _____, a _____ (the "***Purchaser***") in favor of _____, a _____ and _____, a _____, each of the foregoing (other than Purchaser) being a Chapter 11 Debtor and Debtor in Possession under Case No. [_____] in the Bankruptcy Court (the "***Sellers***").  This Assumption is entered into with respect to the following facts and circumstances:

A.  Sellers and Purchaser have heretofore entered into that certain Asset Purchase Agreement dated May _____, 2015 (the "***Purchase Agreement***").  Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.  Concurrently with the execution and delivery of this Assumption, Purchaser and Sellers are consummating the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Purchaser hereby acknowledges, Purchaser hereby agrees as follows:

1.  <u>Assumption</u>.  Effective as of the Closing Date, Purchaser hereby assumes and agrees to perform all of the Assumed Liabilities in accordance with their terms as expressed in the Purchase Agreement.

2.  <u>Amendments</u>.  This Assumption may only be amended by a writing signed by both Purchaser and Sellers.

3.  <u>Governing Law</u>.  This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of [_____].

4.  <u>Execution in Counterparts</u>.  This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature  promptly thereafter.

IN WITNESS WHEREOF, Purchaser has executed this Assumption as of the day and year first set forth above.

**PURCHASER:**

_____,
a _____

By:    _____
Name:  _____
Its:   _____

**Exhibit "G"**

**MANAGEMENT AGREEMENT**

Exhibit "H"

Form of Sale Order

[To Be Attached]

DOCS_SF:87686.15 98003/001

Exhibit "I"

Form of Procedures Order

[To Be Attached]