Brian N. Spector – 010112
D. Trey Lynn – 028054
**SCHNEIDER & ONOFRY, P.C.**
3101 North Central Avenue, Suite 600
Phoenix, Arizona 85012-2658
Telephone: (602) 200-1295
E-mail: bspector@soarizonalaw.com
minute-entries@soarizonalaw.com

Attorneys for Official Committee

**IN THE UNITED STATES BANKRUPTCY COURT**

**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>Z'Tejas Scottsdale, LLC, et al.,<br><br>Debtors.<br><br>Joint Administration With:<br><br>Z'Tejas 6th Street, LLC<br>Z'Tejas Avery Ranch, LLC<br>Z'Tejas Bellevue, LLC<br>Z'Tejas Bethany Home LLC<br>Z'Tejas Chandler, LLC<br>Z'Tejas Costa Mesa, LLC<br>Z'Tejas GP, LLC<br>Z'Tejas Grill Gateway, L.L.C.<br>Z'Tejas Holdings, Inc.<br>Z'Tejas, Inc.<br>Z'Tejas La Cantera, LLC<br>Z'Tejas LP, LLC<br>Z'Tejas of Arboretum, LLC<br>Z'Tejas Restaurant Holdings, LP<br>Z'Tejas Salt Lake City, LLC<br>Z'Tejas Summerlin, LLC<br>Z'Tejas Tempe, LLC<br>Taco Guild Osborn LLC | Case No.: 2:15-bk-09178-PS<br><br>Chapter 11<br><br>Joint Administration With Case Nos.:<br><br>2:15-bk-09180-PS<br>2:15-bk-09184-PS<br>2:15-bk-09188-PS<br>2:15-bk-09193-PS<br>2:15-bk-09194-PS<br>2:15-bk-09195-PS<br>2:15-bk-09198-PS<br>2:15-bk-09200-PS<br>2:15-bk-09201-PS<br>2:15-bk-09203-PS<br>2:15-bk-09205-PS<br>2:15-bk-09207-PS<br>2:15-bk-09208-PS<br>2:15-bk-09210-PS<br>2:15-bk-09212-PS<br>2:15-bk-09213-PS<br>2:15-bk-09214-PS<br>2:15-bk-09215-PS |
| This pleading applies to:<br><br>☑ All Debtors<br><br>☐ Specified Debtors | **COMMITTEE'S OBJECTION TO DEBTORS' MOTION REQUESTING (A) THE SCHEDULING OF AN AUCTION AND SALE HEARING IN CONNECTION** |

**WITH THE SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS, (B) APPROVAL OF BIDDING PROCEDURES AND PROTECTIONS FOR SUCH ASSETS, (C) APPROVAL OF PURCHASE AGREEMENT WITH STALKING HORSE BIDDER, (D) APPROVAL OF THE FORM AND SCOPE OF NOTICE OF AUCTION AND SALE HEARING, (E) APPROVAL OF PROCEDURES FOR THE ASSUMPTION, ASSIGNMENT AND SALE OF CONTRACTS AND LEASES TO THE PURCHASER, AND (F) APPROVAL OF SALE OF THE DEBTORS' ASSETS TO THE PURCHASER**

**Hearing Date: 8/19/15**
**Hearing Time: 9:00 a.m.**

The Official Committee of Unsecured Creditors (the "Committee"), through undersigned counsel, hereby files this Objection to the Debtors' Motion Requesting (A) Scheduling of an Auction and Sale Hearing in Connection with the Sale of Substantially all the Debtors' Assets, (B) Approval of Bidding Procedures and Protections for Such Assets, (C) Approval of Purchase Agreement with Stalking Horse Bidder, (D) Approval of the Form and Scope of Notice of Auction and Sale Hearing, (E) Approval of Procedures for the Assumption, Assignment and Sale of Contracts and Leases to the Purchaser, and (F) Approval of Sale of the Debtors' Assets to the Purchaser (the "Motion").

## PRELIMINARY STATEMENT

1. The Committee generally supports the Debtor's efforts to sell various restaurants as a going concern and appreciates the willingness of Cornbread Ventures, LP ("Cornbread") to serve as a stalking horse. The Committee, however, objects to certain of the proposed Bidding Procedures, bid protections, and aspects of the

APA[1] (including the proposed Break-Up Fee) because they seem inconsistent with the objective of maximizing return to creditors, may unfairly prejudice potential purchasers, and may chill bidding. Additionally, the proposed timetable does not leave much time on the clock for Potential Bidders.

2. Rather than based on the enterprise value, the proposed Purchase Price appears to be derived from a calculation of the minimum amount necessary to (i) clear off the liens and (ii) pay Cure Costs (on Purchased Contracts), other APA-required amounts, and administrative claims.

3. The proposed Purchase Price is not all-cash; and the Committee questions whether Cornbread should be entitled to a Credit Bid for 100% of its pre-petition claim. Particularly considering that it is not all-cash, the court should have the discretion to consider other offers on different terms and make the final determination regarding who has submitted the highest and best offer.

4. The APA grants Cornbread significant termination rights, and the APA schedules are omitted. This makes it difficult for the Committee to assess the binding nature of the proposed transaction, as well as the value of the stalking horse bid, and raises further questions regarding the propriety of a Break-Up Fee.

5. The Committee objects to inclusion of the Avoidance Actions or any other Claims in the sale. No analysis has been made of the Avoidance Actions and other Claims, and it is doubtful that they will add anything to the Purchase Price at an auction sale, in which Potential Bidders will base their bids on the going concern value of the restaurants. Moreover, they are important for the Estate to retain. They are, as Debtors' counsel acknowledged at the initial court hearing, the Debtors' only unencumbered assets; and in the absence of competitive bidding, ***they may be the only source of recovery for unsecured creditors in this case.***

## BACKGROUND

1.  On July 22, 2015 (the "Petition Date"), Debtor Z'Tejas Scottsdale, LLC ("Z'Tejas"), and various other affiliates filed petitions for relief under Chapter 11 of the Bankruptcy Code.

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the same meaning as set forth in the Motion and APA.

2. A hearing on various first day motions was held on July 24, 2015, at which time a further hearing on certain motions was scheduled for August 19, 2015.

3. On August 3, 2015, the United States Trustee appointed the Committee. On August 6, 2015, the Committee held its first meeting. On August 10, 2015, the Committee filed its Application to Employ Counsel. Thus, for the past week, and with the help of counsel, the Committee has attempted to gather the information needed to understand this and other motions and their possible consequences for the Estate and its unsecured creditors.

4. Despite seeking expedited approval of the Motion, APA, and a highly-expedited auction sale process, the Debtors did not file their bankruptcy schedules and statements until August 12, 2015.

5. Additionally, the APA's schedules (the "Omitted Schedules") are missing from the APA. They will set forth important details of the proposed transaction including, for example, the identification of the Restaurant Leases and other Purchased Contracts.[2]

6. The Committee understands that KarpReilly ZT Co-Invest, LLC ("KR") purchased a majority stake in Z'Tejas in approximately 2007 for an amount reportedly in the $25-35 million range; Z'Tejas thereafter expended considerable resources in opening new restaurants within the last few years; the expansion was financed with debt issued by KR and others; the Debtors recently closed certain locations; and the revenues of the Debtors' remaining restaurants can no longer support the Debtors' general and administrative overhead.

---

[2] The Omitted Schedules include Schedules 1.1(a) through (k), 1.3(b), 2.3(a), 2.4, 2.7(c), 3.2(a), 5.4, and 13.1 For example, and without limitation, Schedules 1.1(a) through 1.1(k) identify the Restaurant Leases and other Purchased Contracts (g), Business Permits and Liquor Licenses (i), Furniture and Equipment (a), Intangible Property Assets (f), and excluded assets (k). Also missing are Schedules 1.3(b)(Cure Costs), 2.3(a)(Gift Certificates), 2.4 (Excluded Liabilities), 2.7(c) (Designated Rights Assets), 3.2(a)(designating the "Claim Amount"), 5.4 (pending litigation), and 13.1 (employees who will not be offered employment by the Purchaser).

7. KR, which (through the Debtors' holding company) remains the majority owner of the Debtors, hired Mastodon Ventures, Inc. ("Mastodon") in 2014 to help secure a buyer for the Debtors' restaurants. KR thereafter acquired the debt held by the Debtors' primary lender. Most recently, Mastodon negotiated with Cornbread to become a stalking horse bidder for the restaurants.

8. Cornbread, meanwhile, also acquired a debt shortly before the bankruptcy filing – a $663,662 claim represented by a judgment which purports to be secured by the assets of a single restaurant location.

9. It is against this backdrop that the Debtors seek approval to borrow from Cornbread up to $725,000 in DIP financing that has a maturity date of no greater than five months, as well as an order approving Cornbread as the stalking horse bidder and approval of a Break-Up Fee to Cornbread if it is not the successful bidder.

*The Applicable Standard*

10. Through the Motion, the Debtors seek approval of procedures for the auction sale of nine of its restaurants. Under 11 U.S.C. § 363(b)(1), a debtor may sell property outside of the ordinary course of business after notice and a hearing. To approve a proposed sale, the court must find that a sufficient business reason exists for the sale and that the sale is in the best interest of the estate, i.e., that the sale is fair and reasonable, that it has been adequately marketed, that it has been negotiated and proposed in good faith, and that it is an "arm's length" transaction. *In re Wilde Horse Enters., Inc*., 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991). In deciding whether a sale is in the best interest of the estate, the court must consider the diverse interests of the debtor, creditors and equity holders, alike. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986); *In re Lionel Corp*., 722 F.2d 1063, 1071 (2d Cir. 1983).

11. The debtor must demonstrate that all aspects of the sale are reasonable by showing that (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3)

the debtor provided adequate and reasonable notice to all necessary parties; and (4) the proposed purchaser acted in good faith. *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008*); In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D. W. Va. 2006). The court must make specific findings as to "whether the sale, public or private, is in the best interests of the debtor's estate when [the] consideration paid and all other relevant factors are taken into account." *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okl. 1983). Courts impose a heightened level of scrutiny on the proposed sale when a debtor desires to sell substantially all of its assets. *Wilde Horse*, 136 B.R. at 841.

12. ***The debtor's main responsibility—and the primary concern of the bankruptcy court—is to maximize the value of the asset being sold***. *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995); *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992); *Wilde Horse*, 136 B.R. at 841. The debtor bears the burden to show that it obtained the best possible price for the asset. *Nicole Energy Servs.*, 385 B.R. at 233; In re *New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999); *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (stating that "in appropriate circumstances it is proper for a court to interfere with the trustee's judgment for the purpose of safeguarding the interest of parties concerned").

13. The Committee is not opposed in principal to an auction sale of the restaurants. Based upon the information gathered and reviewed within the short time it has had to do so,[3] however, the Committee has various concerns expressed below regarding the proposed bid procedures, bid protections, and APA (including the proposed Break-Up Fee) because they seem inconsistent with the objective of maximizing return to creditors, may unfairly prejudice potential purchasers, and may chill bidding.

---

[3] Considering the brief opportunity it has had thus far, the Committee reserves the right to raise further objections and concerns at the August 19 hearing and prior to any sale.

*Short Timetable*

14. The Committee is aware of and appreciates Mastadon's pre-petition marketing efforts; however, it is concerned that the expedited timetable proposed in the Motion – *less than four weeks until the Bid Deadline* -- leaves little time to attract Potential Bidders and afford them an opportunity to conduct all due diligence and place a competing bid.

15. The Committee has been told that this expedited timetable is needed so that a sale can be concluded before the Debtors run out of money. Yet, in another first-day motion, the Debtors also sought approval to pay "approximately $275,000"[4] (Docket No. 9 at 3, line 6) in "prepetition sales and use taxes" (Id. at 7, lines 17-18). As discussed in the Committee's response to that motion, it is unclear why the Estate should be in such a hurry to disburse such a large sum in prepetition taxes, particularly if those funds are needed to buy more time for a sale.

*The Proposed Purchase Price May Be Inadequate*

16. The proposed Purchase Price to be paid by Cornbread, as stalking horse, appears to be derived from a calculation of the minimum amount necessary to (i) clear off the liens (held by Cornbread and by KR) and (ii) pay other APA-required items and administrative expenses. The Committee understands that the Debtors do not expect any proceeds to be left from the stalking horse bid to fund a distribution to unsecured creditors. In other words, *if there are no competing bids, there will be no return to unsecured creditors*.

17. Of the proposed $3,727,324 in consideration from Cornbread, the Committee understands that:

---

[4] Accordingly to updated information which it recently received, the Committee understands that number now may be lower.

a. $1,388,572 of it is not actually paid – rather, it represents a "Credit Bid." (See Motion at 8, l. 20; APA §2.1.)

b. $663,662 of the Credit Bid is purportedly for the "Chandler Debt Obligations." As noted, the Committee understands that this claim is secured by personal property at a single store location – Chandler. There has been no determination of the secured status of this claim under Code §506; and the Committee questions whether it is fully secured and whether Cornbread should be entitled to a $663,662 credit bid. That represents 20% of the proposed Purchase Price for all nine restaurants. Considering that the nine restaurant are being sold as a going concern (i.e., based on the values of the revenues and earnings they generate rather than the personal property located at one or all locations), it seems inappropriate to give Cornbread a dollar-for-dollar credit on its claim for bidding purposes. Accordingly, the Committee objects to the Motion to the extent it purports to grant Cornbread a fully-secured $663,662 claim for bidding purposes.[5]

c. $725,000 of the Credit Bid represents the maximum amount of Cornbread's proposed DIP Loan. (See APA §2.1, giving Cornbread a Credit Bid "in the amount of $725,000.") Only $320,000 has been borrowed thus far, however; and the Committee objects to this provision if and to the extent that Cornbread is given a Credit Bid for more than the actual DIP Loan balance payable.

---

[5] The Committee would not be opposed to allowing a Credit Bid for the full $663,662 as long as Cornbread is required to repay to the Estate any portion of that amount which is subsequently determined to be unsecured.

       d. $1,200,000 of the cash consideration is to be paid to the Debtors' majority shareholder, KR, or its affiliate. (See APA §3.2(a); Motion at 7, lines 6-7).

       e. As to the remaining balance, $1,138,572, the Committee understands that this represents the amount needed to pay Cure Costs – amounts to be paid to cure any defaults under the Purchased Contracts – as well as sale prorations, other APA-required items, and administrative expenses.

18. Even assuming this was an all-cash $3.7 million offer,[6] the amount would seem low relative to the annual revenues generated by the nine stores being sold. As previously noted, $27.5 million in revenues were generated during 2014 from just eight of the restaurants being sold, and that does not include revenues from the Arboretum restaurant location.[7] It is the Committee's understanding, based on initial discussions with other restaurant industry experts, that the ratio of sale price to annual revenues for this transaction is at the lower end of the spectrum, at just .137 (even utilizing a $3.7 million cash price and $27.5 million in annual revenues for eight of the stores being sold).

19. Additionally, the proposed sale includes all of the Debtors' remaining cash (see APA §1.1(c)),[8] including presumably any unused drawdown on the DIP Loan which the Debtor has on hand. Cornbread should not be entitled to a Purchase Price credit for all DIP Loan amounts advanced, on the one hand, and receive the unused portion back, on the other.

---

[6] The total consideration is a moving target, as the sale includes remaining cash and certain Assumed Liabilities. The Motion lacks detail regarding the Assumed Liabilities or the Schedules that might include this information. Assumed Liabilities consist mainly of post-Closing liabilities under the Purchased Contracts and post-petition trade payables that come due post-Closing. APA §2.3

[7] The Committee understands that Mastodon conservatively did not include the Arboretum location in that figure because, while that location is being sold, its lease is scheduled to expire in 2016.

[8] Specifically, this is defines to include "[a]ll cash net of cash reasonably required by the Debtors to satisfy post-Petition Date operating expenses of the Business through the Closing Date." Id.

*The Break-Up Fee*

20.     When determining whether to allow a Break-Up Fee, courts analyze a number of elements, including whether the fee provides a "chilling effect on other potential bidders," whether the fee correlates with a maximization of the value to the debtor's estate, and whether the principal secured creditors and the official creditors committee are supportive of the concession. *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 96 (8th Cir. B.A.P. 2003). The Break-Up Fee should only be approved if it is in the best interest of the estate and will further the interests of the debtor, creditors, and equity holders alike. *In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re S.N.A. Nut Company*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) ("absent compelling circumstances which clearly indicate that payment of the fee would be in the best interests of the estate, breakup fees should not be awarded in bankruptcy auction sales").

21.     The proposed Break-Up Fee will likely have a "chilling effect" on other potential bidders. Even though Cornbread is only to come out of pocket with cash of $2,338,572, the Debtors propose that any Potential Bidder must start bidding nearly $1.7 million higher – at $4,026,413 ($3,727,324 plus $149,089 Break-Up Fee, plus $150,000 overbid amount). That is an initial overbid of nearly $300,000, or approximately 8% of the total consideration offered by Cornbread.[9] The Committee is concerned about the chilling effect that will have on competitive bidding. By removing the Break-Up Fee, the initial overbid can be reduced to a more reasonable amount.

22.     Additionally, a Break-Up Fee should not be awarded where the Debtor has been thoroughly marketed and the Break-Up Fee is not likely to induce further bidding or bidding generally. *America West Airlines, Inc.*, 166 B.R. at 913 (declining to allow break-

---

[9] The Committee does not think that the initial overbid should exceed $150,000.

up fee on the basis that America West had been thoroughly marketed and that the break-up fee would chill bidding and potentially deplete assets that could be better utilized by the estate).

23. Any competitive bidding environment that currently exists would appear to be the result of Mastodon's efforts and not as a result of the stalking horse. The Debtors concurrently seek permission to pay a considerable amount for Mastodon's services, including a "Transaction Fee." If the Debtors also are required to pay a Break-Up Fee, they are effectively paying twice for the same thing.

24. There also has been no showing that Cornbread incurred extraordinary due diligence costs in gathering data for the transaction from which other Potential Bidders will benefit.[10] On the contrary, the Committee understands that Cornbread was a relative latecomer to the Debtors' marketing efforts; and Mastodon already had set up a virtual "Data Room" containing due diligence information which Cornbread and others could access. Multiple other entities expressed interest in purchasing Z'Tejas before Cornbread arrived on the scene.

25. Courts give significant weight to the Committee's objections to the Break-Up Fee. *See e.g. In re S.N.A. Nut Co.*, 186 B.R. at 106 ("In a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case 'because the principle [sic] underlying rationale for the 'business judgment rule', i.e., that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances.'"). The Committee believes that this Break-Up Fee will tend to chill bidding and not benefit the unsecured creditors. Moreover, it seems inappropriate in the context of an APA transaction in which the proposed Purchase Price (i)

---

[10] Disapproval of the Break-Up Fee could, of course, be made without prejudice to any post-sale Code §503(b) application by Cornbread.

- 11 -
Case 2:15-bk-09178-PS   Doc 108   Filed 08/17/15   Entered 08/17/15 11:39:47   Desc
Main Document   Page 11 of 17

requires Cornbread to come out-of-pocket with only $2,338,572[11] in cash; (ii) appears based on the minimal amount needed to clear bankruptcy; and (iii) would yield no recovery to the unsecured creditors. Certainly, the bankruptcy estate could find better uses for these funds. *In re America West Airlines, Inc. supra* (recognizing that the break-up fee would potentially deplete assets of that could be better utilized by the estate.)

***Allowing Flexibility and Giving the Court Discretion to Determine the Highest and Best Offer***

26. The Committee understands that Potential Bidders need not bid solely on the basis of the current APA terms. The Committee strongly encourages this flexible approach. While the APA may provide a good baseline for the auction sale, requiring strict adherence to it may stifle Potential Bidders and might not maximize value to the estate. For example, a Potential Bidder may be willing to exclude certain assets from the sale and match Cornbread's price, in which case there should be sufficient flexibility and discretion for the court to determine the highest and best offer.

27. Additionally, since there has been no determination of the secured status of the Chandler Debt Obligations, the court should be free to determine, for example, that an equivalent all-cash amount is actually a higher and better bid than the Cornbread stalking horse bid. Accordingly, the Committee objects to the Motion to the extent it requires other Potential Bidders to make a cash bid "***of at least***" $4,026,413 (see Motion at 9, lines 21-24) and does not give the court the discretion to determine that some other all-cash bid might be higher and better than the stalking horse bid.

---

[11] The proposed Break-Up Fee is based upon 4% of the gross Purchase Price. By comparison, a break-up fee equal to 2.5% of the $2,338,572 cash amount would be approximately $50,000.

*Deposits and Financial Qualification Should Be the Same for All*

28. Potential Bidders are asked to make a larger cash deposit – $387,732 – than the $280,000 Deposit which Cornbread is required to make pursuant to the APA. The Committee does not see a good reason for this disparity in treatment and therefore objects to it.

29. Similarly, the Committee objects to the financial qualification provisions if and to the extent they are any more rigorous for Potential Bidders than they were for Cornbread.

*Cornbread's Termination Rights and the Lack of a Fully-Binding Commitment*

30. The APA grants Cornbread significant termination rights and is missing schedules. This makes it difficult for the Committee to assess the binding nature of the proposed transaction, as well as the value of the stalking horse bid.

31. For example, the Committee understands the issues related to the proposed assumption of third-party real property leases have yet to be resolved. As a result, the Committee is concerned that Cornbread will have the discretion to terminate the Purchase Agreement if such issues are not resolved (and various other conditions are not satisfied) in a manner that Cornbread considers acceptable. (See APA §3.2(b), requiring the Seller to deliver an Assignment and Assumption of Restaurant Lease for all Restaurant Leases for the Acquired Restaurants; APA §4.2(b), making it a condition precedent that the Seller tender delivery of everything listed in Section 3.2; and APA §14.4(e), giving the Purchaser the right to terminate if a condition precedent has not been satisfied. There are other similar yet-to-be fulfilled obligations.[12]

32. If Cornbread terminates the Purchase Agreement as a result of the failure of one of these conditions and the assets are otherwise sold, Cornbread would arguably be

---

[12] For example, there is a similar provision giving the Purchaser the right to terminate if the Purchaser fails to deliver an Assignment and Assumption of Leases and Contracts for all of the other Purchased Contracts. APA §3.2(c). The Schedule listing the Purchased Contracts is one of the Omitted Schedules.

entitled to a $149,089 Break-Up Fee.  This and other provisions of the APA therefore should be modified to ensure that the Estate does not pointlessly incur the expense of a sale process only to have the potential purchaser walk away from the transaction before it closes and later seek a large Break-Up Fee once the assets are liquidated.  As previously discussed, no Break-Up Fee should be authorized, particularly at a time when there is not a fully-binding commitment from the Purchaser.

33. Considering the Omitted Schedules and lease assumption/assignment issues, including Cornbread's right to terminate in connection therewith, the relief requested in the Motion, particularly approval of the Break-Up Fee, seems premature.

*No Avoidance Actions or other Claims Should Be Sold.*

34. The APA contemplates the sale to Cornbread of all Avoidance Actions, defined to include all claims and actions arising under Bankruptcy Code sections 544, 547, 548, 549, and 550.  (See APA §1.1(h) and "Avoidance Action" definition at APA page 28). It also may include the sale to Cornbread of additional Claims (broadly defined to include "any claim, cause of action, right of recovery, right of set-off, and right of recoupment or every kind and nature") other than those arising in connection with any Excluded Contract or Asset.  (See APA §1.1, defining "Purchased Assets" to include all assets other than the Excluded Assets; and APA §1.2(e), only excluding "Claims arising with respect to or arising in connection with any Excluded Contract or Excluded Asset").  Thus, for example, any Claims which the Debtors may have for breach of fiduciary duty, embezzlement, overpayment, theft, fraud, and the like may be construed to be part of the sale.

35. To evaluate any proposed sale of these actions, the bankruptcy court must apply the standards for approving compromises under 11 U.S.C. § 363(b)(1). See *Nicole Energy Services, supra,* 385 B.R. 201, 237 (stating that, before approving a sale, the bankruptcy court also must determine whether the proposed compromise is fair and

equitable).[13] No analysis or investigation has been made regarding the potential universe of Avoidance Actions and Claims – indeed, the Debtors just filed their schedules last week – and there is an insufficient basis from which to evaluate any proposed sale of these actions.

36. Avoidance actions should only be exercised for the benefit of the Debtor's estate. *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002). The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors. *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ostpetition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . ."

37. No analysis has been made of the Avoidance Actions and other Claims, and it is doubtful that they will add anything to the Purchase Price at an auction sale, in which Potential Bidders will base their bids on the going concern value of the restaurants. At the same time, they are important for the Estate to retain. They are, as Debtors' counsel acknowledged at the initial court hearing, the Debtors' only unencumbered assets; and, considering the proposed terms of the APA, in the absence of competitive bidding ***they may be the only source of recovery for unsecured creditors in this case.*** Particularly in that context, it would not be in the estate's best interest to sell them; and the Committee objects to including them in the sale.

---

[13] That would require the bankruptcy court to consider the following four factors: (1) the probability of success in the litigation; (2) the difficulties, if any, the trustee may encounter in collecting on a judgment; (3) the complexity of the litigation and the attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and a proper deference to their reasonable views concerning the litigation. *In re Flight Transportation Corp.*, 730 F.2d 1128, 1135 (8th Cir. 1984).

*The Right to Challenge Secured Claims Should Be Preserved.*

38. The Committee objects to giving any kind of preclusive effect that the Motion may seek as to the extent, nature, validity, and secured status of the (i) Chandler Debt Obligations or (ii) KR claim. The Committee should be given proper opportunity to investigate and, if appropriate, challenge the extent, validity, and secured status of those claims.

*The Auction Sale Should Be Held in and Presided Over By the Court*

39. The Committee objects to the Auction taking place anywhere other than in open court and to anyone other than the court making the final determination regarding whether any interested bidder is a Qualified Bidder and who has submitted the highest and best offer.[14]

*Concluding Comments*

40. In *In re On-Site Sourcing, Inc.*, 412 B.R. 817 (Bankr. E.D. Va. 2009), the Court observed that "Chapter 11 is a community action. It is hoped that through the analysis and action of the creditor body both collectively and individually that the best result for the most creditors within the confines of the Bankruptcy Code will be achieved." *Id*, 412 B.R. at 828. Similarly, in *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 426 (Bankr. S.D. Tex. 2009), the Court noted that "bankruptcy is, at its essence, a collective remedy intended to benefit all creditors, not just the secured lender." *Id.*, 404 B.R. at 426.

41. Additionally, caution should be exercised against the use of Chapter 11 in a manner that benefits specific parties without an appreciable expectation of a recovery for unsecured creditors. *In re Duro Industries, Inc.*, No. 02-16131-CJK, 2002 WL 34159091, at *5 (Bankr. D. Mass. Oct. 7, 2002)(stating that "[w]here all equity in a debtor's assets belongs to the secured creditor, with no appreciable expectation of a remainder for

---

[14] The Committee appreciated the Debtors' most recent revisions to its proposed order addressing this issue, but it still curiously gives the Debtor discretion to designate an "other place" than the court.

unsecured creditors, the liquidation of the assets serves no bankruptcy purpose and should not be permitted to occur in bankruptcy."); *see also In re Cloverleaf Enterprises, Inc.*, No. 09-20056, 2010 WL 1445487, at *3 (Bank. D. Md. Apr. 2, 2010) (declining to approve Section 363 motion for several reasons, including because unsecured creditors would not benefit from proposed transaction); *In re Encore Healthcare Associates*, 312 B.R. 52, 57 (Bankr. E.D. Pa. 2004) (§363 motion denied because proposed sale would generate funds only for secured creditor and would not advance any bankruptcy purpose).

42. The Committee requests that the Motion not be approved until the sale and bid procedures have been modified to account for the Committee's objections and concerns set forth herein. Doing so will increase the chance of a recovery for the unsecured creditors.

Dated August 17, 2015

SCHNEIDER & ONOFRY, P.C.

By  /s/ *Brian N. Spector*
Brian N. Spector
D. Trey Lynn
3101 N. Central Avenue, Suite 600
Phoenix, Arizona  85012-2658
Attorneys for Official Committee

COPY emailed this same date to:

Jordan A. Kroop, Esq.
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Attorney for Cornbread Ventures, LLP

John W. Lucas, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500
Attorneys for Debtors and Debtors in Possession