Brian N. Spector – 010112
D. Trey Lynn – 028054
**SCHNEIDER & ONOFRY, P.C.**
3101 North Central Avenue, Suite 600
Phoenix, Arizona 85012-2658
Telephone: (602) 200-1295
E-mail: bspector@soarizonalaw.com
minute-entries@soarizonalaw.com

Attorneys for Official Committee

# IN THE UNITED STATES BANKRUPTCY COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Case No.: 2:15-bk-09178-PS |
| Z'Tejas Scottsdale, LLC, et al., | Chapter 11 |
| Debtors. | Joint Administration With Case Nos.: |
| Joint Administration With: | 2:15-bk-09180-PS |
| Z'Tejas 6th Street, LLC | 2:15-bk-09184-PS |
| Z'Tejas Avery Ranch, LLC | 2:15-bk-09188-PS |
| Z'Tejas Bellevue, LLC | 2:15-bk-09193-PS |
| Z'Tejas Bethany Home LLC | 2:15-bk-09194-PS |
| Z'Tejas Chandler, LLC | 2:15-bk-09195-PS |
| Z'Tejas Costa Mesa, LLC | 2:15-bk-09198-PS |
| Z'Tejas GP, LLC | 2:15-bk-09200-PS |
| Z'Tejas Grill Gateway, L.L.C. | 2:15-bk-09201-PS |
| Z'Tejas Holdings, Inc. | 2:15-bk-09203-PS |
| Z'Tejas, Inc. | 2:15-bk-09205-PS |
| Z'Tejas La Cantera, LLC | 2:15-bk-09207-PS |
| Z'Tejas LP, LLC | 2:15-bk-09208-PS |
| Z'Tejas of Arboretum, LLC | 2:15-bk-09210-PS |
| Z'Tejas Restaurant Holdings, LP | 2:15-bk-09212-PS |
| Z'Tejas Salt Lake City, LLC | 2:15-bk-09213-PS |
| Z'Tejas Summerlin, LLC | 2:15-bk-09214-PS |
| Z'Tejas Tempe, LLC | 2:15-bk-09215-PS |
| Taco Guild Osborn LLC | |
| This pleading applies to: | **COMMITTEE'S OBJECTION TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS** |
| ☑ All Debtors | |
| ☐ Specified Debtors | |

The Official Committee of Unsecured Creditors (the "Committee"), through undersigned counsel, hereby files this Objection to the Debtors' proposed sale of substantially all of their assets (the "Sale").

## PRELIMINARY STATEMENT

1. The Committee generally supports the Debtor's efforts to sell the restaurants as a going concern but has various concerns.

2. If there are no competing bids, the proposed Purchase Price appears low relative to the going concern value of nine restaurants which, in 2014, generated $31.9 million in revenues.

3. The Stalking Horse should only be entitled to a credit for 100% of the allowed secured portion of its claim.

4. The Stalking Horse credit with respect to the DIP Loan should be limited to amounts actually advanced to the Debtors less remaining cash on hand.

5. The APA grants the Purchaser significant termination rights.  No sale should be approved without a fully-binding and enforceable commitment from the Purchaser.

6. Irrespective of the approval of any Sale, the Committee's court-approved right to assert Challenges as to the secured claims must be preserved.

7. The Committee objects to inclusion of the Avoidance Actions or any other Claims in the sale.  It is doubtful that they will add anything to the Purchase Price at an auction sale, in which Potential Bidders will base their bids on the going concern value of the restaurants.  Moreover, they are important for the Estate to retain.  In the absence of competitive bidding, *they may be the only source of recovery for unsecured creditors in this case.*

## **BACKGROUND**

1. On July 22, 2015 (the "Petition Date"), Debtor Z'Tejas Scottsdale, LLC and various other affiliates (collectively, the "Debtors" or "Z'Tejas") filed petitions for relief under Chapter 11 of the Bankruptcy Code.

2. The Debtors filed a motion (at Doc. 13, the "Bid Procedures Motion") seeking, among other things, an order granting expedited approval of various procedures for an auction sale of nine restaurants (the "Restaurants"). An order was entered in connection with the Bid Procedures Motion on or about August 21, 2015 scheduling a Sale hearing for September 25, 2015.

3. Despite seeking expedited approval of the Bid Procedures Motion, the APA's schedules (the "Omitted Schedules") were missing from the APA when the Bid Procedures Motion was filed. The Omitted Schedules are supposed to set forth important details of the proposed transaction including, for example, the identification of the Restaurant Leases and other Purchased Contracts.[1]

4. The Omitted Schedules still not been filed. Certain information is attached to a Notice of (A) Proposed Assumption, Assignment and Sale of Executory Contracts and Unexpired Leases and (B) PACA Interests filed on August 25, 2015 (the "Notice" filed at Doc. 143); however, the Notice does not determinatively state which leases and other contracts are being assigned and which are not. Rather, it lists thirty-three contracts (including twelve leases) and states that they "*may*" be designated as Purchased Contracts under the APA. (Id. at 2, lines 3-4 and lines 12-13).

---

[1] The Omitted Schedules include Schedules 1.1(a) through (k), 1.3(b), 2.3(a), 2.4, 2.7(c), 3.2(a), 5.4, and 13.1 For example, and without limitation, Schedules 1.1(a) through 1.1(k) identify the Restaurant Leases and other Purchased Contracts (g), Business Permits and Liquor Licenses (i), Furniture and Equipment (a), Intangible Property Assets (f), and excluded assets (k). Also missing are Schedules 1.3(b)(Cure Costs), 2.3(a)(Gift Certificates), 2.4 (Excluded Liabilities), 2.7(c) (Designated Rights Assets), 3.2(a)(designating the "Claim Amount"), 5.4 (pending litigation), and 13.1 (employees who will not be offered employment by the Purchaser).

- 3 -

5.      KarpReilly ZT Co-Invest, LLC ("KRI") is the majority owner of the Debtors. It hired Mastodon Ventures, Inc. ("Mastodon") in 2014 to help secure a buyer for the Debtors' restaurants.  KRI or its affiliate thereafter (i) paid $600,000 to acquire a $1.2 million loan participation in the Debtors' main credit facility with National Bank of Arizona (the "NBAZ Claim") – and (ii) just before the bankruptcy filing, acquired the NBAZ Claim.

6.      Cornbread Ventures, LP ("Cornbread" or the "Stalking Horse") has submitted a stalking horse bid for the Restaurants.  Immediately before the bankruptcy filing, Cornbread acquired a $663,662 claim secured by the hard assets of the Debtors' Chandler restaurant.

***The Applicable Standard***

7.      Under 11 U.S.C. § 363(b)(1), a debtor may sell property outside of the ordinary course of business after notice and a hearing. To approve a proposed sale, the court must find that a sufficient business reason exists for the sale and that the sale is in the best interest of the estate, i.e., that the sale is fair and reasonable, that it has been adequately marketed, that it has been negotiated and proposed in good faith, and that it is an "arm's length" transaction. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991). In deciding whether a sale is in the best interest of the estate, the court must consider the diverse interests of the debtor, creditors and equity holders, alike. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

8.      The debtor must demonstrate that all aspects of the sale are reasonable by showing that (1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor provided adequate and reasonable notice to all necessary parties; and (4) the proposed purchaser acted in good faith. *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008*); In re Shipman*, 344 B.R. 493, 495 (Bankr. N.D. W. Va. 2006).

The court must make specific findings as to "whether the sale, public or private, is in the best interests of the debtor's estate when [the] consideration paid and all other relevant factors are taken into account." *In re Ancor Exploration Co.*, 30 B.R. 802, 808 (N.D. Okl. 1983). Courts impose a heightened level of scrutiny on the proposed sale when a debtor desires to sell substantially all of its assets. *Wilde Horse*, 136 B.R. at 841.

9. ***The debtor's main responsibility—and the primary concern of the bankruptcy court—is to maximize the value of the asset being sold.*** *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995); *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992); *Wilde Horse*, 136 B.R. at 841. The debtor bears the burden to show that it obtained the best possible price for the asset. *Nicole Energy Servs.*, 385 B.R. at 233; In re *New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999); *In re Bakalis*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) (stating that "in appropriate circumstances it is proper for a court to interfere with the trustee's judgment for the purpose of safeguarding the interest of parties concerned").

10. While the Committee is not opposed in principal to a sale of the restaurants as a going concern, based upon the information gathered and reviewed,[2] the Committee has the following concerns about the proposed Sale.

***The Proposed Purchase Price Appears Low.***

11. Rather than the "best possible price" or even a "fair price," the proposed Stalking Horse price – at $3.7 million[3] -- appears low relative to the going concern value of the nine Restaurants. According to the Debtors' Statement of Financial Affairs, those

---

[2] Considering the compressed schedule, the Committee has not had an opportunity to review bids and reserves the right to raise further objections and concerns on or before the September 25 hearing.

[3] The total consideration is a moving target, as the sale includes remaining cash and certain Assumed Liabilities. The Committee has requested but not received a list of the Assumed Liabilities or the Schedules that might include this information. Assumed Liabilities consist mainly of post-Closing liabilities under the Purchased Contracts and post-petition trade payables that come due post-Closing. APA §2.3

1  Restaurants generated $31.9 million in revenues during 2014. It is the Committee's

2  understanding, based on discussions with other restaurant industry experts, that the ratio of

3  sale price to annual revenues for this transaction is at the low end of the spectrum, at just

4  .116 (utilizing a $3.7 million cash price and $31.9 million in annual revenues). [4]

5      12.    Rather than being reflective of the going concern value of the Restaurants,

6  the proposed Purchase Price appears to be derived from a calculation of the minimum

7  amount necessary to (i) clear off the liens (held by the Stalking Horse and KRI) and (ii)

8  pay other sale-related items and administrative expenses.

9      13.    The Committee understands that the Debtors do not expect any proceeds to

10  be left from the stalking horse bid to fund a distribution to unsecured creditors. As to the

11  cash remaining after payment of secured claims, $1,138,572,[5] the Committee understands

12  that this represents the amount needed to pay Cure Costs – amounts to be paid to cure any

13  defaults under the Purchased Contracts – as well as sale prorations, other APA-required

14  items, administrative expenses, and "wind-down costs." (See APA §1.3(b)(as to Cure

15  Costs); Bid Procedures Motion at 2, line 9 and at 7, lines 6-11). Regarding wind-down

16  costs, the Committee understands that the Sale necessitates that a substantial amount be

17  spent administratively to allow for a transition of liquor licenses to the Purchaser. In sum,

18  if there are no competing bids, there likely will be no return to unsecured creditors.

---

22  [4] In its Objection to the Bid Procedures Motion was filed, the Committee noted that $27.5 million in
23  revenues were generated by eight of the Restaurants. That figures was taken from Mastodon's marketing
    materials, which did not include the Arboretum location in that figure because (while that location was
    being sold) its lease is scheduled to expire in 2016. Even at $27.5 million in revenues, however, the ratio of
24  sale price to annual revenues for this transaction is still at the lower end of the spectrum, at just .137.
25  [5] Of the proposed $3,727,324, (a) $1,388,572 represents a Credit Bid (see APA §2.1) and (b) $1,200,000 is
    to be paid to KRI (See APA §3.2(a); Bid Procedures Motion at 7, lines 6-7; and 10, lines 2-5), thereby
26  leaving $1,138,752.

***The Stalking Horse Should Only Be Entitled to a Credit for the Allowed Secured Portion of its Claim.***

14.     The APA calls for the Stalking Horse to receive a $663,662 credit for the full amount of its pre-petition claim. This claim is secured by personal property at just one of the Restaurants – Chandler ; and it has not been allowed or its secured status determined. Indeed, the court has granted the Committee the right to file a Challenge to the claim on or before September 25.[6]

15.     The Committee believes that the collateral securing the claim has a value substantially less than $663,662 and that the Stalking Horse should only be entitled to a credit for the allowed secured portion – not the entire $663,662. Accordingly, the Committee objects to any Sale purporting to grant the Stalking Horse a credit for the entire $663,662 claim, before such claim is allowed or any determination of it secured status has been made.[7]

16.     At the August 19 hearing, the Stalking Horse argued that it was entitled pursuant to Code §363(k) to a credit bid for the full amount of its claim, regardless of how much of it was actually secured. It cited the Third Circuit's decision in *In re SubMicron Systems Corp.*, 432 F.3d 448 (3rd Cir. 2006) in support of its position.

17.     As the Third Circuit itself has since recognized, however, the §363(k) "right to credit bid is not absolute. A secured lender has the right to credit bid 'unless the Court for cause orders otherwise.' 11 U.S.C. §363(k). In a variety of cases where a debtor seeks to sell assets pursuant to § 363(b), courts have denied secured lenders the right to bid their credit." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315-16 (3rd Cir. 2010)(citing *In re Aloha Airlines*, No. 08–00337, 2009 WL 1371950, at *8 (Bankr.D.Hawaii May 14,

---

[6] See ¶19 of Doc. 138, the Court's Order Authorizing Postpetition Secured Financing and the Use of Cash Collateral and Granting Other Related Relief.

[7] The Committee would not be opposed to allowing a Credit Bid for the full $663,662 as long as the Stalking Horse is required to repay to the Estate any portion of that amount which is subsequently determined to be unsecured.

2009) (determining that "cause exists to deny the credit bid" under § 363(k)); *Greenblatt v. Steinberg*, 339 B.R. 458, 463 (N.D.Ill.2006) (holding the "bankruptcy court did not err in refusing to allow [a secured creditor] to credit bid"); *In re Antaeus Technical Servs., Inc.*, 345 B.R. 556, 565 (Bankr.W.D.Va.2005) (denying right to credit bid to facilitate "fully competitive" cash auction); and *In re Theroux*, 169 B.R. 498, 499 n. 3 (Bankr.D.R.I.1994) (noting that "there is no absolute entitlement to credit bid").

18.    Not only has the Third Circuit itself qualified *SubMicron*, but it is distinguishable from the facts here; and other courts have declined to follow it. In *SubMicron*, the lender had a valid security interest "in essentially all of the assets sold." 432 F.3d at 461. Here, by comparison, ***the Stalking Horse has a security interest in the hard assets of only one of the nine Restaurants***.

19.    *In re Fisker Automotive Holdings, Inc.* 510 B.R. 55 (Bankr. Del. 2014) is instructive. There, the potential acquirer, Hybrid, sought to credit bid $168.5 million owing under a credit facility it had acquired just before bankruptcy; yet, of the assets offer for sale, there were "material assets that were not subject to the properly perfected liens in favor of Hybrid." *Id.* at 58. The *Fisker* court declined to follow *SubMicron*, pointing out that the subject claim had not yet been allowed and there had not yet been any determination as to "how much of the claim … will be *allowed* as a secured claim." Id. at 61 (emphasis in original). It further stated: "The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien." Id. at 61 (citing *In re Daufuskie Isl. Props., LLC,* 441 B.R. 60, 63 (Bankr.D.S.C.2010)(holding that creditor was not entitled to credit bid where its claim was unresolved). For additional authority, see *See National Bank of Commerce of El Dorado v. McMullan (In re McMullan),* 196 B.R. 818, 835 (Bankr. W.D.Ark. 1996) (at sale, mortgagee not allowed to

credit bid its claimed liens or security interest because the validity of its liens and security interests were unresolved).[8]

20.    In *Fisker, supra,* the court found that good cause to "limit the credit bid" to $25 million of the $168.5 million total claim amount, noting that the bidding might be chilled or frozen if it was not capped. *Id.* at 60. That, in turn, would eliminate "chance of creating material value for the estate over and above the present Hybrid bid." *Id.* at 58. Here, as in *Fisker,* the Stalking Horse claim has not been allowed; and there is similar good cause for the court to order to limit its credit bid– to increase the chance of creating value for the estate.

*The Stalking Horse Credit with Respect to the DIP Loan Should Be Limited to Amounts Actually Advanced Less Remaining Cash on Hand.*

21.    The APA calls for the Stalking Horse to receive a credit of $725,000, the maximum amount of the DIP Loan.  (See APA §2.1, giving the Stalking Horse a Credit Bid "in the amount of $725,000.")  Not all of that has been advanced, however; and the Committee objects to giving the Stalking Horse a Credit Bid for more than the actual DIP Loan balance payable.

22.    Additionally, the proposed sale includes all of the Debtors' remaining cash (see APA §1.1(c)),[9] including presumably any unused drawdown on the DIP Loan which the Debtor has on hand.  The Stalking Horse should not be entitled to a credit for all DIP Loan amounts advanced, on the one hand, and receive the unused portion back, on the other.  Accordingly, the Stalking Horse credit with respect to the DIP Loan should be limited to amounts actually advanced less remaining cash on hand.

_____

[8] *See also In re Octagon Roofing,* 123 B.R. 583, 592 (Bankr.N.D.Ill.1991)(bank allowed to credit bid conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the lien were later avoided).

[9] Specifically, this is defines to include "[a]ll cash net of cash reasonably required by the Debtors to satisfy post-Petition Date operating expenses of the Business through the Closing Date." Id.

***The Purchaser's Termination Rights and the Lack of a Fully-Binding Commitment***

23.     The APA grants the Purchaser significant termination rights. That is particularly so if all issues related to the proposed assumption of third-party real property leases have yet to be resolved. If they have not, the Committee is concerned that the Purchaser will have the discretion to terminate the APA if such issues are not resolved (and various other conditions are not satisfied) in a manner that the Purchaser considers acceptable. (See APA §3.2(b), requiring the Seller to deliver an Assignment and Assumption of Restaurant Lease for all Restaurant Leases for the Acquired Restaurants; APA §4.2(b), making it a condition precedent that the Seller tender delivery of everything listed in Section 3.2; and APA §14.4(e), giving the Purchaser the right to terminate if a condition precedent has not been satisfied. There are other similar yet-to-be fulfilled obligations.[10]

24.     If the Purchaser terminates the APA as a result of the failure of one of these conditions, it arguably would be entitled to walk away from the transaction without penalty. The court should not approve a Sale unless this and other provisions of the APA are modified to ensure that this cannot occur. No sale should be approved without a fully-binding and enforceable commitment from the Purchaser.

***No Avoidance Actions or other Claims Should Be Sold.***

25.     The APA contemplates the sale to Purchaser of all Avoidance Actions, defined to include all claims and actions arising under Bankruptcy Code sections 544, 547, 548, 549, and 550. (See APA §1.1(h) and "Avoidance Action" definition at APA page 28). It also may include the sale to Purchaser of additional Claims (broadly defined to include "any claim, cause of action, right of recovery, right of set-off, and right of recoupment or every kind and nature") other than those arising in connection with any Excluded Contract

---

[10] For example, there is a similar provision giving the Purchaser the right to terminate if the Purchaser fails to deliver an Assignment and Assumption of Leases and Contracts for all of the other Purchased Contracts. APA §3.2(c). The Schedule listing the Purchased Contracts is one of the Omitted Schedules.

or Asset. (See APA §1.1, defining "Purchased Assets" to include all assets other than the Excluded Assets; and APA §1.2(e), only excluding "Claims arising with respect to or arising in connection with any Excluded Contract or Excluded Asset"). Thus, for example, any Claims which the Debtors may have for breach of fiduciary duty, embezzlement, overpayment, theft, fraud, and the like may be construed to be part of the sale.

26. To evaluate any proposed sale of these actions, the bankruptcy court must apply the standards for approving compromises under 11 U.S.C. § 363(b)(1). See *Nicole Energy Services, supra,* 385 B.R. 201, 237 (stating that, before approving a sale, the bankruptcy court also must determine whether the proposed compromise is fair and equitable).[11]

27. Avoidance actions should only be exercised for the benefit of the Debtor's estate. *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002). The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors. *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ostpetition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . ."

28. It is doubtful that the Avoidance Actions and other Claims will add anything to the Purchase Price at an auction sale, in which Potential Bidders will base their bids on the going concern value of the restaurants. At the same time, they are important for the Estate to retain. Considering the proposed terms of the APA, in the absence of competitive

---

[11] That would require the bankruptcy court to consider the following four factors: (1) the probability of success in the litigation; (2) the difficulties, if any, the trustee may encounter in collecting on a judgment; (3) the complexity of the litigation and the attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and a proper deference to their reasonable views concerning the litigation. *In re Flight Transportation Corp.*, 730 F.2d 1128, 1135 (8th Cir. 1984).

- 11 -

bidding *they may be the only source of recovery for unsecured creditors in this case.*
Particularly in that context, it would not be in the estate's best interest to sell them; and the
Committee objects to including them in the sale.

**The Right to Challenge Secured Claims Should Be Preserved.**

29.     The Court previously has ordered that the Committee shall have through and
including September 25, 2015 within which to file Challenges to the (i) Chandler Debt
Obligations and the (ii) KRI claim. (See ¶19 of Doc. 138, the Court's Order Authorizing
Postpetition Secured Financing and the Use of Cash Collateral and Granting Other Related
Relief.) Without limitation, the Committee believes that the collateral securing one or both
of these claims has a value less than its respective claim amount. Accordingly, the
Committee objects to any sale order if and to the extent the Committee's right to pursue
such Challenges is not preserved.

**Concluding Comments**

30.     In *In re On-Site Sourcing, Inc.*, 412 B.R. 817 (Bankr. E.D. Va. 2009), the
Court observed that "Chapter 11 is a community action. It is hoped that through the
analysis and action of the creditor body both collectively and individually that the best
result for the most creditors within the confines of the Bankruptcy Code will be achieved."
*Id*, 412 B.R. at 828. Similarly, in *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 426 (Bankr.
S.D. Tex. 2009), the Court noted that "bankruptcy is, at its essence, a collective remedy
intended to benefit all creditors, not just the secured lender." *Id.*, 404 B.R. at 426.

31.     Additionally, caution should be exercised against the use of Chapter 11 in a
manner that benefits specific parties without an appreciable expectation of a recovery for
unsecured creditors. *In re Duro Industries, Inc.*, No. 02-16131-CJK, 2002 WL 34159091,
at *5 (Bankr. D. Mass. Oct. 7, 2002)(stating that "[w]here all equity in a debtor's assets
belongs to the secured creditor, with no appreciable expectation of a remainder for
unsecured creditors, the liquidation of the assets serves no bankruptcy purpose and should

- 12 -

not be permitted to occur in bankruptcy."); *see also In re Cloverleaf Enterprises, Inc.*, No. 09-20056, 2010 WL 1445487, at *3 (Bank. D. Md. Apr. 2, 2010) (declining to approve Section 363 motion for several reasons, including because unsecured creditors would not benefit from proposed transaction); *In re Encore Healthcare Associates*, 312 B.R. 52, 57 (Bankr. E.D. Pa. 2004) (§363 motion denied because proposed sale would generate funds only for secured creditor and would not advance any bankruptcy purpose).

32.     The Committee requests that the Sale not be approved unless and until the Committee's objections and concerns set forth herein are addressed.

Dated September 15, 2015

SCHNEIDER & ONOFRY, P.C.

By  /s/ *Brian N. Spector*
Brian N. Spector
D. Trey Lynn
3101 N. Central Avenue, Suite 600
Phoenix, Arizona 85012-2658
Attorneys for Official Committee

COPY emailed this same date to:

Jordan A. Kroop, Esq.
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Attorney for Cornbread Ventures, LLP

John W. Lucas, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500
Attorneys for Debtors and Debtors in Possession

Randy Nussbaum
Nussbaum Gillis & Dinner, P.C.
14850 N Scottsdale Road, Suite 450
Scottsdale, AZ 85254
RNussbaum@ngdlaw.com
Attorneys for Debtors