ORDERED.

Dated: September 29, 2015

Paul Sala, Bankruptcy Judge

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| In re: | |
|---|---|
| Z'Tejas Scottsdale, LLC, et al., | Case No.: 2:15-bk-09178-PS |
| Debtors. | Chapter 11 |
| Joint Administration Pending With: | Joint Administration With Case Nos.: |
| Z'Tejas 6th Street, LLC | 2:15-bk-09180-PS |
| Z'Tejas Avery Ranch, LLC | 2:15-bk-09184-PS |
| Z'Tejas Bellevue, LLC | 2:15-bk-09188-PS |
| Z'Tejas Bethany Home LLC | 2:15-bk-09193-PS |
| Z'Tejas Chandler, LLC | 2:15-bk-09194-PS |
| Z'Tejas Costa Mesa, LLC | 2:15-bk-09195-PS |
| Z'Tejas GP, LLC | 2:15-bk-09198-PS |
| Z'Tejas Grill Gateway, L.L.C. | 2:15-bk-09200-PS |
| Z'Tejas Holdings, Inc. | 2:15-bk-09201-PS |
| Z'Tejas, Inc. | 2:15-bk-09203-PS |
| Z'Tejas La Cantera, LLC | 2:15-bk-09205-PS |
| Z'Tejas LP, LLC | 2:15-bk-09207-PS |
| Z'Tejas of Arboretum, LLC | 2:15-bk-09208-PS |
| Z'Tejas Restaurant Holdings, LP | 2:15-bk-09210-PS |
| Z'Tejas Salt Lake City, LLC | 2:15-bk-09212-PS |
| Z'Tejas Summerlin, LLC | 2:15-bk-09213-PS |
| Z'Tejas Tempe, LLC | 2:15-bk-09214-PS |
| Taco Guild Osborn LLC | 2:15-bk-09215-PS |

This Pleading applies to:

☑ All Debtors

☐ Specified Debtors

**ORDER: (1) APPROVING ASSET PURCHASE AGREEMENT AMONG THE DEBTORS AND THE BUYER, (2) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(B), (F) AND (M), (3) APPROVING ASSUMPTION, ASSIGNMENT AND**

**SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 363 AND 365, AND (4) DETERMINING THE AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND GRANTING RELATED RELIEF**

The Court having considered the *Motion Requesting (A) the Scheduling of an Auction and Sale Hearing in Connection with the Sale of Substantially All the Debtors' Assets, (B) Approval of Bidding Procedures for Such Assets, (C) Approval of Purchase Agreement with Stalking Horse Bidder, (D) Approval of the Form and Scope of Notice of Auction and Sale Hearing, (E) Approval of Procedures for the Assumption, Assignment and Sale of Contracts and Leases to the Purchaser, and (F) Approval of Sale of the Debtors' Assets to the Purchaser* (the "Motion")[1] filed by Z'Tejas Scottsdale, LLC, the debtors and debtors in possession in the above-captioned cases (the "Debtors"), whereby the Debtors sought an order, among other things, (a) approving certain procedures to conduct a sale of substantially all of the Debtors' assets and for approval, at a subsequent hearing, of the sale of such assets to Cornbread Ventures, LP (the "Purchaser") who was the highest bidder that complied with the applicable procedures, including the overbid provisions (the "Bid Procedures"); and because there were no other parties submitting a qualified bid there was no auction (the "Auction") necessary for the sale of the Purchased Assets, pursuant to the terms of the Asset Purchase Agreement in the form filed with the Court [Docket No. 175] (the "Asset Purchase Agreement") to the Purchaser, (b) authorizing the sale of the Purchased Assets and the transactions contemplated thereby (the "Sale Transaction") to the Purchaser pursuant the Asset Purchase Agreement, (c) approving the assumption, assignment and sale of the Purchased Contracts under section 365 of the Bankruptcy Code, subject to the terms of the applicable purchase agreement(s), and (d) scheduling the Auction and hearing for the sale of the Purchased Assets; and this Court having entered an order on August 24, 2015 [Docket No. 130] (the "Sale Procedures Order")

[1] Capitalized terms not otherwise defined in this Sale Order shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined below).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

approving, among other things, the dates, deadlines and procedures with respect to the Sale Transaction (the "Sale Procedures"), and notice of the Sale Transaction have been provided [Docket No. 131] and notice of assumption and assignment contracts and leases having been provided [Docket No. 132] ("Notice of Assumption, Assignment, and Cure"); and Cornbread Ventures, LP having submitted that certain Stalking Horse Agreement, dated as of July 22, 2015 as amended and executed as the Asset Purchase Agreement by and between the Debtors and the Purchaser (Cornbread Ventures, LP) for the sale of substantially all of the Debtors' assets as designated thereunder (the "Purchased Assets"); and a hearing having been held on September 25, 2015 (the "Sale Hearing") to consider approval of the Asset Purchase Agreement and Sale Transaction; and adequate and sufficient notice of the Sale Motion having been given to all parties in interest in these cases; and all such parties having been afforded due process and an opportunity to be heard with respect to the Sale Motion and all relief requested therein; and the Court having reviewed and considered: (a) the Sale Motion; (b) the objections to the Sale Motion, if any; and (c) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation and sufficient cause appearing;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) & (O). Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. The statutory bases for the relief sought in the Sale Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 6004-1 and 6006-1.

C. As evidenced by the affidavits of service on file with the Court, (i) due, proper, timely, adequate, and sufficient notice, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Sale Procedures Order and the Asset Purchase Agreement; (ii) such notice was good, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion is or shall be required.

D. As demonstrated by (i) evidence adduced at and prior to the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have determined that the Asset Purchase Agreement represents the highest and/or best offer for the Purchased Assets and that no further marketing or sales process with respect to the Purchased Assets is in the best interests of the Debtors' estates or creditors or is likely to lead to an offer that provides consideration in excess of the consideration provided in the Asset Purchase Agreement. The Sale Procedures were non-collusive, duly noticed, substantively and procedurally fair to all parties, and were the result of arm's length negotiations. The Sale Procedures Order has been complied with in all material respects.

E. Upon entry of this order (the "Sale Order"), the Debtors shall have full authority to consummate the Sale Transaction.

F. Approval of the Asset Purchase Agreement and the Management Agreement and consummation of the Sale Transaction is in the best interests of the Debtors, their estates, creditors, and other parties in interest. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the sale to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.

G. The Asset Purchase Agreement and the Management Agreement were negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions. The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101 of the Bankruptcy Code.

H. The sale price in respect of the Purchased Assets was not controlled by any agreement among potential acquirers of the Debtors' Assets and neither the Debtors nor the Purchaser engaged in collusion or any other conduct that would cause or permit the Asset Purchase Agreement or Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code. Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to any damages or other recovery pursuant to section 363(n).

I.      The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  The Purchaser is acting in good faith within the meaning of section 363(m) in consummating the Sale Transaction.

J.      The consideration to be provided by the Purchaser pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and/or best offer for the Purchased Assets; (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative; and (iv) constitutes reasonably equivalent value and fair consideration.

K.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and will vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and interests of any Governmental Body), other than (i) Liens specifically assumed by Purchaser under the Asset Purchase Agreement, (ii) Liquor Licenses or other licenses, registrations, qualifications, or permits necessary to continue operation of the Business that are subject to review and approval by a Governmental Body, (iii) any alcohol beverage inventory that can be transferred only upon authorization of the pertinent Governmental Body or issuance of the pertinent Liquor License Approval, (iv) Permitted Exceptions; provided, that all Liens, claims, encumbrances and interests of which the Purchased Assets are sold free and clear shall attach to the proceeds of the sale, in order of priority, and (v) where applicable, rights afforded and preserved in accordance with Paragraph 13 below.  The Debtors may sell the Purchased Assets free and clear of all such Liens, claims, encumbrances and interests because, in each case, except where rights are afforded and preserved in accordance with Paragraph 13 below, one or more of the standards set forth in section 363(f)(2) and (3) of the Bankruptcy Code have been satisfied.

L.      For purposes of section 363(b)(1) of the Bankruptcy Code, the Debtors have, in connection with offering a product or service, previously disclosed to one or more individuals a policy prohibiting the transfer of "personally identifiable information" (as defined in 11 U.S.C. § 101(41A)) about individuals to persons that are not affiliated with the Debtors, and the Sale

Transaction is consistent with that policy because the policy, as in effect on the Petition Date, specifically permits the transfer of such "personally identifiable information" to the Purchaser because the Purchaser has agreed to be bound by the same or substantially similar privacy protections as those established by the Debtors' privacy policy.

M. The transfer of the Purchased Assets to the Purchaser or its designee(s), including the assumption by the Debtors and assignment and sale to the Purchaser or its designee(s) of the Purchased Contracts, will not subject the Purchaser or its designee(s) to any liability whatsoever (including any successor liability) with respect to the operation of the Business prior to the Closing or by reason of such transfer, except that the Purchaser or its designee(s), as applicable, shall remain liable for the Assumed Liabilities.

N. The Asset Purchase Agreement and the Management Agreement are valid and binding contracts between the Debtors and the Purchaser, which are and shall be enforceable according to their respective terms.

O. Notice of the Debtors' assumption, assignment and sale to the Purchaser of the Purchased Contracts has been provided to each non-Debtor party thereto, together with a statement therein from the Debtors with respect to the amount, if any, to be paid to such non-Debtor party under section 365(b) of the Bankruptcy Code as a condition to such assumption, assignment and sale [Docket No. #143]. With respect to each Purchased Contract, payment of the amounts set forth on Schedules 1.1(e) and 1.3(b) of the Asset Purchase Agreement (the "Cure Schedule") (each a "Cure Cost" and collectively, the "Cure Costs") and as annexed hereto as **Exhibit A** is sufficient for the Debtors to comply fully with the requirements of section 365(b)(1)(A) and (B) of the Bankruptcy Code, subject to the exceptions provided herein. In addition, the Purchaser has provided adequate assurance of its ability to perform its obligations under each of the Purchased Contracts within the meaning of Section 365(b) and (f)(2)(B) of the Bankruptcy Code, subject to the exceptions provided herein. Therefore, the Purchased Contracts may be assumed by the Debtors and assigned and sold to the Purchaser.

P. The Debtors currently hold or have been issued Liquor Licenses or other licenses, registrations, qualifications, or permits necessary to continue operation of the Business that remain

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

in effect authorizing the respective licensees to conduct retail sales of alcohol beverages at each of the restaurant properties included in the Purchased Assets and the Designation Rights Assets. Schedule 1.1(g) of the Asset Purchase Agreement identifies (i) each such Liquor License or other license, registration, qualification, or permit; (ii) the property location that is the licensed premises associated with each such Liquor License or other license, registration, qualification, or permit; and (iii) the state or municipal government alcohol regulatory agency respectively responsible for issuing and regulating each such Liquor License or other license, registration, qualification, or permit. The sale of alcohol beverages is an important component of the Business. The Court finds that it is in the best interests of the estates and all other parties in interest for these sales to continue uninterrupted during the transition of ownership from the Debtors to the Purchaser following the Court-ordered transfer of the Purchased Assets (including, without limitation, any Designation Rights Asset that is deemed a Purchased Asset pursuant to Section 2.7(c) of the Asset Purchase Agreement), subject to reasonable and good faith efforts to timely transfer existing Liquor Licenses or other licenses, registrations, qualifications, or permits or apply for new licenses, permits, registrations or qualifications equivalent to the existing Liquor Licenses or other licenses, registrations, qualifications, or permits that are not subject to transfer.

Q. There is other good and sufficient cause to grant the relief requested in the Sale Motion and approve the Asset Purchase Agreement, the Management Agreement and the Sale Transaction.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1. The Sale Motion is GRANTED as set forth herein.

2. Except as otherwise provided in this Sale Order or set forth on the record of the Sale Hearing, any objections to the Sale Motion or the entry of this Sale Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby DENIED and OVERRULED.

3. The Asset Purchase Agreement, including all of its terms and conditions, and the Sale Transaction are hereby approved.

4. The Management Agreement, including all of its terms and conditions, is hereby approved.

5. Pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized to (i) execute, deliver, and perform under, consummate, and implement the Asset Purchase Agreement and Management Agreement together with all additional instruments and documents that are requested by the Purchaser and may be reasonably necessary or desirable to implement the Asset Purchase Agreement and Management Agreement, and (ii) take any and all actions as they deem necessary, appropriate, or advisable for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to Purchaser's possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement, including, without limitation, any and all actions reasonably requested by the Purchaser to effectuate the Asset Purchase Agreement.

6. Pursuant to sections 105(a), 363(f) and 365(b) of the Bankruptcy Code, upon the Closing: (i) the transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest the Purchaser with all right, title, and interest in and to the Purchased Assets; (ii) the Purchased Assets shall be transferred to the Purchaser free and clear of all Liens, encumbrances, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and interests of any Governmental Body), other than Liens specifically assumed by Purchaser under the Asset Purchase Agreement and Permitted Exceptions, in accordance with section 363(f) of the Bankruptcy Code, with any such Liens, claims, encumbrances and interests of which the Purchased Assets are sold free and clear to attach to the proceeds of the Sale Transaction, in the order of their priority, with the same validity, force, and effect which they had against the Purchased Assets prior to the entry of this Sale Order, subject to any rights, claims, and defenses the Debtors and all interested parties may possess with respect thereto; and (iii) each of the Contracts designated as Purchased Contracts at Closing shall be deemed assumed by the Debtors and assigned and sold to the Purchaser.

7. Except as otherwise provided herein, the Sale Order is and shall be effective as a determination that all Liens, claims, encumbrances and interests, other than Liens specifically assumed by Purchaser under the Asset Purchase Agreement and Permitted Exceptions, shall be and are, without further action by any Person, released with respect to the Purchased Assets as of the Closing Date.

8. Except to the extent expressly included in the Assumed Liabilities, to enforce the Asset Purchase Agreement, or otherwise provided herein, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, without limitation, the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), all debt security holders, all equity security holders, the Debtors' employees or former employees, governmental, tax, and regulatory or investigatory authorities of any sort, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding any Liens, claims, encumbrances, and other interests of any kind and every kind whatsoever against, in or with respect to any of the Debtors, the Business, or all or any part of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, all or any part of the Purchased Assets, the operation of the Business prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Liens, claims, encumbrances, or other interests, whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser or any affiliate, successor, or assign thereof, or against the Purchased Assets, except as set forth herein.

9. The Purchaser shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity and the Purchaser has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as otherwise expressly provided in the Asset Purchase Agreement or in this Sale Order.

10. Notwithstanding anything to the contrary in the Asset Purchase Agreement, any and all causes of action, claims, objections and defenses arising under or deriving from sections 506(d), 510, 542, 544, 545, 547, 548, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, or any similar

state or federal law ("Avoidance Actions") and proceeds relating thereto, of the Debtors, shall be retained and enforceable by the Debtors.

11. Pursuant to section 365 of the Bankruptcy Code, the Debtors are authorized to assume the Purchased Contracts and assign and sell the Purchased Contracts to the Purchaser. The Purchaser shall pay with Cash Payment to the Purchased Contracts set forth in Schedules 1.1(e) and 1.3(b) of the Asset Purchase Agreement the Cure Costs set forth on the Cure Schedule currently with Closing; provided, however, that the Purchaser may direct the removal of any such contract or lease from the list of Purchased Contracts set forth in Schedule 1.1(b) of the Asset Purchase Agreement, in which case such contract or lease shall not constitute a Purchased Contract and neither the Debtors nor the Purchaser shall have any obligation to pay any Cure Amount with respect thereto. Purchaser may direct the removal of any Contract from the list of Purchased Contracts set forth in Schedule 1.1(e) of the Asset Purchase Agreement in Purchaser's sole and absolute discretion (i) until the Closing, and (ii) after the Closing, if the Cure Amount for such Contract is subject to dispute as of the Closing and is determined by the Bankruptcy Court after the Closing to be greater than the amount set forth in the Cure Schedule or Schedule 1.3(b) of the Asset Purchase Agreement. Notwithstanding anything to the contrary in this Sale Order or the Asset Purchase Agreement, in connection with the Debtors' non-residential real property leases that are being assumed by the Debtors and assigned to the Purchaser pursuant to this Sale Order (collectively, the "Leases"), subject to the Section 2.7(c) of the Asset Purchase Agreement, the Debtors and Purchaser shall assume the liability for all accrued, but unbilled, tenant obligations under and to the extent set forth in the Leases for common area maintenance, taxes, rent adjustments, and reconciliations and allocate the claims arising therefrom to the Debtors and Purchaser, accordingly, relating to the period prior to and after the Closing at the time the Purchaser elects to take assignment of the Leases as set forth in Section 2.7(c) of the Asset Purchase Agreement and Paragraph 13 herein and upon the Purchaser's election to take assignment of the Leases, the Debtors shall file a notice of assignment with the Court and provide with any additional cure obligations that have not been satisfied between entry of this Sale Order and the notice of assignment. The allocation set forth herein is independent of the Landlords' rights to receive payment of these amounts, and the Purchaser shall pay all accrued, but

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

unbilled, tenant obligations under and to the extent set forth in the Leases for common area maintenance, taxes, rent adjustments, and reconciliations when such charges are billed under the Leases in the ordinary course. The Purchaser shall also indemnify and hold harmless the counterparties to the Leases to the extent set forth in the Leases for any event which occurs prior to assumption and assignment of the Leases but that is unknown to the counterparties as of the date of assumption and assignment and Purchaser may make a claim under any applicable insurance policy covering one or more Debtors' operations for any such event.

12. The Purchased Contracts shall be assumed and assigned to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Purchased Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Purchased Contracts after such assignment and sale to the Purchaser.

13. The Lease between Pavilion Holdings, L.L.C., an Arizona limited liability company, ("Pavilion Holdings") as Landlord, and Z'Tejas Chandler, LLC, as the successor to Z'Tejas Chandler, Inc., a Delaware corporation, as Tenant, dated as of December 28, 1999 (the "Ground Lease") is an unexpired lease, the assumption and assignment of which is governed by 11 U.S.C. § 365. The Ground Lease is not subject to or governed by section 363 of the Bankruptcy Code and neither the Ground Lease nor any rights, interests or entitlements provided in the Ground Lease are being sold pursuant to section 363(f) of the Bankruptcy Code or any other subsection of 363 of the Bankruptcy Code. Nothing in the Asset Purchase Agreement, the Management Agreement, the other ancillary agreements or this Sale Order shall impair or affect in any way the rights, interests or entitlements afforded to Pavilion Holdings under the Ground Lease and applicable law, except as may be provided under section 365(b)(2) of the Bankruptcy Code or with respect to prohibitions against assignment subject to section 365(f)(1) of the Bankruptcy Code. Without limiting the foregoing, notwithstanding any other provision in the Asset Purchase Agreement, the Management Agreement, the other ancillary agreements or this Sale Order: (i) the sale of the building and other improvements on the premises covered by the Ground Lease to Purchaser shall not affect or impair

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the right and entitlement of Pavilion Holdings to full and complete ownership of the building and other improvements, free and clear of any liens or encumbrances upon termination of the Ground Lease, as further set forth in the Ground Lease; (ii) neither section 363(f) of the Bankruptcy Code nor any other subsection of 363 of the Bankruptcy Code shall be applicable to the right and entitlement of Pavilion Holdings, L.L.C. to full and complete ownership of the building and other improvements, free and clear of any liens or encumbrances upon termination of the Ground Lease, as further set forth in the Ground Lease; and (iii) the Assignment and Assumption of Ground Lease with Consent of Landlord (the "Assumption and Assignment"), a copy of which is attached as **Exhibit B** and is incorporated as part of this Sale Order, is hereby approved and shall govern the assumption and assignment of the Ground Lease and, to the extent there is any conflict or inconsistency between the Assignment and Assumption and any other provision in the Sale Order, Asset Purchase Agreement, the Management Agreement, the other ancillary agreements or this Sale Order, the provisions of the Assumption and Assignment shall control.

14. Subject to all of the applicable terms and conditions set forth in the Asset Purchase Agreement:

a. During the Designation Rights Period (as defined below), the Debtors (and Purchaser to the extent it takes over Debtors' operations at any premises) shall (A) not reject any Contract unless such Contract is expressly designated by Purchaser in writing as an Excluded Contract or unless otherwise agreed to in writing by Purchaser, (B) hold all Permits and other assets specified by Purchaser in writing in abeyance pending designation for assignment or exclusion by Purchaser in accordance with Section 2.7(c) of the Asset Purchase Agreement, and (C) comply with their obligations under section 365(d)(3) of the Bankruptcy Code, including the maintenance of all insurance policies required under the Leases.

b. Any Contract (A) set forth on Schedule 2.7(c) of the Asset Purchase Agreement, and any Permits and other assets designated in writing by Purchaser on Schedule 2.7(c) of the Asset Purchase Agreement, in each case prior to Closing, shall

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
San Francisco, California

constitute a "Designation Rights Asset." Purchaser shall have the right, by written notice to the Debtors within the Designation Rights Period, to specify that (A) any Designation Rights Asset that is a Contract shall be held by the Debtors and not rejected pursuant to section 365 of the Bankruptcy Code for the duration of the Designation Rights Period or earlier as provided in Section 2.7(c) of the Asset Purchase Agreement, and (B) any Designation Rights Asset that is not a Contract shall be held by the Debtors in abeyance during the Designation Rights Period pending designation for assignment or exclusion by Purchaser in accordance with Section 2.7(c) of the Asset Purchase Agreement.

c. As to each Designation Rights Asset, as soon as practical after receiving further written notice(s) (each, a "Designation Notice") from Purchaser during the Designation Rights Period (*i.e.*, the period commencing on the Closing Date and ending six (6) months after the Closing Date; provided, however, that such period shall be 120 days after the Petition Date for any Designation Rights Asset that is a Real Property Lease pursuant to section 365 of the Bankruptcy Code unless such deadline is extended by motion or consent of the applicable landlord) requesting assumption, assignment and sale of any Designation Rights Asset to Purchaser or a third party, the Debtors shall, subject to Purchaser or such third party resolving any objections reserved herein and paying all Cure Costs to the extent required by section 365 of the Bankruptcy Code, take all actions required by this Sale Order or otherwise that are reasonably necessary to assume, assign and sell to Purchaser or such third party the applicable Designation Rights Asset pursuant to section 363 of the Bankruptcy Code and, if such Designation Rights Asset is a Contract, section 365 of the Bankruptcy Code by filing a notice with the Court and serving such notice on the counterparty of such Designation Rights Asset.

d. Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary, upon receipt of the Designation Notice, Landlords shall have five (5) business days to object to any change in a landlord's Cure Costs or any change

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

in the Purchaser's ability to demonstrate adequate assurance of future performance during the Designation Rights Period.

e.  Notwithstanding anything in the Asset Purchase Agreement to the contrary, on the date any Designation Rights Asset is assumed, assigned and sold to Purchaser or its designee pursuant to Section 2.7(c) of the Asset Purchase Agreement, such Designation Rights Asset shall be deemed a Purchased Asset for all purposes under the Asset Purchase Agreement and this Sale Order, and no further consideration (except for the applicable Cure Cost with respect to Designation Rights Assets that are Contracts or as provided in this Sale Order) shall be required to be paid for any Designation Rights Asset that is assumed, assigned and sold to Purchaser or its designee.

f.  Notwithstanding anything in the Asset Purchase Agreement or this Sale Order to the contrary, (i) accrued real estate taxes that constitute the Debtors' obligations under the applicable Designated Rights Assets; (ii) indemnity obligations for claims that may have accrued (*i.e.*, slip and fall accidents) but not yet been asserted; and (iii) rent that may have accrued but was not paid, each that were not due or payable at the time the Notice of Assumption, Assignment, and Cure was filed and served is hereby reserved and shall be paid, to the extent such claims are valid, as part of the Cure Costs at the time the applicable Designated Rights Assets is assumed and assigned to the Purchaser and such claims shall be paid by the Debtors and Purchaser as allocated under the Asset Purchase Agreement. Purchaser may make a claim under any applicable insurance policy covering one or more Debtors' operations for any accrued indemnity obligation described in (ii) above associated with a claim arising at any time before the time the applicable Designated Rights Assets are assumed and assigned to the Purchaser.

g.  Following the earlier of (A) the end of the Designation Rights Period and (B) the date of the Debtors' receipt of written notice from Purchaser designating the exclusion of a Designation Rights Asset, a Designation Rights Asset shall be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

deemed to be an Excluded Asset for all purposes under the Asset Purchase Agreement.

15. All defaults or other obligations of the Debtors under each Purchased Contract arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured and any pecuniary loss arising therefrom deemed compensated, upon payment of the Cure Amount with respect thereto, if any, and the Purchaser shall have no liability or obligation arising or accruing in respect of the Purchased Contracts on or prior to the Closing, other than as set forth herein. The non-Debtor parties to the Purchased Contracts are barred from asserting against the Debtors, the Purchaser, and their respective successors and assigns, any accrued default or unpaid obligation allegedly accruing before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Purchased Contracts incurred prior to the Closing, other than the Cure Amounts and as otherwise set forth herein. Notwithstanding any other provision of the Asset Purchase Agreement or Sale Order, nothing shall preclude Landlords from seeking to collect from Debtors' insurance policies for any claims against Landlords that arise during the pre-Closing period, if any.

16. The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement and the Management Agreement, including the assumption of the Assumed Liabilities, payment of the Cash Payment as set forth in Section 2.1 of the Asset Purchase Agreement, and release of the Escrow Deposit for the payment of the secured claims and other wind-down expenses of the Debtors, is fair and reasonable.

17. The Asset Purchase Agreement, the Management Agreement and the Sale Transaction shall not be avoided under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Asset Purchase Agreement, the Management Agreement or the Sale Transaction.

18. The Asset Purchase Agreement, the Management Agreement and the Sale Transaction are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Asset Purchase Agreement, the Management Agreement and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Sale Transaction shall not affect the validity of the sale of the Purchased Assets to the Purchaser or any other aspect of the Sale Transaction, unless this Sale Order is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Purchased Assets and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

19. With the exception of alcohol beverage inventories that are received, possessed sold and served pursuant to the Liquor Licenses, all persons and entities that are in possession of some or all of the Purchased Assets as of the Closing are hereby ordered to surrender possession of such Purchased Assets to the Purchaser as of the Closing. Possession of each and any such alcohol beverage inventory shall be surrendered to the Purchaser at the earlier of (i) immediately following Closing where allowed by applicable Law; (ii) receipt by the Purchaser of authorization from the pertinent Governmental Body where required by applicable Law, or (iii) receipt by the Purchaser of the pertinent Liquor License Approval.

20. Notwithstanding anything in the Asset Purchase Agreement or this Sale Order, prior to the transfer of any assets by Debtors to Purchaser pursuant to this Order, Debtors shall segregate and hold in escrow the amount of $150,629.51 (the "Escrow Funds"). The Escrow Funds shall be used solely for the purpose of paying and satisfying claims arising under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.* and the Packers and Stockyards Act, 7 U.S.C. §181 *et seq.*, including but not limited to the claims of PACA creditors, Worldwide Produce ($16,127.48), U.S. Foods ($13,416.37), Brothers Produce of Austin ($46,167.09), and Grand Avenue Produce ($64,091.00), inclusive of accrued attorneys' fees in the amount of $10,827.57 for Grand Avenue Produce, pending final disposition of the Debtors' *Motion for Turnover of PACA Trust Assets* [Docket No. 163], or further order of this Court directing disposition of the Escrow Funds.

21. This Sale Order is and shall be binding upon and shall govern acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is

the assignee and owner of the Purchased Assets free and clear of all Liens, claims, encumbrances and interests, other than Liens specifically assumed by Purchaser under the Asset Purchase Agreement, Permitted Exceptions, or as otherwise provided in this Sale Order (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized and specifically directed to strike recorded claims, Liens and interests against the Purchased Assets recorded prior to the date of this Sale Order, other than Liens specifically assumed by Purchaser under the Asset Purchase Agreement and Permitted Exceptions.

22. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including the Asset Purchase Agreement, the Management Agreement and the Sale Transaction.

23. To the extent any Liquor License or other license, registration, qualification or permit necessary for the operation of the Business is not an assumable and assignable executory contract, Purchaser shall make reasonable efforts to apply for and obtain such Liquor License or other license, registration, qualification or permit promptly after the Closing Date, and the Debtors shall cooperate reasonably with Purchaser in those efforts at Purchaser's expense in accordance with the terms of the Management Agreement and the Asset Purchase Agreement. Each existing Liquor License or other license, registration, qualification or permit applicable to the Business, including but not limited to each of the Liquor Licenses identified on Schedule 1.1(g) of the Asset Purchase Agreement, shall remain in place for Purchaser's benefit until either (i) an equivalent new Liquor License or other license, registration, qualification or permit is obtained, or (ii) the required Liquor License Approvals are secured, or the existing Liquor License or other license, registration, qualification or permit is transferred in accordance with applicable administrative procedures and all costs relating to such shall be borne solely by the Purchaser in addition to the Cash Payment.

24. Specifically, with regard to the sale of alcohol beverages and food at any of the restaurant business properties encompassed by the Purchased Assets (including any Designation Rights Asset that is deemed a Purchased Asset pursuant to Section 2.7(c) of the Asset Purchase Agreement), the Court hereby orders that the Debtors and all other parties in interest shall cooperate with and support the Purchaser in executing such applications and furnishing such documents as are

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

necessary for the Purchaser to obtain, in its name, any such temporary new alcohol beverage license, Liquor License Approvals, transferred Liquor License, and/or other licenses, registrations, qualifications, and permits necessary to continue operation of the Business without interruption. Moreover, except for good cause based on any alleged violations of Law (other than alleged violations based on the transfer of ownership of the Business occurring pursuant to the Asset Purchase Agreement and this Sale Order) each of the state or municipal government agencies regulating restaurants and the sale of food and alcoholic beverages at restaurants shall not interrupt the Business conducted at any of the restaurant business properties listed on Schedule 1.1(g) of the Asset Purchase Agreement, including the sale of alcoholic beverages and food by the Purchaser either on its own behalf, or on behalf of one or more of the Debtors pursuant to a duly executed Management Agreement, without first obtaining relief from this Court. The Purchaser may continue to operate at each of the restaurant business properties identified on Schedule 1.1(g) of the Asset Purchase Agreement under existing Liquor Licenses, state food service licenses, local occupational licenses, and any other licenses, registrations, qualifications or permits needed to operate at any of those restaurant business properties, with no interruption of the business conducted at any such premises, until the Liquor License Approvals have been secured and other licenses, registrations, qualifications and permits have been transferred to the Purchaser, or new alcohol beverage licenses and other licenses, registrations, qualifications and permits have been issued to the Purchaser.

25. The terms and provisions of the Asset Purchase Agreement, the Management Agreement, the other ancillary agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of the Debtors' cases to cases under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding and not subject to rejection or avoidance. The Asset Purchase Agreement, the Management Agreement, the Sale Transaction and this Sale Order shall be binding upon, and shall not be subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee appointed in the Bankruptcy Cases. Further, nothing contained in any plan of reorganization (or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

liquidation) confirmed in these chapter 11 cases or any order confirming any plan of reorganization (or liquidation) or any other order entered in these cases shall conflict with or derogate from the provisions of the Asset Purchase Agreement, the provisions of the Management Agreement or the terms of this Sale Order.

26. The Asset Purchase Agreement, the Management Agreement and any related agreements, documents, or other instruments may be amended by the parties in a writing signed by such parties without further order of the Court, provided that any such amendment does not have a material adverse effect on the Debtors or the Debtors' estates.

27. The failure to include specifically any particular provision of the Asset Purchase Agreement or the Management Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and the Management Agreement be authorized and approved in their entirety.

28. To the extent of any inconsistency between the provisions of this Sale Order, the Asset Purchase Agreement, the Management Agreement, and any documents executed in connection therewith, the provisions contained in the Sale Order, the Asset Purchase Agreement, the Management Agreement and any documents executed in connection therewith shall govern, in that order.

29. To the extent the Schedules to the Asset Purchase Agreement are updated in accordance therewith (with the approval of the Purchaser), the Debtors shall file updated Schedules to the Asset Purchase Agreement (as such Schedules may be approved by the Purchaser) as soon as practicable, but in no event later than five (5) Business Days following the Closing Date.

30. The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of all Liens, claims, encumbrances and interests, other than Liens specifically assumed by Purchaser under the Asset Purchase Agreement and Permitted Exceptions, shall be self-executing, and notwithstanding the failure of the Debtors, the Purchaser, or any other party to execute, file or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof, all Liens, claims, encumbrances, and other interests on or against such Purchased Assets (other than Liens specifically

assumed by Purchaser under the Asset Purchase Agreement and Permitted Exceptions), if any, shall be deemed released, discharged and terminated.

31. In connection with the closing of the Sale Transaction, the Debtors' counsel shall escrow and segregate $1,250,000 of the Sale Transaction proceeds pending documentation and the Court's approval of the settlement among the Debtors, Committee, and KarpReilly Investments, LLC that was set forth on the record of the Sale Hearing.

32. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062, this Sale Order shall be effective and enforceable immediately and shall not be stayed.

33. This Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or related to this Sale Order, the Asset Purchase Agreement, the Management Agreement or any other related agreements, including without limitation: (a) any actual or alleged breach or violation of this Sale Order, the Asset Purchase Agreement, the Management Agreement or any related agreements, (b) the enforcement of any relief granted in this Sale Order, or (c) as otherwise set forth in the Asset Purchase Agreement or in the Management Agreement.

***DATED AND SIGNED AS INDICATED ABOVE***

**EXHIBIT A**

**(Cure Schedule)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:88704.5
21

# EXHIBIT A

| DEBTOR | VENDOR CONTRACTS AND ADDRESS | DESCRIPTION | CURE COST | DESIGNATED |
|---|---|---|---|---|
| Z Tejas Inc | Opentable<br>1 Montgomery Street, Suite 700<br>San Francisco, CA 94104 | Client Agreement | 5,957.97 | |
| Z Tejas Inc | Canon Financial<br>14904 Collections Center Drive<br>Chicago, IL 60693 | Software Licenses & Services Agreement | 3,575.54 | |
| Z Tejas Inc | Ecolab Institutional<br>Po Box 70343<br>Chicago, IL 60673 | Master Distribution Agreement | 7,237.74 | |
| Z Tejas Inc | Fresh Concepts<br>25109 Jefferson Ave , # 305<br>Murrieta, CA 92562 | Produce Purchasing Agreement | 0.00 | |
| Z Tejas Inc | Garda<br>3209 Momentum Place<br>Lockbox #233209<br>Chicago, IL 60689 | Armoured Car Services Agreement | 4,224.46 | |
| Z Tejas Inc | Andy Sundell & Associates<br>5535 E Thunder Hawk Road<br>Cave Creek, AZ 85331 | Client Agreement | 0.00 | |
| Z Tejas Inc | Muzak/Mood<br>1703 W 5th Street, Suite 600<br>Austin, TX 78703 | Services And License Agreement | 1,165.78 | |
| Z Tejas Inc | Mtower IT Solutions<br>10235 S 51ST ST STE 165<br>PHOENIX, AZ 85044 | Client Agreement | 4,340.83 | |
| Z Tejas 6th St | Austin Valet<br>2509 Glen Springs Way<br>Austin, TX 78741 | Valet Services Contract | 4,022.12 | |
| Z Tejas Inc | American Valet<br>8902 N Central<br>Phoenix, AZ 85020 | Valet Services Contract | 8,700.00 | |
| Z'Tejas Arboretum | Brothers Valet LLC<br>11505 Oak Knoll Dr.<br>Austin, TX 78759 | Valet Services Contract | 0.00 | |
| Taco Guild Osborn | Humm<br>7000 N Mo Pac Expressway, Suite 190<br>Austin, TX 78731 | Product And Services Agreement | 0.00 | |

| DEBTOR | VENDOR CONTRACTS AND ADDRESS | DESCRIPTION | CURE COST | DESIGNATED |
|---|---|---|---|---|
| Z Tejas Inc | Wells Fargo Merchant Services<br>Attn: Corporate Trust Services<br>MAC C7301-024<br>1740 Broadway<br>Denver, CO 80274 | Merchant Services Agreement | 0.00 | |
| Z Tejas Inc | Corvirtus<br>1011 N Weber Street<br>Colorado Springs, CO 80903 | Services And License Agreement | 2,354.81 | |
| Z Tejas 6th St | Dyezz<br>2113 Wells Branch Pkwy, Suite 6700<br>Austin, TX 78728 | Security System #101 6th Street | 650.58 | |
| Z Tejas Inc | Inmoment<br>310 East 4500 South, Ste. 450<br>Salt Lake City, UT 84107 | Guest Survey/Feedback | 595.00 | |
| Z Tejas Inc | Andysundell & Associates<br>5535 E Thunder Hawk Road<br>Cave Creek, AZ 85331 | Purchasing Consultant | 0.00 | |
| Z Tejas Inc | James Agency<br>8100 E Indian School Rd, Suite 201<br>Scottsdale, Az 85251 | PR Firm - Marketing | 0.00 | |
| Z Tejas Inc | XO Communications<br>File 50550<br>Los Angeles, CA 90074 | Internet/VOIP All Restaurants | 120.11 | |
| Z Tejas Inc | Directv<br>PO Box 60036<br>Los Angeles, CA 90060 | All Locations Except #102 Scottsdale | 3,126.76 | |
| Z Tejas Inc | Cox Communications<br>PO BOX 53249<br>Phoenix, AZ 85072 | Cable TV #102 Scottsdale/Corporate Internet | 684.26 | |

## EXHIBIT A

| DEBTOR | STORE # | LEASES AGREEMENTS AND EFFECTIVE DATE | LANDLORD AND ADDRESS | CURE COSTS | DESIGNATED |
|---|---|---|---|---|---|
| Z Tejas 6th St | 101 | 6th Street, 1110 W. 6th Street (main building)<br>Lease Agreement - December 2, 1993 | 1110 W 6th Street Property<br>c/o Guy & Larry Restaurants<br>14850 N Scottsdale Rd., Ste 265<br>Scottsdale, AZ 85254 | 29,359.79 | YES |
| Z Tejas 6th St | 101 | 6th Street, 1110 W. 6th Street (annex)<br>Ogden Restaurant Lease - July 5, 1995 | Robert L & Mary D. Ogden, L.P.<br>2302 W. 10th Street<br>Austin, TX 78703 | 0.00 | YES |
| Z Tejas 6th St | 101 | 6th Street, 1110 W. 6th Street (parking lot) | Murphy Family Trust<br>3501 Dime Circle, Suite 101<br>Austin, TX 78744 | 1,105.00 | YES |
| Z'Tejas Scottsdale | 102 | Scottsdale, 7014 E. Camelback Road<br>Lease Agreement - 2009 | Scottsdale Fashion Square LLC<br>Po Box 31001-2156<br>Pasadena, CA 91110 | As agreed to in the Assumption and Assignment Agreement | YES |
| Z'Tejas Arboretum | 104 | Arboretum, 9400 A. Arboretum Blvd.<br>Lease Agreement - November 10, 1994 | Gf Daycare Ltd.<br>c/o Live Oak Gottesman<br>4330 Gaines Ranch Rd., Ste 100<br>Austin, TX 78735 | 0.00 | YES |
| Z'Tejas Gateway | 105 | Gateway, 10625 N. Tatum Blvd.<br>Fundamental Lease Provisions - December 19, 2004 | Shea and Tatum Associates<br>Dept 105748 20309 8764<br>PO Box 73001<br>Cleveland, OH 44193 | 46,319.07 | YES |
| Z'Tejas Tempe | 108 | Tempe, 20 W. 6th Street<br>Centerpoint Retail Lease - April 30, 1999 | Hamilton Chase-Tempe LLC<br>828 Ballard Canyon Rd.<br>Solvang, CA 93463 | 1,080.19 | YES |

| DEBTOR | STORE # | LEASES AGREEMENTS AND EFFECTIVE DATE | LANDLORD AND ADDRESS | CURE COSTS | DESIGNATED |
|---|---|---|---|---|---|
| Z'Tejas Avery Ranch | 120 | Avery Ranch, 10525 W. Parmer Lane<br>Lease Agreement - February 5, 2008 | ARC CAFEUSA001 LLC<br>ID 082230 - Dept 880044<br>2338 W Royal Palm Rd, Ste. J<br>Phoenix, AZ 85021 | 20,634.10 | YES |
| Z'Tejas Bethany Home | 122 | Bethany Home, 1525 E. Bethany Home Rd #6<br>Lease Agreement - September 26, 2011 | 16 Bethany Station, LLC<br>2021 East Camelback Rd., Ste. A38<br>Phoenix, AZ 85016 | 0.00 | YES |
| Taco Guild Osborn | 301 | Taco Guild Osborn, 546 E Osborn Road<br>Lease Agreement - April 10, 2013 | Old School Properties LLC<br>9340 W Pico Blvd., Ste. 2<br>Los Angeles, CA 90035 | 0.00 | YES |
| Z'Tejas Chandler | 109 | Chandler, 7221 West Ray Road<br>Lease Agreement - December 28, 1999 | Pavillion Holdings<br>3131 E. Camelback Road, Ste 310<br>Phoenix, AZ 85016 | Attorneys' fee portion of the cure claim to be determined among the parties or resolved by the Court; otherwise no cure claim. | YES |
| Z Tejas Inc | Corporate | Corporate Office, 6909 E. Greenway Parkway, Suite 195<br>Office Building Lease - July 2, 2012 | Hilltop-Scottsdale LLC<br>c/o Furst Properties<br>14648 N Scottsdale, Ste. 140<br>Scottsdale, AZ 85254 | 0.00 | YES |

# EXHIBIT B

**(PH Assumption/Assignment Agreement)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:88704.5 22

# ASSIGNMENT AND ASSUMPTION OF GROUND LEASE WITH CONSENT OF LANDLORD

This Assignment and Assumption of Ground Lease with Consent of Landlord ("***Agreement***") made and entered into as of September __, 2015 by and between Z'Tejas Chandler, LLC ("ZTC" or "Assignor"), Cornbread Ventures LP ("Cornbread" or "Assignee") and Pavilion Holdings, LLC ("PH" or "Landlord").

RECITALS

1.1. On or about December 28, 1999, Landlord and Z'Tejas Chandler, Inc., as original lessee, entered into a ground lease ("the Lease") of certain real property commonly known as the Z'Tejas restaurant premises situated in the Casa Paloma shopping center ("Shopping Center") near the southeast corner of Ray Road and 54th Street in Chandler, Arizona ("the Leased Premises"). A true and correct copy of the Lease is attached hereto as Exhibit "A."

1.2. Z'Tejas Chandler, Inc. became a party to the Declaration of Covenants, Conditions and Restrictions ("Declaration") and maintenance agreement ("Maintenance Agreement") for the Shopping Center, as such Declaration and Maintenance Agreement are amended from time to time, in accordance with paragraph 7 of the Lease.

1.3. Z'Tejas Chandler, LLC ("ZTC") and its parent company, Z'Tejas Inc., a Delaware corporation ("ZTI") became tenant and guarantor of the Lease, respectively, as a result of a reorganization and name change that occurred during 2002.

1.4. On July 22, 2015, ZTC, ZTI and approximately sixteen of its affiliates (collectively "Z'Tejas") filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Arizona. The cases are being administered under the case name of "Z'Tejas Scottsdale, LLC," case no. 2:15-bk-09178-PS ("Bankruptcy Case").

1.5. ZTC desires to assign its interest in the Lease to Cornbread in accordance with ZTC's Motion for Order: (1) Approving Asset Purchase Agreement Among the Debtors and the Buyer, (2) Approving Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), (f) and (m), (3) Approving Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 363 And 365, and (4) Determining the Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases, and Granting Related Relief ("Sale Motion") on file at docket entry ("DE") 13.

1.6. Cornbread desires to accept an assignment of the Lease and assume all obligations of ZTC under the Lease.

1.7. Landlord will not consent to ZTC's assignment of the Lease to Cornbread unless and until certain conditions are satisfied, as set forth in Landlord's September 15, 2015 Objection on file as DE 161 in the Bankruptcy Case. One of such conditions is a written assumption agreement whereby Assignee assumes in writing all obligations of Assignor under the Lease.

OPERATIVE PROVISIONS

2.1. The foregoing Recitals are hereby incorporated into these Operative Provisions as though fully set forth herein.

2.2. Assignment. Assignor hereby sells, assigns and transfers to Assignee, all interest of Assignor, as tenant, in and to the Lease. Assignor makes no representations and warranties of any kind whatsoever with respect to the Lease.

2.3. Assumption. Assignee hereby accepts the foregoing assignment of the Lease, and does hereby assume the duties and obligations of tenant under the Lease, thereunder accruing from and after the date ("Effective Date") on which ZTC files in the Bankruptcy Case a notice that Assignee has agreed to effectuate the assumption and assignment contemplated hereunder, and does hereby agree to be bound by and to perform or cause to be performed, as a direct obligation to Landlord, each and all of the terms, conditions, covenants and provisions to be done, kept and performed under such Lease accruing from and after the date of this Agreement, to the same extent as if Assignee had been an original party thereto.

Without limiting the foregoing, Assignee hereby acknowledges and assumes the following obligations of tenant under the Lease:

a. Those set forth in the Maintenance Agreement;

b. Those set forth in the Declaration;

c. to not violate any exclusive uses granted by PH to other tenants in the shopping center, which exclusive uses currently consist of the following:

Fidelity: Neither Lessor nor any affiliate of Lessor shall lease space within the Project for an office selling mutual funds and securities brokerage.
Flemings: No leases, subleases or assignments which allow the operation of another upscale restaurant specializing in steaks at the Project. Also, Landlord shall not approve a change in use of any other tenant to an upscale restaurant specializing in steaks.
Jared's: No portion of the Project except Tenant's Premises to be used as its primary use for the retail display and sale of gold, silver, diamonds, colored gemstones and other fine jewelry, watches and clocks.
Roy's: No other upscale restaurants specializing in "seafood," in any portion of the Project.

d. to pay percentage rent for all of 2015, if and when such rent becomes payable;

e. non-removal of vented hood exhaust system, walk-in refrigeration or freezer and similar appliances or fixtures incorporated into the permanent structural improvements on the Chandler premises;

f. limitations on further assignment, which limitations are hereby preserved and not waived by PH; and

g. the obligation to cause the conveyance of the Chandler restaurant building and improvement to PH to be free and clear of any mortgages or other claims or liens of any kind, upon expiration or sooner termination of the

Lease, as set forth in Section 8.4 of the Lease.

2.4. The assumption and assignment set forth above is subject to and conditioned upon each of the following conditions:

a. Entry of a Bankruptcy Court Order Approving this Agreement.

b. Landlord's receipt of this Agreement duly executed by Assignor and Assignee.

c. Landlord's receipt of a Guaranty of Ground Lease in the form attached hereto as Exhibit "B," duly executed by all Guarantors identified therein.

d. ZTC's cure of the following deferred maintenance items: The east facing building sign is missing the red-plex face in the "Z."

e. ZTC's timely payment of all reasonable attorneys' fees incurred by Landlord in accordance with stipulated procedure stated on the record and approved by the Court at a September 25, 2015 hearing (a.m.) in the Bankruptcy Case.

f. The occurrence of the Effective Date.

g. If the Effective Date occurs after October 1, 2015, timely payment of monthly rent and other lease obligations accruing from October 1, 2015 through the Effective Date.

2.5. Assignee's Indemnification. Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignors) and hold Assignors free, clear and harmless from and against any and all claims, demands, suits, causes of actions, penalties, liabilities, costs, fees and expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and costs for the performance or nonperformance of Assignee's obligations under the Lease, which accrued from and after the Effective Date.

2.6. Attorneys' Fees. In the event that any party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

2.7. Amendments. This Agreement may only be amended by a writing signed by Assignor, Assignee and Landlord.

2.8. Delivery Pursuant to Purchase Agreement. Subject to Landlord's rights under the Lease, the Declaration, the Maintenance Agreement and this Agreement, Assignor and Assignee are executing and delivering this Agreement in accordance with and subject to all of the terms and provisions of the purchase agreement ("Purchase Agreement") referred to in the order approving this Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

2.9. Governing Law. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Arizona, without giving effect to the conflicts of laws provisions thereof.

2.10. Execution in Counterparts. This Agreement may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Agreement bearing their original signature as soon thereafter as possible.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**ASSIGNOR:**

Z'Tejas Chandler, LLC, an
Arizona limited liability company,
Chapter 11 Debtor and Debtor in Possession

By: ______________________________
Name: ______________________________
Its: ______________________________

**ASSIGNEE:**

Cornbread Ventures, LP, a
Texas limited partnership,

By: ______________________________
Name: ______________________________
Its: ______________________________

**LANDLORD:**

Pavilion Holdings, LLC, an
Arizona limited liability company,

By: ______________________________
Name: ______________________________
Its: ______________________________

# EXHIBIT A

to

# Assignment and Assumption of Ground Lease with Consent of Landlord

**LEASE**

Between

**Pavilion Holdings, L.L.C.,**
an Arizona limited liability company
("Landlord")

and

**Z'Tejas Chandler, Inc., ~~an Arizona~~ Delaware a corporation**
("Tenant")

Dated as of: December 28, 1999

## TABLE OF CONTENTS

1. DEFINITIONS AND ATTACHMENTS ........ 1
    1.1. Defined Terms ........ 1
    1.2. Attachments ........ 4
2. PREMISES ........ 4
3. TERM ........ 5
    3.1. Term ........ 5
    3.2. Option to Extend the Term ........ 5
4. USE ........ 5
    4.1. Use ........ 5
    4.2. Tenant's Trade Name ........ 5
    4.3. Occupancy ........ 5
5. RENT ........ 6
    5.1. Rent Payable ........ 6
    5.2. Annual Percentage Rent ........ 6
    5.3. Definition of Gross Sales ........ 6
    5.4. Acceptance of Payment ........ 7
    5.5. Books and Records ........ 7
    5.6. Audit ........ 7
    5.7. Competing Business ........ 7
6. TAXES ........ 8
    6.1. Real Property Taxes ........ 8
    6.2. Proration of Taxes and Assessments ........ 8
    6.3. Rental Tax ........ 8
7. MAINTENANCE AGREEMENT AND DECLARATION ........ 8
8. CONSTRUCTION ........ 9
    8.1. Architectural Document Submission ........ 9
    8.2. Plans and Specifications ........ 9
    8.3. Construction ........ 9
    8.4. Ownership Improvements ........ 9
    8.5. Landlord's Non-Responsibility ........ 10
    8.6. Signage ........ 10
9. REPAIR AND MAINTENANCE ........ 10
    9.1. Tenant's Repairs ........ 10
    9.2. Conformity with Law ........ 10
10. MECHANIC'S LIENS ........ 10
11. UTILITIES ........ 10
12. HAZARDOUS SUBSTANCES ........ 10
    12.1. Release ........ 10
    12.2. Compliance ........ 11
13. INDEMNITY AND INSURANCE ........ 11
    13.1. Indemnity ........ 11
    13.2. Landlord Not Responsible for Acts of Others ........ 12
    13.3. Tenant's Insurance ........ 12
    13.4. Policy Requirements ........ 13
    13.5. Waiver of Right of Recovery ........ 13
14. DAMAGE ........ 13
    14.1. Tenant's Obligations ........ 13
    14.2. Tenant's Option ........ 13
    14.3. Termination of Lease ........ 14

15. TRADE FIXTURES AND PERSONAL PROPERTY ..... 15
16. ASSIGNMENT AND SUBLETTING ..... 15
16.1. Consent of Landlord ..... 15
16.2. Information to be Furnished ..... 15
16.3. Conditions to Landlord's Consent ..... 15
16.4. Additional Restrictions ..... 16
16.5. Change in Control ..... 16
16.6. No Waiver ..... 16
17. DEFAULT ..... 16
17.1. Event of Default Defined ..... 16
17.2. Cure ..... 17
17.3. Remedies ..... 17
17.4. Damages ..... 18
17.5. Deficiency ..... 18
17.6. Present Worth ..... 18
17.7. Mitigation ..... 19
18. NOTICES ..... 19
18.1. Sending of Notices ..... 19
18.2. Change of Address ..... 19
19. EMINENT DOMAIN ..... 19
19.1. Total Take ..... 19
19.2. Partial Taking ..... 19
19.3. Division of Award ..... 20
19.4. Voluntary Sale ..... 20
20. QUIET POSSESSION ..... 20
21. RECORDATION OF MEMORANDUM OF LEASE ..... 20
22. EXPIRATION, TERMINATION AND HOLDING OVER ..... 20
22.1. Surrender of Possession ..... 20
22.2. Failure to Surrender ..... 21
22.3. Termination of Lease ..... 21
22.4. Subordination ..... 21
23. MISCELLANEOUS ..... 21
23.1. Estoppel Certificates ..... 21
23.2. Remedies Cumulative ..... 21
23.3. Successors and Assigns ..... 22
23.4. Compliance with Laws and Regulations ..... 22
23.5. Captions and Headings ..... 22
23.6. Joint and Several Liability ..... 22
23.7. Broker's Commission ..... 22
23.8. No Joint Venture ..... 23
23.9. No Option ..... 23
23.10. No Modification ..... 23
23.11. Severability ..... 23
23.12. Third Party Beneficiary ..... 23
23.13. Corporate Covenants and Representations ..... 23
23.14. Applicable Law ..... 23
23.15. Limitation on Right of Recovery Against Landlord ..... 24
23.16. Survival ..... 24
23.17. Excusable Delay ..... 25

23.18. Attorneys' Fees .......... 24
23.19. Conditions to Tenant's Obligations .......... 24
23.20. Financial Statements .......... 24
23.21. Tenant Financing .......... 24

**Exhibits and Addenda**

**Exhibit "A"** - Legal Description of Premises
**Exhibit "A-1"** - Graphic Depiction of Premises
**Exhibit "B"** - Legal Description of Project
**Exhibit "B-1"** - Graphic Depiction of Project
**Exhibit "C"** - Conditions Precedent to Tenant's Obligations

**Addendum A** - Memorandum of Lease
**Addendum B** - Landlord's Work and Tenant's Work and Timing of Tenant's work

GROUND LEASE AGREEMENT

This Ground Lease Agreement (the **"Lease"**) is dated __________ (the **"Lease Date"**), by and between **Pavilion Holdings, L.L.C.**, an Arizona limited liability company (**"Landlord"**), and **Z'Tejas Chandler, Inc.**, an Arizona corporation (**"Tenant"**).

W I T N E S S E T H:

That for and in consideration of the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows:

1. **DEFINITIONS AND ATTACHMENTS.**

1.1. Defined Terms. As used herein, the following terms shall have the following meanings:

1.1.1. "Annual Basic Rent" means (a) One Hundred and Twenty Thousand and No/100 Dollars ($120,000.00) payable in equal monthly installments of Ten Thousand and No/100 Dollars ($10,000.00) with the first of such monthly installments to become due and payable on the Rental Commencement Date and thereafter on the first day of each month for the immediately succeeding fifty nine (59) calendar months and (b) One Hundred Thirty Eight Thousand and No/100 Dollars ($138,000.00) payable in equal monthly installments of Eleven Thousand Five Hundred and No/100 Dollars ($11,500.00) with the first of such monthly installments to become due and payable on the first day of the sixty first (61st) month following the Rental Commencement Date and thereafter on the first day of each month for the immediately succeeding fifty nine (59) months and (c) One Hundred Fifty Eight Thousand Seven Hundred and No/100 Dollars ($158,700) payable in equal monthly installments of Thirteen Thousand Two Hundred Twenty Five and No/100 Dollars ($13,225.00) with the first of such monthly installments to become due and payable on the first day of the one hundred twenty first (121st) month following the Rental Commencement Date and on the first day of each month throughout the balance of the term of this Lease. In the event Tenant elects to extend the term of this Lease (subject to the provisions of Article 3.2, below), then during such Option Terms, the "Annual Basic Rent" shall be (d) One Hundred Eighty Two Thousand Five Hundred Five and No/100 Dollars ($182,505.00) for the First Option Term payable in equal monthly installments of Fifteen Thousand, Two Hundred Eight and 75/100 Dollars ($15,208.75) with the first of such monthly installments to become due and payable on the first day of the one hundred eighty first (181st) month following the Rent Commencement Date and thereafter on the first day of each month for the immediately succeeding fifty-nine (59) calendar months and (e) Two Hundred Nine Thousand Eight Hundred Eighty and No/100 Dollars ($209,880.00) for the Second Option Term payable in equal monthly installments of Seventeen Thousand, Four Hundred Ninety and No/100 Dollars, ($17,490.00) with the first of such monthly installments to become due and payable on the first day of the two hundred forty first (241st) month following the Rent Commencement Date and thereafter on the first day of each month for the immediately succeeding fifty-nine (59) calendar months and (f) Two Hundred Forty One Thousand Three Hundred Sixty Two and No/100 Dollars ($241,362.00) for the Third Option Term payable in equal monthly installments of Twenty Thousand One Hundred Thirteen and 50/100 Dollars ($20,113.50) with the first of such monthly installments to become due and payable on the first day of the three hundred first (301st) month following the Rent

Commencement Date and thereafter on the first day of each month for the immediately succeeding forty-seven (47) calendar months.

1.1.2. "Annual Percentage Rent Rate" means five percent (5.0%).

1.1.3. "Architectural Documents" means the site plan, elevations, exterior color, schedule of exterior building materials, landscaping plans and signage plans, and any other plans necessary to be submitted to the City for its design review.

1.1.4. "Broker" means De Rito Partners, Inc. (Mike Pearlstein) (the listing broker) and The Anz Company, LLC (Brett Anz).

1.1.5. "City" means the City of Chandler, a municipal corporation.

1.1.6. "Conditions to Tenant's Obligations" means the occurrence or waiver by Tenant of the conditions set forth on **Exhibit "C"**.

1.1.7. "Declaration" means that certain Reciprocal Easements and Restrictive Covenants for Casa Paloma Shopping Center, which encumbers the Premises together with certain other portions of the Project dated November 24, 1997 and recorded February 2, 1999 as Instrument Number 99-0102929, records of the Maricopa County Recorder.

1.1.8. "Default Rate" means an annual rate of interest equal to the lesser of (i) the maximum rate of interest for which a Tenant may lawfully contract in the State of Arizona, or (ii) the prime rate of interest as charged by Bank One, Arizona, N.A. (or its successor) or if Bank One, Arizona, N.A. (or its successor) ceases to exist, then such other major bank doing business in Phoenix, Arizona as determined by Landlord shall be substituted for Bank One, Arizona, N.A. (or its successor) plus five (5%) percent.

1.1.9. "Excusable Delay" means any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or material or reasonable substitutes therefor, governmental restrictions, regulations and/or controls, fire, inclement weather or other casualty and any other cause beyond the reasonable control of the party obligated to perform any term, covenant or condition of this Lease (financial inability excepted).

1.1.10. [Intentionally deleted.]

1.1.11. "Landlord" means Pavilion Holdings, L.L.C., an Arizona limited liability company, subject to <u>Article 23.3</u>, below.

1.1.12. "Landlord's Notice Address" means Pavilion Holdings, L.L.C., attention Tom Tait, 777 East Thomas Road, Suite 210, Phoenix, Arizona 85014, with a copy of any notice to Landlord to be transmitted to Tom Tait, 511 W. Northview Avenue, Phoenix, Arizona 85021.

1.1.13. "Lease Commencement Date" means the date on which the Conditions to Tenant's Obligations have been satisfied or waived as set forth in <u>Article 1.1.6</u> or **Exhibit "C"**.

1.1.14. "Lease Year" shall mean a calendar year with the first Lease Year to begin on the Rental Commencement Date and end on the immediately succeeding December 31 and the last Lease Year to commence on January 1 of the last year of the Term of this Lease, as the Term may be extended, and ending on the last day of the Term of this Lease or on the last day of the Term of this Lease as extended.

1.1.15. "Maintenance Agreement" means that certain Maintenance Agreement for Chandler Marketplace dated January 27, 1998 and recorded on January 29, 1998 as Instrument Number 98-0067235, as amended by First Amendment to Maintenance Agreement for Chandler Marketplace dated January 30, 1998 and recorded on February 2, 1998 as Instrument Number 98-0079117, all in the records of the Maricopa County Recorder;

1.1.16. "Mortgagee" means any mortgagee, beneficiary or ground lessor encumbering the Landlord's interest in the Premises.

1.1.17. "Option Term" is defined in <u>Article 3.2</u>.

1.1.18. "Permit Date" means the later of (i) the date the City of Chandler has approved Tenant's application and submittals necessary to obtain a building permit, or (ii) the date the State of Arizona has approved Tenant's application and submittals necessary to obtain a liquor license; but in all events, the "Permit Date" shall be deemed to be one hundred twenty (120) days from the Lease Date, if the preceding approvals have not occurred by such date.

1.1.19. "Permitted Use" means a full-service sit-down, waiter/waitress served Mexican/Southwestern food restaurant, with a full-service bar selling alcoholic beverages, and related, ancillary retail sales or services (including, without limitation sales of promotional items bearing the Tenant's name or logotype (e.g. shirts, hats, etc.); in no event shall the dollar amount of gross sales of alcoholic beverages exceed thirty five percent (35%) of the dollar amount of gross sales of food and non-alcoholic beverages.

1.1.20. "Premises" means that portion of the Project more particularly described on **Exhibit "A"** and graphically depicted on **Exhibit "A-1"**, together with any and all improvements constructed thereon.

1.1.21. "Project" means that certain parcel of land owned, leased or controlled by Landlord situated in the City of Chandler, County of Maricopa, State of Arizona, more particularly described in **Exhibit "B"** and graphically depicted on **Exhibit "B-1"**.

1.1.22. "Rental Commencement Date" means the earlier of (i) two hundred seventy (270) days from the Lease Date, (ii) one hundred eighty (180) days from the Permit Date, or (iii) the date on which Tenant opens for business to the public.

1.1.23. "Restriction Area" means that geogr[...] of three (3) miles measured from the Premises.

~~Jim Parrish pres. Z Tejas Southwestern G[...]~~

1.1.24. "Tenant's Notice Address" means 7[...] ~~Suite 180, Scottsdale, Arizona 85251; attn: Michael J. Archer, Presi[...] notice to Tenant to be simultaneously transmitted to Z'Tejas, Inc., 1[...] A-217, Dallas, Texas 75230, attn: Michael J. Archer, President~~ and v[...]

6909 E Greenway Parkway Suite 295

<u>If to Tenant:</u> 6-26-09

Z'Tejas, Inc.
~~4800 N. Scottsdale Rd., Suite 3400~~
Scottsdale, AZ ~~85251~~ 85254
Phone: 480-612-6381
Fax: 480-612-6390

with a copy to: 11-29-07

Square, Sanders & Dempsey, L.L.P.
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, AZ 85004

~~2/25/04~~ 5-8-06

~~Z Tejas, Inc 4800 N. Sco[...] Scottsdale, [...] Phone: 48[...] Fax: 480-[...]~~

9/5/00 Thompson & Knight, L.L.P. 1700 Pacific Avenue, Suite 3300 Dallas, TX 75201-4693

to Tenant to be simultaneously transmitted to ~~Strasburger & Price, LLP, 901 Main Street, Suite 4300, Dallas, Texas 75202,~~ attn: ~~Marc A. Myrin~~.

1.1.25. "Tenant's Trade Name" means "Z'Tejas Grille", which Tenant represents it is entitled to use pursuant to all applicable laws.

1.1.26. "Term" means fifteen (15) years plus the period of time between the Lease Commencement Date and the Rental Commencement Date. Subject to the express provisions and conditions hereof, to the extent applicable, "Term" shall also include each "Option Term" which is implemented.

1.2. Attachments. The following exhibits and/or addenda are attached to this Lease and incorporated herein by this reference.

| | | |
|---|---|---|
| Exhibit "A" | - | Legal Description of Premises |
| Exhibit "A-1" | - | Graphic Depiction of Premises |
| Exhibit "B" | - | Legal Description of Project |
| Exhibit "B-1" | - | Graphic Depiction of Project |
| Exhibit "C" | - | Conditions Precedent to Tenant's Obligations |
| Addendum A | - | Memorandum of Lease |
| Addendum B | | Landlord's Work and Tenant's Work and Timing of Tenants Work |

Although the information set forth on Exhibits "A-1" and "B-1" is believed to be materially accurate, no representation or warranty is given or shall be implied, and Landlord reserves the right to modify, augment or delete the indicated configuration, improvements and features, from time to time. However, any modifications, augmentations or deletions to such Exhibits "A-1" and "B-1" which have a materially adverse affect upon the Premises or Tenant's use and enjoyment thereof (as permitted under this Lease), shall require the approval of Tenant, which shall not be unreasonably withheld, conditioned or delayed.

2. **PREMISES.** Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises. Notwithstanding anything to the contrary contained herein, the Premises have been inspected by Tenant who shall be deemed to have accepted the same as existing as of the date Landlord delivers possession of the Premises to Tenant. Landlord agrees not to deliver possession of the Premises to Tenant until such time as Landlord has substantially completed preliminary grading of the pad on which the Tenant's building will be constructed by Tenant. Tenant acknowledges that pursuant to the Declaration and Maintenance Agreement, Landlord reserves from the Premises a portion thereof, including as indicated on **Exhibit "A-1"** and **"B-1"** hereto, for signage, entry features and other uses contemplated thereby.

3. TERM.

3.1. Term. The Term of this Lease shall commence on the Lease Commencement Date and shall expire fifteen (15) years from the Rental Commencement Date. Landlord and Tenant agree upon demand of the other to execute a Memorandum of Lease setting forth the Lease Commencement Date as soon as the Lease Commencement Date has been determined. Possession of the Premises shall be tendered to Tenant on the Lease Commencement Date.

3.2. Option to Extend the Term. Landlord hereby grants to Tenant three (3) separate options to extend the Term of this Lease (each such term, an "Option Term"), the first two of such options entitling Tenant to extend the Term of this Lease for five (5) years, and the third option entitling Tenant to extend the Term of this Lease for four (4) years. The first option to extend the term for an additional five (5) years ("First Option Term") shall be exercised, if at all, by written notice received by Landlord not earlier than twelve (12) months nor later than nine (9) months prior to the expiration of the Term of this Lease. In the event the first option is exercised then Tenant shall be entitled to exercise the second option for an additional five (5) years ("Second Option Term"), which second option shall be exercised, if at all, by written notice received by Landlord not earlier than twelve (12) months nor later than nine (9) months prior to the expiration of the First Option Term as previously extended. In the event the second option is exercised then Tenant shall be entitled to exercise the third option for an additional four (4) years ("Third Option Term"), which third option shall be exercised, if at all, by written notice received by Landlord not earlier than twelve (12) months nor later than nine (9) months prior to the expiration of the Second Option Term as previously extended. Tenant shall not be entitled to exercise an option if on the date of Landlord's receipt of written notice from Tenant an Event of Default has occurred unless the default is cured within the applicable period of grace, if any, and if an Event of Default has occurred as of the first day of the Term as extended, Tenant's option to extend the Term shall be deemed null, void and of no force and effect unless the default is cured within the applicable period of grace, if any.

4. USE.

4.1. Use. Tenant shall occupy the Premises for the Permitted Use and for no other purpose.

4.2. Tenant's Trade Name. Tenant shall conduct business in the Premises, and in all other locations in Maricopa County, Arizona, only in the Tenant's trade name. Landlord shall not unreasonably withhold its consent to a waiver or modification of this covenant, provided Tenant demonstrates to Landlord that Tenant shall continue to support the trade name and operation at the Premises consistent with a first-class, national restaurant operator in its advertising, marketing and operational effort, and that as a result, no erosion of the Gross Sales applicable to the Premises shall reasonably be estimated to result.

4.3. Occupancy. Tenant shall from and after the Rental Commencement Date cause its business to be conducted and operated in good faith and shall occupy and conduct its business in and from the Premises, fully stocked and staffed all as necessary to maximize the Gross Sales, during each day of the Term as the same may be extended from and after the Rental Commencement Date. Notwithstanding the above, Tenant shall have the right to close for remodeling and/or refurbishing for a period not to exceed 90 days, for each sixty (60) month period during the Term and any extension thereof.

5. **RENT.**

5.1. Rent Payable. Tenant covenants and agrees to pay to Landlord as rent for the Premises (i) the monthly installments of Annual Basic Rent as specified in Article 1.1.1, plus (ii) Annual Percentage Rent at the Annual Percentage Rent Rate specified in Article 1.1.2 hereof, plus (iii) all additional sums, charges or amounts of whatsoever nature to be paid by Tenant to Landlord or to be paid by Tenant for the benefit of Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as rent (collectively referred to as "Additional Rental"). Tenant's obligations to pay the rent as required in this Lease shall be an independent covenant, and not subject to deduction, offset, prior notice or demand, except as expressly provided in Article 23.15.4, below.

5.2. Annual Percentage Rent. In addition to the Annual Basic Rent, Tenant shall pay to Landlord in the manner hereinafter set forth Annual Percentage Rent at the Annual Percentage Rent Rate set forth in Article 1.1.2 hereof of all Gross Sales as defined in Article 5.3 below for the Lease Year over the break point of Four Million Two Hundred Thousand and No/100 Dollars ($4,200,000.00) ("Annual Percentage Rent"). Within sixty (60) days after the end of each Lease Year, Tenant shall submit to Landlord a statement certified to as correct by Tenant reflecting the total Gross Sales as hereinafter defined for the preceding Lease Year and the amount, along with the payment, of Annual Percentage Rent, if any, due and payable from Tenant to Landlord for such preceding Lease Year.

5.3. Definition of Gross Sales. The term "Gross Sales" as used in this Lease shall mean Gross Sales as determined in accordance with this Article. Gross Sales shall include the dollar aggregate of: (a) the sales price of all food, beverages, goods, wares and merchandise sold, and the charges for all services performed by Tenant or any licensees, concessionaires, and subtenants of Tenant from all business conducted on, in, at or from the Premises, whether such sales or charges are made for cash, by check, on credit or otherwise, without reserve or deduction for inability or failure to collect for the same (except as specifically provided below), including, but not limited to, sales and services (i) where the orders therefor originate at and are accepted in the Premises, but delivery or performance thereof is made from or at any other place, (ii) made pursuant to mail, telegraph, telephone or other similar orders received or billed at or from the Premises, (iii) made by means of mechanical or other vending devices located on the Premises, but only to the extent that the proceeds from such sales are retained by Tenant and not paid over to the owner of any leased vending machines as rental therefor, or (iv) made as a result of transactions originating from whatever source which in the normal and customary course of operations would be credited or attributed to business at the Premises, and (b) all monies or other things of value received by Tenant or its licensees, concessionaires or subtenants from its or their operations which are neither included in or excluded from Gross Sales by the other provisions of this definition. There shall be deducted from the above sum in determining Gross Sales the amount of cash or credit refunds made upon, but not in excess of, transactions previously included within Gross Sales for merchandise returned by the purchaser and accepted by Tenant. Gross Sales shall not include: (i) the exchange of merchandise between businesses of Tenant where such exchanges are made solely for the convenient operation of Tenant's business; (ii) returns to shippers or manufacturers; (iii) sales of fixtures after use thereof; (iv) tips and other compensation paid directly by customers to employees of the restaurant business conducted on the Premises, if any, or designated for such employees on credit card charge slips; (v) the amount of any food sales to employees at cost (but only up to the first $2,400 each Lease Year) or food sales to customers for which such customers are not required to pay; (vi) insurance proceeds paid to

Tenant; (vii) pay phone receipts; (viii) receipts from vending machines owned and operated by third parties for which Tenant derives no income or profit; (ix) the amount of any city, county, state or federal sales, luxury or excise tax which is added to the selling price or absorbed therein and also paid to the taxing authority by Tenant; or (x) losses from bad debts, uncollectible accounts and credit card "charge-backs" from the sales of goods and services, not to exceed $1,500.00 each Lease Year.. No franchise or capital stock tax and no income or similar tax based upon income, profits or Gross Sales as such shall be deducted from Gross Sales in any event whatsoever. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment therefor.

5.4. Acceptance of Payment. The acceptance by Landlord of payments of Annual Percentage Rent or reports thereof shall be without prejudice and shall in no case constitute a waiver of Landlord's right to examine Tenant's books and records of Gross Sales.

5.5. Books and Records. Tenant shall prepare or cause to be prepared full, complete and proper books, records and accounts of the daily Gross Sales, both for cash and on credit, made by each separate department and concession at any time operated on the Premises, sales tax, discounts from published prices, and of all other transactions and matters, including sales slips, cash register tape readings, sales books, bank books, deposit slips, admission tickets, and sales tax reports. All such books, records and accounts shall be kept for a period of not less than three (3) years following the end of each Lease Year.

5.6. Audit. Landlord shall have the right to cause, upon ten (10) days' prior written notice to Tenant, an audit of Tenant's business to be made by a certified public accountant or representative of Landlord's selection and Tenant shall make all records available for said examination at the Premises. If the results of such audit show that Tenant has underpaid Annual Percentage Rent, such underpayment shall be paid by Tenant to Landlord within ten (10) days after the date of Tenant's receipt of a copy of such audit, and in the event the results of such audit reflect that Tenant has overpaid Annual Percentage Rent, the amount of such overpayment shall be returned by Landlord to Tenant within ten (10) days after the date of Landlord's receipt of a copy of such audit. If the results of such audit show that Tenant's statement of Gross Sales for any period has been understated by three percent (3%) or more, then Tenant shall within ten (10) days after the date of Tenant's receipt of a copy of such audit, pay Landlord the reasonable cost of such audit. A report of the finding of such accountant or representative shall be binding and conclusive upon Landlord and Tenant.

5.7. Competing Business. Neither Tenant nor any affiliate or subsidiary of Tenant, directly or indirectly, shall operate, manage or have any interest in any competing or similar business at any location within the Restriction Area set forth in Article 1.1.22 hereof. Without limiting Landlord's remedies, if Tenant should violate this covenant, Landlord may, at its option, include the Gross Sales of such other business(es) in the Gross Sales transacted in the Premises for the purpose of computing Annual Percentage Rent due hereunder, as though said sales had actually been made from the Premises. If Landlord so elects, all of the provisions of this Article shall be applicable to all records pertaining to such other business(es). Notwithstanding the foregoing, Landlord shall not unreasonably withhold, condition or delay its consent to a waiver of the foregoing covenants in regard to a drive-through/fast food concept operation of Tenant, which may include countertop service, but may not have sit-down, table side waiter service, with average entree cost not greater than $66^2/_3$% of the average entree cost of the Tenant's operation in the Premises.

6. **TAXES**.

6.1. Real Property Taxes. Tenant shall pay all real property taxes and assessments, levied, assessed or imposed against the Premises (the "Taxes") and levied, assessed or imposed against any personal property of Tenant located upon or within the Premises and shall furnish to Landlord at least ten (10) days prior to delinquency evidence of the payment of the Taxes. Landlord shall in good faith and using reasonable efforts attempt to cause the Premises to be separately assessed from other real estate owned by Landlord as soon as reasonably possible after the Lease Commencement Date. Prior to the date on which the Premises have been separately assessed, Tenant shall pay to Landlord that portion of Taxes which are fairly and equitably attributable to the Premises. Such payments shall be made not more frequently than semi-annually. Landlord shall endeavor to transmit to Tenant at least thirty (30) days prior to delinquency a copy of the tax assessment attributable to the larger parcel of which the Premises are a part, and the allocation of the tax bill between the Premises and the balance of the property within the larger parcel, and Tenant shall pay its allocable share at least fifteen (15) days prior to the date of delinquency. With the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed), Tenant may contest or protest any Taxes or valuation related thereto, at Tenant's sole cost and expense.

6.2. Proration of Taxes and Assessments. Tenant's Obligations to pay Taxes shall commence on the Rental Commencement Date and shall be prorated on the basis of a three hundred sixty five (365) day period to account for any fractional portion of a fiscal tax year which falls within the Term, including any extensions, at its commencement and expiration.

6.3. Rental Tax. Tenant shall pay to Landlord any sales, privilege, rental, excise or like tax levied, assessed or imposed on Landlord attributable to the Annual Basic Rent, Annual Percentage Rent, and Additional Rental payable by Tenant which shall be paid at the same time and in addition to the payment by Tenant of each monthly installment of Annual Basic Rent, the payment of Annual Percentage Rent, and the payment of Additional Rental.

7. **MAINTENANCE AGREEMENT AND DECLARATION.** Tenant acknowledges that the Premises are a part of a significantly larger development (the "Project"). Tenant agrees to comply with all terms, conditions, covenants and restrictions set forth in the Maintenance Agreement and in the Declaration that apply to the Premises. Tenant agrees to indemnify, defend with counsel reasonably acceptable to Landlord, and to hold Landlord harmless from any and all loss, liability, damage, obligation, cost, and/or expense including reasonable attorneys' fees which Landlord may incur should Tenant fail to comply with the terms, conditions, covenants and restrictions of the Maintenance Agreement and/or of the Declaration. In addition, Tenant acknowledges that there are certain Common Expenses as that term is defined in the Maintenance Agreement and in the Declaration which each Owner, as defined in the Maintenance Agreement and in the Declaration, is obligated to pay. At Landlord's option, Tenant shall pay Landlord's share of all such Common Expenses to Landlord which are attributable to the Premises, who shall then pay the same as required pursuant to the Maintenance Agreement and the Declaration or, alternatively, Landlord may require Tenant to assume Landlord's obligations under the Maintenance Agreement and/or under the Declaration with respect to the payment of Common Expenses attributable to the Premises and Tenant shall be deemed to have assumed Landlord's obligation as Owner of the Premises and shall pay Landlord's share of the Common Expenses in accordance with the provisions of the Maintenance Agreement and the Declaration.